# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: SUNEDISON, INC. SECURITIES LITIGATION | Case No. 16-MD-2742-PKC |
| THIS DOCUMENT APPLIES TO: | |
| DARCY CHURCH, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, <br><br>             Plaintiff, <br><br>       v. <br><br> AHMAD R. CHATILA and BRIAN WUEBBELS, <br><br>             Defendants. | Case No. 16-cv-7962-PKC <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

# SECOND AMENDED COMPLAINT
# FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................ 1

JURISDICTION AND VENUE .......................................................................................... 8

PARTIES ............................................................................................................................ 8

FORMER EMPLOYEES.................................................................................................... 11

FACTUAL BACKGROUND ............................................................................................. 14

    SunEdison's Business Model............................................................................... 14

    Defendants' Financial Incentives For Unsustainable Explosive Growth. ........ 16

    The First Wind Acquisition, the Exchangeable Notes, and the Margin Loan ................ 18

    The Acquisition Spree Continues .................................................................... 20

THE VIVINT ACQUISITION ......................................................................................... 22

SUNEDISON'S TRUE LIQUIDITY POSITION  DURING THE CLASS PERIOD ............... 25

SUNEDISON'S INTERNAL CONTROLS DURING THE CLASS PERIOD ........................ 33

    The Exchange Act Requires Issuers to Create and Maintain a System of
        Internal Controls ............................................................................. 33

    SunEdison's Internal Controls Were Materially Deficient.............................. 36

    SunEdison's Accounting Division Was Grossly Deficient .............................. 36

    SunEdison's False Revenue Projections Created Internal Control Problems.................. 39

    False Projections In The Vivint Acquisition.................................................... 41

    SunEdison Had Numerous Incompatible Accounting Systems....................... 42

    SunEdison Could Not Successfully Consolidate Its Financial Statements...................... 46

    Double Billing................................................................................................. 52

    Cash Management........................................................................................... 53

    SunEdison Later Admitted Its Internal Controls Were Materially Deficient ................ 58

AS THE TRUTH GRADUALLY EMERGES, DEFENDANTS' MISREPRESENTATIONS
CONTINUE ....................................................................................................................... 64

    Defendants Falsely Reassure Investors that SunEdison is Flush With Cash While
        Secretly Scrambling to Generate Liquidity.......................................... 64

    The Margin Call and the 15% Goldman Sachs Loan ...................................... 67

    SunEdison Slow-Walks the Vivint Acquisition Because It Lacked Liquidity ............... 68

    Senior SunEdison Executives Raise Internal Concerns About  "The Accuracy of
        SunEdison's Public Statements Regarding Its Financial Condition" ................ 70

    3Q 2015 Earnings Releases ............................................................................ 74

The "Friday Night Massacre" ............................................................................... 77

The Amended Merger Agreement ........................................................................ 80

Lawsuits And a Desperate Loan ......................................................................... 82

Termination of the Vivint Acquisition................................................................. 85

DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............................................ 89

Misrepresentations about Liquidity in the 2014 10-K, 1Q 2015 10-Q,
    and 2Q 2015 10-Q.................................................................................... 89

Misrepresentations About SunEdison's Available Cash on August 6, 2015.................. 92

Misrepresentations About SunEdison's Debts in the 2Q 2015 10-Q ......................... 93

August 18, 2015 Preferred Offering .................................................................... 95

Defendant Chatila's September 2, 2015 Statements To The Press................................ 97

October 7, 2015 Conference Call And Business Update................................................ 98

3Q 2015 10-Q .................................................................................................. 101

November 18, 2015 Deutsche Bank Investor Meeting................................................ 105

November 23 and 24, 2015 Announcements.......................................................... 106

False and Misleading Statements about Internal Controls........................................... 108

Item 303 Omissions .......................................................................................... 111

Defendants Were Aware that Vivint Investors Were Relying On Their Statements..... 114

CLASS ACTION ALLEGATIONS .......................................................................... 115

FIRST CAUSE OF ACTION ................................................................................. 118

Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5  Against All
    Defendants........................................................................................... 118

SECOND CAUSE OF ACTION .............................................................................. 121

Violation of Section 20(a) of the Exchange Act  Against All Defendants .................... 121

PRAYER FOR RELIEF ........................................................................................ 123

JURY TRIAL DEMANDED .................................................................................... 123

Lead Plaintiff Don Harris and Named Plaintiff Kyle Tervort ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through Lead Counsel, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by their attorneys. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities, other than Defendants (defined below) and their affiliates, who purchased or acquired the publicly traded securities of Vivint Solar, Inc. ("Vivint" or the "Company") between July 20, 2015 and April 1, 2016, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     In July 2015, SunEdison and Vivint reached an agreement for SunEdison to acquire Vivint (the "Vivint Acquisition") for approximately $2.2 billion. The consideration consisted of approximately $350 million in SunEdison shares and $370 million in convertible SunEdison bonds—with the remaining $1,480 million in cash.

3.     The Vivint Acquisition was the last of a series of SunEdison purchases whose total cash consideration raised eyebrows. To proceed with the Vivint Acquisition, SunEdison would have to secure enough liquidity both to fund its operations and to pay the substantial cash consideration. This, in turn, depended on SunEdison's ability to convince its lenders that its financial statements were accurately stated and that it had enough cash that it was not a significant bankruptcy risk.

4.      Upon learning of the Vivint Acquisition, Vivint investors immediately turned to SunEdison's past public statements, which assured them as to SunEdison's internal controls and liquidity. In particular, SunEdison's 2014 10-K and its 1Q 2015 10-Q both assured investors that SunEdison's internal controls on financial reporting were adequate, meaning that there was only a remote chance that the financial figures set out in SunEdison's financial statements were inaccurate. These financial figures, and particularly figures about SunEdison's liquidity, were likewise reassuring. SunEdison reported that it had ample cash to meet its obligations as they came due, and did not disclose any liquidity deficiency at all. Accordingly, upon the announcement of the Vivint Acquisition, Vivint's stock price immediately jumped to just shy of the acquisition price.

5.      But SunEdison's public statements were far from the truth. SunEdison had engaged in pervasive manipulations to conceal that it was woefully short of cash and that its internal controls over financial reporting were an abject failure.

6.      According to a former SunEdison executive (defined below as FE 1), SunEdison would offer its customers discounts if they paid on or before the last day of a given quarter, even though they were not contractually obligated to do so. At the same time, SunEdison would reach agreements with its vendors and lenders delaying payments until a few days after the close of the quarter in exchange for price or interest rate concessions. The net result, and the intention, was that even if SunEdison's financial statements reflected the cash available on the last day of the quarter, that day was grossly unrepresentative, showing SunEdison with ***much more*** cash than it had on a more typical day. Indeed, the CEO of a company SunEdison had acquired for $2.4 billion in January 2015, was shocked to discover SunEdison's true cash situation shortly after the acquisition. He repeatedly asked the former executive interviewed by Plaintiffs how it was

2

possible that SunEdison had so little cash (given that SunEdison had reported $841 million in cash and cash equivalents as of September 30, 2014). The CEO and his legal team had exhaustively reviewed SunEdison's financials prior to the acquisition – but they, like investors, were misled, because they did not know that the cash SunEdison had on hand on last day of the quarter was not at all representative of the cash it had on hand on other days during the quarter.

7.      In fact, SunEdison's cash position was incredibly tenuous. Throughout 2014 and 2015, SunEdison only paid about 10% of its bills on time. SunEdison's vendors constantly complained about non-payment and threatened to cut off service. SunEdison's employees were so hampered by SunEdison's failure to pay its bills that they took matters into their own hands. According to a former SunEdison finance employee, defined below as FE 3, when he started in October 2014, on about 40% of SunEdison's projects, project managers had to pay SunEdison's vendors with their personal credit cards. SunEdison's subsidiaries, in violation of agreements, began withholding cash from SunEdison to pay their vendors' bills. Because of SunEdison's dysfunctional internal controls, SunEdison would then, months later, pay the vendors again— resulting in double payments, not all of which were returned.

8.      By November 2015, halfway through the Class Period, SunEdison was resorting to outright theft to sustain itself. Faced with a $328 million margin call which would trigger cross-default provisions in SunEdison's $8 billion of debt, SunEdison sought to have one of its partially-owned subsidiaries, TerraForm Global, make $100 million available to SunEdison. Since TerraForm Global's board could not authorize the payment without violating their fiduciary duties, SunEdison replaced the board. Defendant Chatila then told the replacement board the purpose of the payment was to complete a project purchase—rather than its true

purpose of meeting SunEdison's margin call. Notably, these facts were revealed in a verified complaint *filed against SunEdison by TerraForm Global.*

9.      In fact, according to the former SunEdison senior executive, SunEdison's approach to financial reporting was not to start with SunEdison's financial records and then attempt to portray them accurately. Rather, SunEdison senior executives, such as Defendant Wuebbels or Deputy CFO Manavendra Sial, would first determine what numbers SunEdison needed to show in order to satisfy lenders and Wall Street. SunEdison would then reach those numbers by searching for accounting loopholes or extremely aggressive accounting positions, and browbeating SunEdison's auditor into agreeing that these positions were tolerable, if barely so.

10.      Moreover, SunEdison's revenue and income projections were fabricated outright to please lenders. SunEdison's direction from the top thus gave SunEdison employees powerful incentives to falsify financial metrics to meet these fabricated goals. And SunEdison's chaotic financial reporting made it easy for employees to do so. SunEdison's subsidiaries, and sometimes individual projects, maintained their financial records on separate and mutually incompatible accounting databases. To produce consolidated financial statements, SunEdison had to take these individual financial records, produce Excel spreadsheets, and attempt to somehow merge the financial information contained therein, eliminate inter-company transactions, and find and correct errors.

11.      And SunEdison suffered from other internal control deficiencies that were even worse. SunEdison kept its financial records on a shared drive to which all accounting personnel had access. Thus, the most junior accounting clerk could access an Excel spreadsheet, make critical manipulations—say, increase revenue from a project by $500,000—and no one would

know. SunEdison employees regularly did so, often at the direction of senior executives, including Wuebbels and Chatila. According to FE 3, the directions, when they came, did so in a handwritten note, not an email—because SunEdison did not want to leave a paper trail. These manipulations increased as SunEdison's financial condition worsened throughout 2015.

12.     Defendants were fully aware of SunEdison's liquidity problems and deficient internal controls. In particular, according to lawsuits recently filed by Terraform Power's former CEO and COO, Defendants were presented throughout the Class Period with internal reports demonstrating that SunEdison's liquidity position was substantially worse than Defendants had portrayed to investors and were even repeatedly urged to ensure they accurately represented SunEdison's liquidity to the SunEdison Board and to investors.

13.     SunEdison's true liquidity position was revealed in a series of corrective disclosures that caused Vivint's stock price to decrease:

(a)     On November 9, 2015, SunEdison revealed that it had misclassified $700 million of debt as non-recourse to SunEdison, when in fact the debt was recourse. SunEdison also revealed that it had been forced to take a $169 million short-term loan at a 15% interest rate. Vivint's stock price fell by 11.3% over the next two trading days.

(b)     Because SunEdison did not actually have enough cash to pay for the Vivint Acquisition, it deliberately slow-walked the acquisition, resulting in a huge waste of Vivint employee and senior executive's time. The distraction caused Vivint to have extremely poor Q3 2015 results. When these results were revealed on November 16, 2015, Vivint's stock price fell by 23.3% over one trading day.

(c)     As part of the financing for the Vivint Acquisition, TerraForm Power, a partially-owned SunEdison subsidiary, agreed to buy Vivint Solar's rooftop solar

portfolio for $922 million in cash. It later became clear that TerraForm Power would not be willing to rubberstamp SunEdison's plans because they were unfair to TerraForm Power. SunEdison then fired TerraForm Power's board, replacing it with SunEdison loyalists—but drawing a lawsuit from a large SunEdison investor seeking to enjoin the Vivint Acquisition. Developments in the lawsuit caused Vivint's stock price to fall by 6.4% on December 22, 2015.

       (d)      On January 7, 2016, SunEdison announced that it had obtained $725 million in funding at an incredible LIBOR + 10% interest rate. In addition, to obtain the funding, SunEdison had had to issue approximately $158 million in shares, or another 21.8% of the total loan. Investors concluded that SunEdison was desperate for funding. On January 7, 2016, Vivint's stock price fell by 6.6%.

       (e)      On February 10, 2016, investors in a company whose acquisition by SunEdison had fallen through sued. The investors' lawsuit revealed that, contrary to SunEdison's representations, it was not the investors' unwillingness to close that had caused the acquisition to fall through, but SunEdison's inability to secure funding. Vivint's stock price fell by 29.9% over three trading days.

       14.      But the nail in the Vivint Acquisition's coffin was SunEdison's poor internal controls. SunEdison had obtained bridge financing for the Vivint Acquisition, at extremely high interest rates. A condition precedent to the financing, however, was SunEdison's timely filing its financial statements. On February 29, 2016, SunEdison revealed that it would be not be able to timely file its 2015 10-K because of poor internal controls. On March 1, 2016, Vivint's stock price fell by 17.4%.

15.     Then, on March 2, 2016, the Wall Street Journal reported that SunEdison's lenders had pulled the plug on the bridge loans—making the Vivint Acquisition impossible. On March 2, 2016, Vivint's stock price fell 25.0%.

16.     On March 8, 2016, Vivint announced that it had terminated the Vivint Acquisition because SunEdison had failed to consummate it. Vivint's stock price fell by 20%.

17.     That same day, Vivint also sued SunEdison, raising hopes that it would be able to recover a substantial payment, due under the acquisition agreement, as a result of SunEdison's failure to close.

18.     On March 14, 2016, Vivint announced poor Q4 2015 results, which it attributed again to the distraction from the failed SunEdison acquisition. On March 15, 2016, Vivint's stock price fell by 7.8%.

19.     On March 22, 2016, an article published on Debtwire reported that SunEdison was in talks with holders of its second-lien loans to fund a debtor-in-possession facility, casting doubt on whether Vivint would be able to recover a judgment against SunEdison. On March 23, 2016, Vivint's stock price fell from by 10.8%.

20.     On March 31, 2016, SunEdison announced that it had received a subpoena from the Department of Justice and an inquiry from the SEC concerning, among other things, the Vivint Acquisition's financing. On April 1, 2016, Vivint's stock price fell by 3.8%.

21.     Then, on April 3, 2016, SunEdison's subsidiary TerraForm Global sued SunEdison, claiming that SunEdison had misappropriated $231 million in cash from TerraForm Global because of its desperate cash position. On April 4, 2016, Vivint's stock price fell by 5.1%.

22.     From the day after the Vivint Acquisition was announced to the last day of the Class Period, Vivint's stock price fell from $15.75/share to $2.42/share. SunEdison's false statements thus caused Vivint investors to lose approximately 85% of their investment.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

24.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

25.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.

26.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

27.     As set out in their previously-filed PSLRA certifications, Lead Plaintiff Don Harris and Named Plaintiff Kyle Tervort acquired Vivint securities at artificially inflated prices during the Class Period and were damaged thereby.

28.     Non-party SunEdison is a Delaware corporation headquartered at 13736 Riverport Dr., Maryland Heights, Missouri. SunEdison securities trade on the New York Stock Exchange ("NYSE") under the ticker symbol "SUNE." SunEdison is a renewable energy development

company that develops, finances, installs, owns, and operates renewable power plants. SunEdison also delivers electricity to residential, commercial, governmental and utility customers. On April 21, 2016, SunEdison filed for bankruptcy under Chapter 11 of the Bankruptcy Code. *See In re SunEdison, Inc. et al*, No. 16-10992-SMB (Bankr. S.D.N.Y. filed Apr. 21, 2016).

29.     Non-party Vivint is a Delaware corporation headquartered at 1800 West Ashton Blvd., Lehi, Utah. Vivint securities trade on the NYSE under the ticker symbol "VSLR".

30.     Non-party TerraForm Power, Inc. ("TerraForm Power" or "TERP") is a Delaware corporation headquartered in Bethesda, Maryland. SunEdison is TERP's parent and controlling shareholder. TERP was formed in January 2014 by SunEdison to own and operate solar and wind generation assets, primarily "dropped down" from SunEdison but also sometimes acquired from unaffiliated third parties. TERP completed its initial public offering ("IPO") on July 18, 2014 and its common stock is publicly traded on NASDAQ under the symbol TERP.

31.     Non-party TerraForm Global ("TerraForm Global" or "Global") is a Delaware corporation headquartered at 7550 Wisconsin Avenue, Bethesda, Maryland 20814. SunEdison is Global's parent and controlling shareholder. Global is a globally diversified owner of clean power generation assets in high-growth emerging markets including solar and wind projects in Asia, Africa and Latin America. Global completed its IPO on July 31, 2015, and its common stock is publicly traded on NASDAQ under the symbol GLBL.

32.     Together, TerraForm Power and Global are referred to as the "YieldCos."

33.     Defendant Ahmad Chatila ("Chatila") was, at all relevant times, the President, CEO and a Director of SunEdison, a director and Chairman of the Board of TERP, and a director and Chairman of the Board of Global. Chatila became President and CEO of SunEdison and a

member of the Board of Directors in March 2009. Chatila oversaw the acquisition of SunEdison LLC in 2009 and, during the Class Period, developed SunEdison's solar strategy. On May 26, 2016, after the close of the Class Period, Chatila resigned as director and Chairman of the Board of both TERP and Global. On June 22, 2016, Chatila resigned as President and CEO of SunEdison.

34.    Defendant Brian Wuebbels ("Wuebbels") was, at all relevant times, the Executive Vice President, Chief Administrative Officer ("CAO"), and CFO of SunEdison. Beginning at SunEdison in 2007, Wuebbels held numerous positions with SunEdison before being appointed Executive Vice President and CFO of SunEdison in May 2012 and CAO in December 2014. Following the events described herein, Wuebbels was appointed as the CEO and President of TERP and Global in November 2015. On March 30, 2016, Wuebbels resigned as TERP's and Global's President and CEO. On May 10, 2016, SunEdison announced that Wuebbels would be resigning, with his last day of employment June 9, 2016.

35.    Defendants Chatila and Wuebbels are sometimes referred to herein collectively as the "Defendants."

36.    The Defendants:

(a)    directly participated in the management of SunEdison;

(b)    were directly involved in the day-to-day operations of SunEdison at the highest levels;

(c)    were privy to confidential proprietary information concerning SunEdison and its business and operations;

(d)    were directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)      were directly or indirectly involved in the oversight or implementation of SunEdison's internal controls;

(f)      were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning SunEdison; and/or

(g)      approved or ratified these statements in violation of the federal securities laws.

## FORMER EMPLOYEES

37.      Former Employee 1 ("FE 1") worked at SunEdison from July 2013 until May 2016, first as a Senior Manager from approximately July 2013 through approximately September 2014, then as the Director of Corporate Development from approximately September 2014 through March 2016, and finally as Finance Chief of Staff from approximately March 2016 through May 2013. FE 1's office was located next to Defendant Wuebbels's. FE 1's responsibilities included being Integration Lead for the Vivint Acquisition.

38.      Former Employee 2 ("FE 2") served as SunEdison's Head of Global Field Operations from April 2015 through the end of October 2015. FE 2 reported to Gokul Krishnan, SunEdison's COO–Global Residential & Small Commercial Solar. After leaving SunEdison, FE 2 went to work for Bright Planet Solar, which does significant business with SunEdison, as its CEO.

39.      Former Employee 3 ("FE 3") worked at SunEdison as a Business/Financial Analyst and Contract Consultant from October 2014 through June 2016, in its Finance Division. FE 3's supervisor reported directly to SunEdison's Chief Information Officer. FE 3 had access to SunEdison's accounts payable and other internal financial information, and was frequently copied on emails to Wuebbels and Chatila concerning the information set out in this Complaint.

40.     Former Employee 4 ("FE 4") served as SunEdison's Senior Internal Auditor (Lead) at SunEdison from August 2014 through December 2015. Her responsibilities included managing SunEdison's Sarbanes-Oxley Act of 2002 ("SOX") 404 audit and reviewing its internal controls.

41.     Former Employee 5 ("FE 5") served as TerraForm Power's Director of Global Financial Planning & Analysis from August 2014 to May 2015. He reported to Tom Lowe, TerraForm Power's Senior Director of Global Finance, Planning & Analysis, who in turn reported to TerraForm Power CEO Carlos Domenech. He worked as part of a group of several analysts who monitored TerraForm Power's projected revenues and costs, and was responsible for monitoring the operating budgets of hundreds of TerraForm Power acquisitions throughout the world. He also worked to assess compliance and satisfaction of debt services on these same projects. He would occasionally participate in weekly telephone conferences led by SunEdison CEO Ahmad Chatila.

42.     Former Employee 6 ("FE 6") served as a Finance Assistant at SunEdison from June 2015 through November 2015. She reported to Mark Schumacher, SunEdison's Vice President, Corporate Controller. Her responsibilities included preparing the SEC filings of SunEdison and the YieldCos. She was part of the SOX department/financial reporting teams.

43.     Former Employee 7 ("FE 7") was a SunEdison Senior Manager, University Relations and Leadership Development Program from June 2015 through June 2016. He regularly spoke directly with vendors concerning overdue accounts.

44.     Former Employee 8 ("FE 8") worked at SunEdison from August 2014 to November 2015, first as an Interconnections Program Analyst, then as a Development Operations Analyst. She reported to Tim Laoscki, SunEdison's Head of Business Operations and

12

Global Asset Management, Residential and Small Commercial. Her responsibilities included overseeing the information flow into SunEdison's System Advisor Model ("SAM"), which is a computer model that calculates performance and financial metrics of renewable energy systems that is used throughout the renewable energy industry.

45.     Former Employee 9 ("FE 9") was a Senior Accountant–Solar Materials at SunEdison from July 2014 through April 2016. She was responsible for invoicing and accounting for SunEdison's Solar Materials division, which manufactured everything from polysilicon to modules. She reported to Brian Krupich, Controller of Solar Materials.

46.     Former Employee 10 ("FE 10") was a Manager–Financial Planning & Analysis Solar Materials from January 2013 to March 2013, and a Senior Analyst–Financial Planning & Analysis from April 2011 to January 2013. He reported to SunEdison's CFO. He was responsible for preparing financial reports which were presented at weekly review meetings, and prepared presentations for quarterly and ad hoc meetings attended by the Operations Team and key executives like SunEdison then-president Carlos Domenech.

47.     Former Employee 11 ("FE 11") was a SunEdison Senior Settlement Accountant from May 2014 through July 2015. Her responsibilities included revenue recognition. She resigned voluntarily because SunEdison's inability to pay its bills on time caused her to believe that it did not have a long-term future.

48.     Former Employee 12 ("FE 12") was Senior Director, Financial Planning & Analysis at SunEdison from June 2013 to November 2014. He led SunEdison's Financial Planning & Analysis division. FE 12 supervised a team embedded in every region where SunEdison had projects ongoing and which tracked SunEdison's finances. FE 12 was also responsible for SunEdison's high-level financial modeling. He had regular direct

13

communications with Chatila. He was recruited to join SunEdison by its deputy CFO, Manavendra Sial.

49.     Former Employee 13 ("FE 13") served as President of SunEdison's Micro-Inverter business from August 2011 to December 2015. He previously co-founded and served as President of GreenRay, a Massachusetts-based solar energy company that SunEdison acquired in August 2011. While at SunEdison, he reported to SunEdison's Chief Technology Officer. He had personal responsibility for the SunEdison team that was developing a micro-inverter, and as such had personal contact with the team's vendors.

## FACTUAL BACKGROUND

### SunEdison's Business Model

50.     Between 2013 and 2015, SunEdison transformed itself from a manufacturer of semiconductors into a company that developed, financed, installed, owned, and operated renewable power plants.

51.     This transformation required an enormous level of debt—between the second quarter of 2013 and the second quarter of 2015, SunEdison's long-term debt nearly tripled, increasing from $2.4 billion to $9.2 billion.

52.     SunEdison financed this transformation by dividing its business activities into separate segments: (i) Renewable Energy Development ("DevCo") and (ii) the TerraForm Companies, TERP and Global (together, the "YieldCos"). SunEdison, as the DevCo, took on the risk of underwriting and developing new renewable energy projects. It then negotiated long-term "power purchase agreements" ("PPAs") with utility companies to distribute electricity generated from the projects. Once a project was constructed, it would be sold (or "dropped down") to a YieldCo.

14

53.     The YieldCos were separate publicly-traded companies that functioned essentially as revolving credit facilities for SunEdison. SunEdison controlled both YieldCos by maintaining more than 90% of the voting power. SunEdison also entered into management services agreements, under which SunEdison was responsible for all day-to-day management, accounting, banking, treasury, administrative, and regulatory functions and obligations of the YieldCos. Under these agreements, SUNE (among other things) hired and supervised the YieldCos' employees; oversaw the preparation of the YieldCos' books and records and financial statements; oversaw the YieldCos' accountants, legal counsel, and other accounting, financial, or legal advisors; and arranged for individuals to carry out the functions of the principal executive, accounting, and financial officers of the YieldCos.

54.     SunEdison's senior management consistently claimed that this structure allowed SUNE to realize greater value than it could by simply developing and selling the projects outright to third parties. Because the YieldCos had stable and predictable cash flows from the long-term PPAs, they could promise a steady dividend yield and thus raise funds in the stock market more cheaply than SunEdison could borrow them. Because the DevCo could reliably sell its projects to the YieldCos, it could develop and construct renewable energy projects quickly and then sell them to the YieldCos, freeing up the DevCo's liquidity for other projects. And after projects were dropped down, SUNE would continue to share in the cash flow they generated because it would receive dividends from the YieldCos.

55.     For example, Defendant Chatila told investors during an earnings call on November 6, 2014 that the YieldCo model allowed SUNE to generate "two to three times more value" than "selling to third-parties," largely "by lowering the cost of capital, eliminating friction losses on project sales, and retaining value from the tail of the projects beyond the contracted

15

life." Ultimately, this "maximize[d] longterm contracted cash flows, maximize[d] retained value for SunEdison and TerraForm shareholders, and enable[d] the growth of our downstream business," resulting in a "virtuous cycle enabling even stronger future results and faster growth."

56.     However, especially because SUNE itself was highly leveraged, this "virtuous cycle" only worked if the YieldCos could access equity and debt markets at attractive terms to fund project acquisitions from SunEdison. This, in turn, depended upon SunEdison's ability to develop and drop down projects capable of generating the cash available for distribution ("CAFD") necessary to support the high dividends the YieldCos had promised to their investors. Otherwise, SunEdison's growth would stall, tying up its liquidity and increasing the risk of default on its borrowing arrangements.

57.     Thus, SunEdison's balance sheet, capital structure, liquidity, and financial strength were critical to investors. Accordingly, on repeated conference calls throughout the Class Period, Defendants maintained that they held "appropriate level[s] of cash and liquidity to support our growth" and were "comfortable with [SunEdison's] balance sheet and liquidity position." SunEdison and the YieldCos also made a point of disclosing CAFD because, as stated in the registration statement used in connection with Global's IPO, "management recognizes that it will be used as a supplemental measure by investors and analysts to evaluate our liquidity."

**Defendants' Financial Incentives For Unsustainable Explosive Growth.**

58.     SunEdison's rapid growth occurred in part because SunEdison's executive compensation plan incentivized Defendants Chatila and Wuebbels to dramatically build up SunEdison's pipeline, even at the cost of SunEdison's long-term profitability.

59.     In March 2014, SunEdison altered its executive compensation program to focus on SunEdison's "foregone margin," rather than the more typical measures of corporate

16

profitability, like operating income and cash flow, on which the 2013 plan had been based. As detailed in SunEdison's 2015 Annual Proxy Statement, the 2014 executive compensation plan measured profitability as "the sum of SunEdison EBITDA and foregone margin (a measure which tracks margin foregone due to the strategic decision to hold projects on the balance sheet vs. selling them)."

60.     The Second Lien Credit Agreement, filed as Exhibit 10.1 to SunEdison's Form 8-K filed on January 11, 2016, provided additional details about foregone margin and how it was to be calculated. Foregone margin is defined as "the net income (or loss) in connection with the Disposition or planned Disposition of any Solar Energy System (or any Person owning such Solar Energy System) by the Borrower." It is calculated by "multiplying (i) the difference between (x) total revenue … earned ***or projected to be earned***" from the project "and (y) total projected costs" to construct the project "by (ii) the estimated percentage of completion" of the project, "and then subtracting any previous foregone margin previously included in the calculation.

61.     The result was that SunEdison's executives could now benefit from "projected" earnings, rather than actual earnings.

62.     Defendants responded to these incentives. Over the course of 2014 and 2015, particularly after SunEdison instituted this new compensation model, SunEdison's foregone margins were substantial:

|  | 2014 Q1 | 2014 Q2 | 2014 Q3 | 2014 Q4 | 2015 Q1 | 2015 Q2 | 2015 Q3 |
|---|---|---|---|---|---|---|---|
| Foregone margin: | $25m | $145m | $180m | $130m | $31m | $94m | $138m |

63.     Meanwhile, SunEdison's total operating income and free cash flow—on which the 2013 executive incentive plan had been based—fared poorly. Total operating income

declined from a loss of $313 million in 2013 to a loss of $536 million in 2014—a 70% decrease. Similarly, on a non-GAAP basis, SunEdison's free cash flow plummeted from a loss of $107.1 million in 2013 to a loss of $562.1 million in 2014—a decline of over 425%.

### The First Wind Acquisition, the Exchangeable Notes, and the Margin Loan

64.     On November 18, 2014, SunEdison announced the acquisition of First Wind LLC ("First Wind"). Defendants touted the transaction as transformational for SunEdison, turning it into "the world's largest renewable energy development company."

65.     SunEdison, along with TERP, agreed to pay $2.4 billion for First Wind. SunEdison's share of the acquisition price was made up of a $1 billion upfront payment and $510 million to be paid out later in "earnout" payments as First Wind completed projects.

66.     As SunEdison later explained in a February 3, 2015 SEC filing, SunEdison funded its share of the upfront payments for First Wind in part through the sale of $337 million 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes"). SunEdison funded the remainder through a $410 million two-year loan (the "Margin Loan") from Goldman Sachs Lending Partners LLC, Deutsche Bank AG, Barclays Bank plc, Morgan Stanley Bank, N.A. and Mall LLC. Goldman Sachs also served as a broker on the deal.

67.     As SunEdison later informed the Bankruptcy Court on April 21, 2016, "[t]he terms of the Margin Loan incurred in connection with the First Wind acquisition were integral to SunEdison's liquidity position." Specifically, the Margin Loan Agreement required SunEdison to post a number of shares of TERP common stock as collateral, and it also contained provisions requiring prepayment or additional collateral under several circumstances that were dependent on the price of TERP common stock. First, if TERP's common stock price fell below a certain undisclosed price (the "TERP Stock Price Trigger"), SunEdison had to prepay all outstanding

indebtedness, in full, by the next business day. Second, if the loan-to-value ratio of the collateral offered by SunEdison relative to the total borrowings fell below an undisclosed level (the "Loan-To-Value Trigger"), SunEdison had to either prepay the loan in full or provide additional cash collateral to bring the Loan-To-Value Trigger down to the permitted level by 5 p.m. on the second business day thereafter.

68.      Neither the TERP Stock Price Trigger nor the Loan-To-Value Trigger were publicly disclosed. However, according to SunEdison's Form 10-Q for the first quarter of 2015 (the "1Q 2015 10-Q"), filed on May 7, 2015, the Margin Loan required SunEdison to maintain a loan-to-value ratio below 50%—in other words, SunEdison had to post at least $2 in collateral for each $1 borrowed under the agreement.

69.      According to the Margin Loan Agreement, SunEdison provided as collateral 32.2 million TERP shares, as well as additional IDR interests in TERP that did not have a publicly disclosed market value. On January 29, 2015, when the parties entered into the Margin Loan Agreement, TERP's stock price was $32.58. Based on the $410 million loan balance and the 32.2 million TERP shares pledged (but not including the additional unspecified IDR collateral), the Loan-To-Value Trigger would be exceeded if TERP's stock price fell to $25.24. TERP's stock price would not reach $25.24 until August 7, 2015.

70.      In presentations and SEC filings, Defendants categorized the Exchangeable Notes and the Margin Loan as "non-recourse" debt, meaning that they posed no liquidity risk to SunEdison itself because the lenders could not resort to SunEdison for repayment. In reality, as investors learned months later in November 2015, this $750 million was actually recourse debt, with highly significant repercussions for SUNE's financial position. Had SunEdison properly

categorized this debt, it would have increased the amount of debt applicable to its credit facility covenants in the first and second quarters of 2015 by 119% and 131%, respectively.

## The Acquisition Spree Continues

71.     As SunEdison later admitted to the Bankruptcy Court on April 22, 2016, SunEdison began to experience a "liquidity challenge" by the spring of 2015. Notwithstanding this "liquidity challenge," after acquiring First Wind, SunEdison announced a dizzying array of large-scale expensive projects and acquisitions.

72.     Between May and July 2015, SunEdison announced the following projects:

(a)     On May 19, 2015, SunEdison entered into an agreement to acquire Latin America Power Holding, B.V. ("LAP"), which included six operating hydro-electric projects in Peru with a combined generation capacity of 73 megawatts ("MWs") per year, which SunEdison would drop down to Global after acquisition. With one MW enough to power 750-1,000 average American homes, according to the Electric Power Supply Association, the LAP projects alone could potentially power more than 70,000 homes.

(b)     On June 16, 2015, SunEdison announced it had signed an agreement to acquire Continuum Wind Energy Limited, which owned 412 MW of wind power projects operating and under development in India and 1000 MW of wind projects under development.

(c)     Also on June 16, 2015, SunEdison announced that it would acquire Globeleq Mesoamerica Energy, owner of 405 MW of wind and solar projects operating or under development in Central America and 246 MW of wind projects under development.

20

(d)     On June 25, 2015, SunEdison and TERP announced the acquisition of a 9-MW net-ownership stake in a portfolio of operating and distributed solar power plants from Duke Energy Renewables.

(e)     On June 29, 2015, SunEdison announced that it had acquired 521 MW of wind power plants in Idaho and Oklahoma from Atlantic Power and had formed a $525 million warehouse financing facility to hold the assets before dropping them down to TERP.

(f)     On July 1, 2015, SunEdison announced that it had secured financing and started construction on the Bingham Wind project in Maine, a 185 MW wind project. The financing facility for the project was $360 million, and the total construction cost was estimated to be $420 million.

(g)     On July 2, 2015, SunEdison announced that it had signed a memorandum of understanding with Gamesa, a wind turbine and wind farm manufacturer based out of Spain, to develop up to 1 GW of wind power plants by 2018. SunEdison would acquire the projects upon the start of construction and would drop the projects down to TERP once they were operational.

(h)     On July 6, 2015, SunEdison announced a $2 billion agreement to acquire 930 MW of wind power plants from Invenergy Wind LLC.

(i)     On July 15, 2015, Global entered into an agreement to acquire the rights to three wind and hydropower projects in Brazil from Renova Energia, S.A. for cash and (upon the completion of Global's IPO) Global common stock.

(j)      On July 15, 2015, SunEdison announced the closing of its agreement to finance and deliver 50 MW of energy storage for Southern California Edison, which would be dropped down to TERP once operational.

(k)      On July 15, 2015, SunEdison completed the acquisition of Mark Group, a U.K. based solar panel installer, for $24 million in cash plus deferred consideration of $14 million.

73.      At the same time, Defendants maintained that SunEdison had sufficient capital to finance these transactions while continuing to grow the business. For example, during an August 6, 2015 conference call, Defendant Wuebbels stated: "If you look at the capital and the liquidity that's in the business, as well as the dividend forbearance that the parent has done through 2016 on that, there's sufficient capital within the vehicle to be able to grow that business for the first 12 to 18 months at its 20% stated dividend rate." On that same conference call, Defendant Wuebbels stated: "We currently have $1.3 billion of liquidity, which is more than sufficient to support our growth needed to reach 2016 targets."

## THE VIVINT ACQUISITION

74.      On July 20, 2015, SunEdison and TERP announced a "definitive agreement" (the "Original Merger Agreement") to "acquire Vivint Solar for approximately $2.2 billion, payable in a combination of cash, shares of SunEdison common stock and SunEdison convertible notes" (the "Vivint Acquisition"). Vivint offers rooftop solar-panel systems to residential homeowners through long-term leases or power purchase agreements. Vivint installs and maintains the systems for little to no upfront cost to the homeowner, in exchange for customers agreeing to purchase the solar energy their panels produce. Because Vivint retains ownership of the systems,

it also benefits from investment tax credits, accelerated tax depreciation, and other incentives from federal, state, and local governments.

75.     As part of the deal, SunEdison "entered into a definitive purchase agreement with a subsidiary of TerraForm Power which, concurrently with the completion of SunEdison's acquisition of Vivint Solar, will acquire Vivint Solar's rooftop solar portfolio, consisting of 523 megawatts (MW) expected to be installed by year-end 2015, for $922 million in cash" (the "TERP Purchase Agreement").

76.     In the press release announcing the deal, SunEdison "initiate[d] 2016 guidance of 4,200 MW to 4,500 MW delivered, a 50 percent year-on-year increase over previous 2016 outlook of 2,800 MW to 3,000 MW." The press release also stated that TERP would "raise[] 2016 DPS guidance from $1.70 to $1.75 and initiate[] 2017 guidance of $2.05, up from previous target of $2.00." It also quoted Defendant Chatila as saying that "as of the fourth quarter of 2015, our organic growth and recent acquisitions will put SunEdison on track to deploy *more than 1 gigawatt per quarter*." And in a conference call held that same day to discuss the Vivint Acquisition, Chatila boasted that distributed generation (i.e., Vivint and SunEdison's existing residential and small commercial business) would install 1,200 megawatts in 2016.

77.     The press release described the substantial financing necessary for the deal:

### Terms of Transaction and Financing

Under the merger agreement, *Vivint Solar stockholders will receive $16.50 per share, consisting of $9.89 per share in cash, $3.31 per share in SunEdison stock, and $3.30 per share in SunEdison convertible notes*. The $2.2 billion acquisition price is based on approximately 115 million Vivint Solar shares outstanding after inclusion of employee stock options and restricted stock units that will vest upon the completion of the acquisition, the repayment of approximately $263 million of Vivint Solar debt and the payment of transaction costs. SunEdison expects that Vivint Solar will have approximately $100 million of cash on its balance sheet at the time of closing. *SunEdison expects to issue approximately $370 million of its common stock and approximately $350*

*million of SunEdison convertible notes to Vivint Solar stockholders as merger consideration*.

\* \* \*

*SunEdison intends to fund the cash portion of the merger consideration primarily from the proceeds of a new $500 million secured debt facility and the completion of the $922 million sale of assets to TerraForm Power. However, completion of the merger with Vivint Solar is not conditioned on consummation of the new debt facility or of any other third-party financing or the completion of the asset purchase by TerraForm Power*. If SunEdison were unable to obtain the funding needed to complete the merger at a time when all other conditions to the merger are satisfied, SunEdison could be liable for breach and be subject to customary remedies, including contract damages.

*To support the merger transaction, SunEdison has entered into a commitment letter with Goldman Sachs Bank USA for a $500 million secured term loan facility to be provided to a wholly-owned, indirect subsidiary of SunEdison which will hold certain development assets of the expanded SunEdison RSC platform after the merger with Vivint Solar*. The funding of the term facility is subject to customary conditions, including the negotiation of definitive documentation and other customary closing conditions.

*TerraForm Power has entered into a debt commitment letter with Goldman Sachs Bank USA for a $960 million unsecured bridge facility*. The funding of the bridge facility is subject to the negotiation of definitive documentation and other customary closing conditions. The TERP Purchase Agreement is not conditioned on TerraForm Power's receipt of the new unsecured bridge facility or any other third-party financing.

78.     In other words, TERP would contribute the majority of the necessary cash by purchasing Vivint Solar's rooftop solar portfolio from SunEdison when the deal closed. But SunEdison was still short by hundreds of millions of dollars. Goldman Sachs was willing to loan the $500 million difference, but only on a secured basis—so SunEdison offered, as collateral, the future Vivint projects it expected to develop. Further, SunEdison instituted a "Take/Pay Arrangement" whereby TERP agreed in advance to buy all those future projects, sight unseen. On that basis, Goldman agreed to provide the additional $500 million SunEdison needed to close the deal.

79.     On this announcement of the Vivint Acquisition, Vivint's stock price increased

$4.87 (or 44.8%) to close at $15.75, just shy of the $16.50 merger price.

## SUNEDISON'S TRUE LIQUIDITY POSITION
## DURING THE CLASS PERIOD

80.     Contrary to Defendants' statements before and during the Class Period that

SunEdison was a company with "sufficient" capital, a "solid" liquidity position, and "appropriate

level[s] of cash and liquidity" to fund these acquisitions and growth, numerous former

employees of SunEdison—and SunEdison itself—have since confirmed the opposite.

81.     Indeed, former SunEdison employees have explained that, in the run up to

SunEdison's filing of its 2014 10-K and even well before then, SunEdison was suffering from

ongoing significant liquidity shortfalls, which became a full-blown liquidity crisis by the first

quarter of 2015.

82.     This liquidity crisis manifested itself in, among other things, SunEdison's

systemic inability to pay SunEdison's critical vendors and accounts payable. Moreover, when

SunEdison did pay its critical vendors, because its liquidity was so poor, it often took cash

specifically earmarked for construction on one project and inappropriately used it to pay vendors

associated with unrelated projects. These practices allowed Defendants to maintain the

appearance that SunEdison had sufficient funds to drive its acquisition-fueled growth.

83.     As SunEdison's counsel explained to the Bankruptcy Court on April 22, 2016

when pleading for permission to pay some of its $357 million in then-outstanding vendor

invoices:

> I'd like to talk a little bit about the debtors' business of developing renewable
> energy projects. As set forth in the motion and Mr. Cook's [referring to
> SunEdison Vice President, Capital Markets and Corporate Finance] declaration,

25

the debtors develop large-scale solar and wind projects that involve highly individualized site-specific construction. It's fair to say no two projects are alike.

Each project requires customized design and engineering, not only for construction, but also for the components utilized in each project. Vendors are generally not interchangeable, and the risk of nonpayment could delay construction, risking significant loss in the value for SunEdison stakeholders.

Accordingly, SunEdison's financial success was dependent on its continued access to reliable vendors in the highly specific fields in which SunEdison operated.

84.     Notwithstanding the critical and unique nature of SunEdison's vendors, by the first quarter of 2015, SunEdison routinely delayed or refused to pay its vendors in order to disguise its liquidity shortfalls and maximize the publicly reported cash on its balance sheet. SunEdison's former employees and vendors worldwide and at every level of SunEdison hierarchy confirmed that this was SunEdison's Class Period practice.

85.     According to FE 13, SunEdison's inability to timely pay vendors was systemic as early as 2011, when he joined the company. In fact, "there was never a time at SunEdison that vendors got paid promptly," and he personally received calls from unpaid vendors "in any quarter you could name."

86.     According to FE 12, SunEdison had difficulty paying bills timely because of liquidity issues as early as 2013, but it became "uglier" in 2014. Moreover, SunEdison's zeal to acquire other businesses was, in part, an attempt to "grow themselves out of" these liquidity issues. But as their liquidity got tighter, they kept taking out loans at higher and higher rates while trying to be "creative" about preserving available cash, in part by pushing off vendor invoices.

87.     According to the SunEdison Investor Complaint,[1] a Project Coordinator & A/P Analyst who worked at SunEdison from May 2013 to May 2016—who reported directly to Justin Tomljanovic, who in turn reported directly to Defendant Wuebbels—stated that (i) SunEdison "never had cash"; (ii) SunEdison's liquidity problem was so obvious that "even the janitor" knew SunEdison didn't have sufficient cash on hand to pay its bills; (iii) SunEdison's corporate practice was to prioritize vendor payments based on which vendor's refusing to work would cause greatest harm to SunEdison; and (iv) on a daily basis, she received calls from vendors demanding payment for unpaid invoices.

88.     By the fall of 2014, SunEdison's cash position was already so weak that that it routinely failed to pay its core vendors responsible for supplying basic utilities and necessary services. For example, the SunEdison Investor Complaint reports information attributed to a former SunEdison Senior Auditor & Accountant (the "Senior Auditor") who recalled receiving calls from AT&T in the summer of 2014 threatening to cancel SunEdison's telephone service because of its failure to pay delinquent invoices. FE 3 confirmed that AT&T "did not get paid on time" because SunEdison "didn't have any cash." According to the SunEdison Investor Complaint, the Senior Auditor also recalled receiving calls in August and September of 2014 from Portland General Electric, threatening to shut off power due to non-payment for invoices owed.

89.     According to FE 11, because vendors' services were essential for SunEdison's projects, project managers would even pay vendors' invoices with personal funds and then seek reimbursement. According to FE 3, project managers ended up paying for project expenses with

---

[1] Second Am. Compl., *Horowitz v. SunEdison, Inc., et al.*, No. 1:16-cv-07917-PKC (S.D.N.Y. Jul. 22, 2016), ECF No. 165.

their own personal credit cards and then seeking reimbursement on around 40% of projects in 2014 and up to 70% of projects towards the end of 2015. FE 1 confirmed that, by the second half of 2015, this was "standard practice"—because getting a bill paid directly was "mind-numbingly hard," it was easier simply to seek reimbursement for personal expenses. But eventually, even the reimbursements stopped.

90.     The SunEdison Investor Complaint also reports information from a former Project Control and Procurement Manager at SunEdison from January 2015 to April 2016, who "was forced to pay SunEdison's electric bills on SunEdison Visa card at least five separate times" because SunEdison delayed paying its electric bills for as long as possible, even though electric power was obviously essential to SunEdison's projects.

91.     SunEdison also failed to timely pay its core vendors that supplied SunEdison with necessary safety and compliance testing for its equipment. According to FE 13, Reliant Labs, a product testing service which performed legally-mandated quality testing for SunEdison's inverter devices, had stopped working for SunEdison by the summer of 2014 because of non-payment.

92.     SunEdison even failed to pay government entities for fees relating to permits and licenses necessary for SunEdison's solar and wind projects. According to the SunEdison Investor Complaint, the Project Control and Procurement Manager reported that the San Joaquin Valley Air Pollution Control District threatened to sue SunEdison because SunEdison failed to pay a three-year old invoice for $8,624.73 in connection with air quality district permits.

93.     SunEdison's former employees report that SunEdison's systemic and routine inability to pay its vendors continued and in fact worsened in early-mid 2015, and that

SunEdison's acquisition spree was in large part an attempt to "grow out of" its problems with liquidity.

94.     According to FE 1, as soon as the First Wind acquisition closed, SunEdison executives moved to take control of First Wind's cash accounts. FE 1 recalled receiving a phone call from First Wind CEO Paul Gaynor, who had realized that SunEdison had far less cash than he'd been led to believe and was bewildered as to "how in the world" a company of SunEdison's size could have "no cash." A month or two later, FE 1 participated in a phone conversation with Gaynor and Michael Alvarez of First Wind and Chatila and other SunEdison executives. In that call, First Wind executives demanded their own cash account because SunEdison's cash management was so bad that the First Wind executives worried about having access to enough cash to complete their own projects. SunEdison granted First Wind's request because it was worried that if it did not, it would be violating its contractual obligations to First Wind by not providing it with sufficient cash to fund its operations.

95.     According to FE 11, who acted as a revenue recognition accountant for SunEdison around the summer of 2015, SunEdison was knowingly "acquiring companies instead of paying their bills." In particular, employment agencies and vendors that provided repair and maintenance services were not being paid. FE 11 once received a phone call from someone at Robert Half Management Resources (one of the largest professional staffing companies in the U.S.) who was "cold calling, trying to see if they could get anybody to pick up the phone" because "they hadn't been paid in six months."

96.     According to FE 3, from October 2014 to June 2016, SunEdison paid only 5% of its bills on time and it "shuffled" the rest—meaning that, to preserve cash, they only "paid the suppliers they needed to pay to keep their business going." That allowed SunEdison to keep

"making deal after deal" despite being "cash insolvent." SunEdison even pushed off bills from critical vendors it could not afford to lose. For example, SunEdison paid every AT&T bill 60 days late, even though AT&T was a "critical vendor." This only worsened over time.

97.     According to the SunEdison Investor Complaint, the former Executive Assistant to Alejandro Hernandez (former CFO of TERP) from February 2015 to August 2015 reported that SunEdison's problem paying vendors was so bad that "almost every bill to vendors was overdue"—even the agency that placed her at SunEdison contacted her over SunEdison's failure to pay its fee.

98.     According to the SunEdison Investor Complaint, the Project Control and Procurement Manager reported that SunEdison, in the midst of a dizzying acquisition spree, was over a year delinquent in paying the $1.5 million it owed to Garrad Hassan for due diligence services on those very acquisitions.

99.     According to FE 7, by September to October 2015, "things started getting really weird with us not paying vendors." Vendors contacted FE 7 and others in FE 7's department about the late payments and started refusing to provide any further services until the invoices were paid. As a result, FE 7 believed that "everybody, from executives all the way down," knew about the delinquent payments and the vendors suspending services.

100.    According to the SunEdison Investor Complaint, the Project Control and Procurement Manager also reported that by the winter of 2015, SunEdison could not even afford to pay the snow plow operator at a wind farm project in Maine.

101.    SunEdison's former vendors have substantiated the accounts of these former Company employees through their own formal litigation against SunEdison for unpaid bills. For example, Aerotek, Inc. ("Aerotek"), a Maryland-based staffing firm, entered into an agreement

30

with SunEdison in May 2013 whereby Aerotek agreed to place temporary contract employees

with SunEdison. According to FE 13, Aerotek was an "absolutely critical" vendor, and during

the summer of 2015, he received weekly calls from Intertek requesting payment of invoices

totaling $20,000. Even though FE 13 begged SunEdison's Accounts Payable department to pay

Intertek because Intertek had threatened to stop working for SunEdison and SunEdison needed

Intertek's services to keep its projects alive, "nine times out of ten" the invoices were never paid

on anything close to a timely basis. Ultimately, according to a lawsuit Aerotek filed against

SunEdison for breach of contract and unjust enrichment, SunEdison failed to pay Aerotek at least

approximately $1.02 million, with numerous invoices being over 90 or even 180 days late. *See*

*Aerotek, Inc. v. SunEdison, Inc*., No. 16-cv-00453-CDP (E.D. Mo. Apr. 1, 2016). Similarly,

Paragon Partners, Ltd. ("Paragon Partners"), a California-based construction services company,

entered into an agreement in August 2013 to perform various right-of-way services for

SunEdison. According to a lawsuit filed by Paragon Partners, SunEdison has failed to pay

Paragon Partners invoices totaling approximately $69,529 since January 31, 2014. *See Paragon*

*Partners, Ltd v. Sunedison, LLC*, No. 30-2016-00847905 (Cal. Super. Ct. Apr. 21, 2016).

102.    Defendants knew about SunEdison's endemic inability to timely pay its vendors.

As explained by FE 4, in April 2015, SunEdison management ordered an accounts payable audit

(the "A/P Audit"). FE 4 was assigned to the A/P Audit by her supervisor, Martha Hernandez,

SunEdison's Internal Audit Manager. The A/P Audit was completed in July 2015 and identified

multiple duplicate A/P issues. Moreover, within a few weeks of beginning the audit, FE 4

discovered that the core issue underlying SunEdison's inability to timely pay vendor invoices

was, in reality, a "cash shortfall." As a result, FE 4 recommended to Hernandez a "scoping

change," i.e., to change the audit's scope from an A/P examination to a cash flow audit. After

Hernandez refused the scoping change, FE 4 conducted her own informal investigation and discovered that SunEdison's cash position was not sufficient "to deal with the increasing growth of the company" and that SunEdison "will be in trouble due to the weak cash position" if it continued with its rapid growth strategy.

103.    Moreover, Defendants Chatila and Wuebbels knew about SunEdison's systemic and repeated failure to pay its vendors based on regular conference calls among finance personnel, headed by Defendant Wuebbels, in which this issue was explicitly addressed. According to the SunEdison Investor Complaint, as the Senior Auditor explained, Wuebbels "wanted to know about everything," and payments to vendors were discussed during weekly meetings and monthly finance meetings, both of which Wuebbels either personally attended or the results of which were brought to his direct attention by Marcie Washburn (SunEdison's Controller), Jenny Cooper (SunEdison's CFO of Global Operations), or SunEdison's Director of Accounting. During these weekly "cash calls," which occurred at 9AM PST on Tuesday or Wednesday of every week, the CFOs of each region and their respective teams would take turns explaining the status of their projects and their cash needs in order to get SunEdison's Finance Department to authorize the cash necessary to pay vendors and thus continue to projects' operations. Also according to the SunEdison Investor Complaint, the Project Coordinator & A/P Analyst, who was on these calls from 2014 to 2016, explained that Zach Groves, SunEdison's Director of Finance would lead the calls and allocate the cash, but it was Wuebbels who had to "sign off" on the decisions.

104.    Similarly, also according to the SunEdison Investor Complaint, the former Director of Asset Management and Operations at SunEdison from December 2014 to December 2015, recalled a January 2015 "all-hands" conference call led by Defendant Chatila, in which a

SunEdison employee announced that they had been warned three times by a utility provider that they would turn off phone service because SunEdison had not paid its bills, and that suppliers were "breathing down their necks" and wanted escrow for lines of credit with SunEdison. In response, Defendant Chatila went on a "very concerted rant," telling the SunEdison employees that they could either work for a company that grew slowly (and thus had the cash to timely pay its vendors), or they could work for SunEdison, which was a big, fast-growth company.

105.    Throughout the Class Period, Defendant Chatila also directly addressed SunEdison's delayed payments to its vendors during quarterly live-casts to SunEdison employees during which Chatila would give his "state of the union" on SunEdison. During these live-casts, as FE 13 explained, Chatila acknowledged that SunEdison's problem paying vendors was a "broken system" which he promised to fix—in fact, during one of the livecasts in 2015, Chatila vowed not to give himself a bonus until SunEdison sorted out its problems paying its vendors. Ultimately, after Chatila repeated the same message over multiple quarterly live-casts, FE 13 realized that SunEdison was really just a "house of cards."

106.    FE 11 confirmed that Chatila held regular "all-hands meetings" with all SunEdison employees, typically every quarter, and that employees frequently asked about delays with paying vendor invoices.

## SUNEDISON'S INTERNAL CONTROLS DURING THE CLASS PERIOD

### The Exchange Act Requires Issuers to Create and Maintain a System of Internal Controls

107.    The Exchange Act requires issuers like SunEdison to keep books and records setting out the transactions it engages in. Further, an issuer's system of internal controls requires that transactions be recorded as necessary to both prepare financial statements and compare

transactions with assets at reasonable intervals. Specifically, the Exchange Act requires issuers to:

> (**A**) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (**B**) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that—
>
>> ….
>>
>> (**ii**) transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets; [and]
>>
>> ….
>>
>> (**iv**) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences […]

15 U.S.C. §78m(b)(2)(b).

108.    A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations as well as by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in *Internal Control—Integrated Framework* (the "COSO Report").[2]

109.    The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the

---

[2] The COSO report was issued in September 1992 as a four-volume set. An Addendum to Reporting to External Parties was issued in May 1994.

"effectiveness and efficiency of operations, reliability of financial reporting, [and] compliance with applicable laws and regulations." More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

110.    The COSO Report requires that financial statements prepared for external purposes be "fairly presented in conformity with generally accepted or other relevant and appropriate accounting principles and regulatory requirements for external purposes." Consistent with generally accepted accounting principles, the COSO Report defines "fair presentation" as the following:

> (a)    the accounting principles selected and applied have general acceptance;
>
> (b)    the accounting principles are appropriate in the circumstances;
>
> (c)    the financial statements are informative of matters that may affect their use, understanding and interpretation; and
>
> (d)    the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[3]

111.    The COSO Report describes internal control as "consist[ing] of five interrelated components" that "are derived from the way management runs a business, and are integrated with the management process." The five components of an internal control framework that are

---

[3] *See* COSO Report at 35.

needed to enable a business to achieve its objectives are: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

112.    SEC rules also require management to evaluate a company's internal controls and disclose *every* material weakness they are aware of. *See Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports*, 68 Fed. Reg. 36636, 36639 (June 18, 2003).

<u>**SunEdison's Internal Controls Were Materially Deficient**</u>

113.    In SunEdison's Form 10-K for the fiscal year ended December 31, 2014 (the "2014 10-K"), and in each of its 2015 10-Qs, Defendants represented that SunEdison's internal controls over financial reporting did not contain any material weaknesses.

114.    A "material weakness" is defined as "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[4] In fact, SunEdison's internal controls fell far short of this standard.

<u>**SunEdison's Accounting Division Was Grossly Deficient**</u>

115.    According to multiple former SunEdison employees, the preparation of every financial statement was a scramble, as inexperienced employees struggled to understand, document, and report byzantine financial arrangements.

---

[4] 17 C.F.R. § 240.12b-2.

116.    According to FE 7, it was common knowledge that SunEdison was having difficulty completing financial filings. "That was pretty widely known that there was an issue within the company."

117.    Indeed, according to FE 6, the financial reporting team worked 20-hour shifts around financial reporting time, and frequently worked overnight. This created high risks that the exhausted teams would make mistakes in the complex and tedious task of consolidating SunEdison's financial statements.

118.    The SunEdison Investor Complaint reports information attributed to a former SunEdison Senior Auditor who worked at SunEdison from September 2012 to September 2014 and who evaluated SunEdison's internal controls "every single day". As alleged in the SunEdison Investor Complaint, according to the Senior Auditor, and as confirmed by FE 3, accountants were constantly leaving SunEdison, with accountants sometimes staying for only a week. The SunEdison Investor Complaint alleges that the Senior Auditor stated that because of SunEdison's high turnover of accountants, new employees were not familiar with the accounts, with particular coding requirements, the projects, and the transferring of codes from each project's accounting software to Excel, and all of these factors exacerbated the existing problems with SunEdison's internal controls—claims that FE 3 confirms. The SunEdison Investor Complaint further alleges that the Senior Auditor explained, which again FE 3 confirmed, that in addition to the problems of having to learn how to navigate SunEdison's convoluted consolidation process, "there may be an accountant working on a particular group of projects one month, and the next month it's a completely different person who has no idea these bills or line items are miscoded, so they never find it." As a result, according to the Senior Auditor and FE 3, line items that were initially miscoded were never corrected, since new personnel simply were

not aware of the circumstances in which an entry was made. Moreover, SunEdison never adequately invested in teaching its employees how to use its accounting systems. The SunEdison Investor Complaint quotes the Senior Auditor as stating that "there was no formal or even informational training for new people that came into finance. The philosophy of the controllers was basically if you spent some time in accounting at all, you should be able to come in and pick it up immediately, which was not the case."

119.    FE 8 worked as a Development Operations Analyst for part of her tenure at SunEdison. In this capacity, she maintained SunEdison's SAM database. To do her job, FE 8 was required to regularly speak with project managers, engineers and others throughout SunEdison to obtain information to enter into the SAM database. FE 8 corroborates the Senior Auditor's account, because she reports that as a result of rapid turnover, new workers simply wouldn't have the information she needed. According to FE 8, "People were moving in and out of departments. It was always a constant moving around since I worked there." And FE 1 confirms that SunEdison's high turnover meant that auditors regularly did not have reasonable training or experience.

120.    As FE 1 summed it up, "Everybody knew our Accounting team was not best in class. Almost worst in class because of how it functioned."

121.    Moreover, Defendants were aware of these problems. According to FE 1, in late 2014, SunEdison decided to attempt to implement a company-wide accounting system. The process was to take place in phases. The first phase, creating a North America-wide accounting system, was set to terminate in mid to late 2015. This was a massive project. SunEdison brought in an "army" of consultants, including from overseas, to work on the project, who worked non-stop.

122.    Internally, SunEdison acknowledged the reason it needed a company-wide accounting system. According to FE 1, both Wuebbels and Chatila admitted in finance team-wide meetings taking place before the beginning of the implementation (i.e., in 2014) that SunEdison's current accounting systems were "unsustainable". Thus, Wuebbels and Chatila recognized that SunEdison's current internal controls over financial reporting were not sufficient. Yet notwithstanding their acknowledgment, Defendants continued to maintain that there was no material deficiency in SunEdison's internal controls.

### SunEdison's False Revenue Projections Created Internal Control Problems

123.    FE 1 reports that he constantly tried to find justifications for SunEdison's public statements about its projects after the statements were made, such as project earnings projections. Yet FE 1 was frequently unable to find any information at all supporting these public statements. When he brought the issue to SunEdison's higher-ups, they told him to move on. "I tried for a year to get that level of information. It was really more 'move on to the next thing.' As long as the stock price is going up, let's just keep buying and doing projects and everything we're doing is great."

124.    According to FE 1, the publicly-disclosed earnings projections that accompanied project or merger announcements did not reflect SunEdison's actual expectations, or even its best hopes. This was because instead of grounding its projections in reality, SunEdison tried to determine what the revenue or income projections would have to be in order to entice lenders to provide financing both for the specific project and for SunEdison's running expenses. According to FE 1, "There was a culture of 'Here is what the numbers have to be. Find a way to make it work. You basically were given the goal and said, justify how this works, as opposed to rationally saying, these are the numbers. That was the mentality." According to FE 1, in many

cases, the financial assumptions that underlay the projections were not supportable; FE 1 cites as examples the assumptions made in the First Wind and Vivint acquisitions. The direction frequently came from Defendant Wuebbel, who, according to FE 1, was particularly good at determining the numbers lenders or Wall Street would like to see to provide funding to SunEdison.

125.    And FE 5 corroborates FE 1's report. FE 5 reports that Chatila would order SunEdison and TerraForm employees to make false revenue forecasts. "You would hear people say 'I'm not going to meet my forecast; it's not possible'," FE 5 recalled. "[Chatila] would say 'I don't care what's possible, I'm telling you what will happen. Just put down the numbers.'"

126.    SunEdison, inevitably, was unable to meet these impossible projections. SunEdison addressed the situation in two ways, both of which created internal control problems. First, SunEdison prioritized growth at all costs. According to FE 1, the operations team was required to "grow, grow, grow—we have to get to the next project because we have these hyper goals" while the accounting teams told them "we can't go any faster—records are not complete." This unsustainable growth allowed SunEdison to make up part of the gap between reality and their projections.

127.    And second, according to FE 1, SunEdison used "accounting gymnastics" to generate historical revenue, income, and cash figures reported in its SEC filings. According to FE 1, "there were times at the end of quarters, we had to justify a cash position or justify revenue we said existed versus per regular accounting rules. It was a standard practice for the company." FE 1 recalls Wuebbels and Manavendra Sial, SunEdison's interim CFO, regularly stating "We need to get this [number] in order to secure financing." According to FE 1, this happened every quarter—indeed, it happened so often he became "numb" to it. "We figured out either a loophole

or a loose interpretation that would allow KPMG [SunEdison's auditor] to be comfortable—not agree we were right, but say it's right enough." According to FE 1, SunEdison definitely employed these manipulations in the 2014 10-K. Summing up, FE 1 reports that SunEdison "was good at getting financing [because it] kn[e]w what numbers people want to see."

### False Projections In The Vivint Acquisition

128.    In the conference call announcing the Vivint Acquisition, Chatila projected that the combined Vivint/SunEdison entity would install 1.2 GW of residential and small commercial solar capacity in 2016. FE 1 was in Salt Lake City with the Vivint team when that press release was issued. According to FE 1, the Vivint leadership team's (including Paul Dickson, Vivint's then-SVP and Head of Operations) "jaw kind of dropped [at the claim]. They were really confused because they knew what they [Vivint] were doing and what their projections were."

129.    According to FE 1, Chatila's projection was "impossible". In fact, in the first six months of 2015, Vivint had only installed approximately 110 MW of solar capacity, or an annualized amount of about 220 MW. According to FE 1, Vivint executives (including Mr. Dickson) believed it was completely impossible for their own business to come anywhere near 1.2 GW in 2016.

130.    But Vivint was led to believe that SunEdison might account for much of the growth. SunEdison had reported 25 MW in residential and small commercial solar capacity in the first three months of 2015, for an annualized rate of 100 MW. According to FE 1, Vivint executives thought "we had maybe something crazy up our sleeves." In fact, far from being positioned to grow, the 25 MW SunEdison had reported substantially overstated SunEdison's actual installations. SunEdison's public statements—contrary to industry practice—reported megawatts **sold** rather than megawatts **installed**. In truth, as of the date of the Vivint acquisition,

41

SunEdison had only installed 20 megawatts to date in 2015 – for an annualized rate of less than 40 MW. Moreover, in October 2015, FE 1 was specifically ordered by Vikas Desai to perpetuate the deception by not disclosing to Vivint that the number in SunEdison's public statements was the number of megawatts that had been sold, rather than installed. SunEdison thus ensured that Vivint would not discover the deception and blow the whistle.

### SunEdison Had Numerous Incompatible Accounting Systems

131.    SunEdison's business strategy involved acquiring renewable energy companies and projects and then developing and managing these companies' projects. But SunEdison never integrated the acquired companies' systems—including their accounting systems—into its own, and thus never created effective and accurate intercompany systems, including financial reporting systems. According to FE 2, this included "systems in general on tracking and managing jobs and quarterly accounting for job costs and everything else." As a result, FE 2 reported, the companies effectively operated on a "partner" system, as a collection of loosely affiliated companies, rather than one organized whole. When SunEdison tried to reconcile the partners' accounts, "there w[ere] always discrepancies.[] A partner thought or knew they were owed something, but our system said something different, and they never reconciled." Indeed, "numbers never matched up anywhere." According to FE 2, as a result of SunEdison's woefully ineffective internal controls, SunEdison was "the most dysfunctional company [he] ever worked for" with "unexplainably bad" accounting systems, no security on data, no checks and balances on data access and data input, and, overall, an utter lack of internal controls in place. Indeed, FE 2 was told in his job interview that SunEdison knew how terrible its systems, including its accounting systems, were and he was recruited, in part, to help fix those problems.

132.     According to FE 5, TerraForm administered "hundreds" of different projects, each with its own accounting system managed with different and incompatible accounting software. This "fundamental" issue made it difficult for TerraForm even to determine "what was happening"—"It was a nightmare". FE 3 likewise confirms that SunEdison's various subsidiaries and projects kept individual records in incompatible databases, such as Oracle and SAP.

133.     For example, in July 2013, SunEdison acquired EchoFirst and, as explained by FE 2, never integrated EchoFirst's "massive" systems, including its accounting system, NetSuite, into SunEdison's own systems. As FE 2 explained, SunEdison's failure to integrate NetSuite into its own accounting platform resulted in the systems in Residential Small Commercial ("RSC"), the division of SunEdison in which he worked that used NetSuite, not effectively speaking with SunEdison's other systems and RSC "never connected dots to anything else at SunEdison." As a result, RSC was "living on its own platform." Accordingly, monitoring and updating SunEdison's financial data was a "clunky and broken process" through a "poorly built system" such that there was always a "massive disconnect" between RSC and the corporate/accounting systems. And when SunEdison acquired Lightwing, a "solar platform solution company" in May 2015, Lightwing's project management program "was another system bolted onto NetSuite," but, as FE 2 explained, it did not connect to NetSuite. When SunEdison tried to move Lightwing's data to NetSuite, the resulting data was not accurately reconciled and it added "more layers of complexity."

134.     Not only did SunEdison rely on numerous systems and accounting platforms to report its revenue and costs, none of these systems worked together. In other words, if a SunEdison employee adjusted a line item on a project, that same adjustment would have to be manually entered across every system and accounting platform in order to accurately reflect the

change. As a result, as FE 2 described it, such manual inputting of data across platforms led to "bastardized" financial results so there was "never a true version of the truth." Moreover, as SunEdison continued to acquire companies throughout the Class Period, SunEdison continued to introduce more systems and processes. SunEdison was so disorganized that it could not even accurately keep track of how many projects or employees it had—much less its available cash and debts it owed to its creditors. As FE 2 explained the situation with SunEdison's many accounting systems, "every division was off in their own world" and accurate consolidation and representation was impossible. Indeed, according to FE 9, reconciling the various accounting platforms (FE 9 names Oracle, ARP, and Timberline, as examples) caused SunEdison to have to create "massive reports", which would then have to be checked for accuracy.

135.    The problem had existed for many years. As attributed in the SunEdison Investor Complaint to the Senior Auditor, when MEMC acquired SunEdison, MEMC continued to use its own system, SAP, while not integrating SunEdison's accounting systems, which included Timberline and Oracle, a fact that FE 3 confirms. As a result, SunEdison's various business divisions were segregated by their respective accounting systems; while MEMC divisions, including the semiconductor business, ran on SAP, the solar divisions ran on their own differing platforms. And attempting to use all of SunEdison's accounting systems to consolidate SunEdison's financial statements and ensure the efficacy of SunEdison's internal controls, was, as the Senior Auditor allegedly explained, "a cluster of different accounting systems that made it a nightmare for any sort of internal controls to be functional."

136.    Indeed, FE 2, in his resignation email to his supervisor, Gokul Krishnan, SunEdison's COO, Global Residential & Small Commercial Solar, dated October 5, 2015,

reported that SunEdison's flawed internal controls were part of the reason he could not

effectively do his job, thus forcing him to resign:

> Complicated systems and process- this is probably the biggest weakness at
> SunEdison currently and there was never a true focus on getting them fixed. There
> were a lot of meetings and a lot of discussions on it but in the end not much would
> change and the hard part of this was me and my team ended up being the brunt of
> most of the gaps in the systems and having to explain these to partners or other
> internal teams …

137.    FE 2 reported similar issues to Krishnan in an email dated May 30, 2015, when he

wrote that: "Reporting- this is a tough one for me because I know the value of the reporting and

it is absolutely crucial for us to be able to know where we are and measure progress. The

problem is there are no tools in place to help with this and the data is so choppy you need to have

a PHD in NetSuite to even be able to decipher the code. This is the first company I have ever

worked at that does not have a sequel or python reporting system that gives the ability to tie into

the data without having to do it with the built in report function of the CRM. I know there is

progress being made here, we just need to make sure that the data behind the reporting is correct

and consistent."

138.    SunEdison also conducted the YieldCos' operations, and was thus responsible for

their internal controls. When asked whether TerraForm Power attempted to follow GAAP, FE 5

just laughed. He then responded that TerraForm's accounting "system was a mess." According to

FE 5, "when I got there in August 2014, it was the worst situation I had ever seen."

139.    Instead, SunEdison management, including Defendants, turned a blind eye to the

risks of misstatement. As the Senior Auditor allegedly explained, "To say that what management

was looking at [the financials] was complete and accurate was false." This is because properly

reconciling financial data from SunEdison's myriad accounting platforms would have required

greater scrutiny from SunEdison's internal auditors—or inquiries from SunEdison's outside

auditor, KPMG, which SunEdison and the Defendants sought to avoid. As the Senior Auditor described the situation: "If management attempted to consolidate the [accounting] systems, I think it would [have] become apparent how many issues and things had been swept under the rug, and I think that would trigger much more investigation because it would become obvious to us [in Internal Audit]."

### SunEdison Could Not Successfully Consolidate Its Financial Statements

140.    The process for consolidating these hundreds of different accounting systems was appallingly complex and generated pervasive accounting errors. According to the SunEdison Investor Complaint, the Senior Auditor described the process by which SunEdison's financial data was consolidated into a single source: all of the entities using one system, for example Timberline, had to input their financial data into the system, close out, and those entries were passed to SunEdison's Finance Department; each SunEdison project or acquisition would then have to go through this process on its own; the controller for each group would go through the line items for each project; after this was done for each project in each accounting system, SunEdison's Finance Department would then consolidate each project from each accounting system into a massive Excel spreadsheet document, done manually. The Senior Auditor explained that SunEdison had been using this practice and manually consolidating its financial data into an Excel spreadsheet since 2009, and continued to do so after the time he left.[5]

---

[5] And numerous former SunEdison employees, including FE 3, FE 9, and FE 10, confirm that SunEdison kept important financial records in unsecured Excel spreadsheets. FE 9 confirms that intercompany transactions, at the very least, were created through Excel spreadsheets to reconcile and follow-up. And FE 10 confirms that SunEdison used Excel for much of its basic reporting.

141.    Moreover, unlike proper accounting software, which has built-in controls, Excel has no input controls to ensure that data is entered correctly by code and category. As such, line items that are incorrectly entered can go unnoticed and generate domino effects of miscalculations. Thus, according to the SunEdison Investor Complaint, as the Senior Auditor explained, "huge categories" of data were misclassified and financial information was misreported, such that amounts of $200,000 per project were often lost in the reconciliation process for any given project at any given time, resulting in, as explained by the FE 2, multi-million dollar swings on how much a vendor or creditor was owed. "They would believe ***and they were right*** [that] they were owed millions of dollars and SunEdison's records would show they would only be owed several hundred thousand dollars."

142.    In another material internal control deficiency, SunEdison had no "access controls" to its massive Excel spreadsheets—and thus anyone with even minimal security clearance had access to, and could make changes to, SunEdison's central reporting system. Access controls regulate and restrict users' ability to make certain data entries unless users provide the appropriate clearance. And according to the SunEdison Investor Complaint, in SAP, a common accounting platform, a SunEdison controller had specific access rights that were not conferred to junior accountants or administrative assistants; if there was an entry for $500,000—an amount that would require the controller's authorization—it would have to be entered using the controller's user identification code and a junior accountant's user identification code was not authorized to make that entry. Excel, on the other hand, does not have these access controls, so, as the Senior Auditor explained, "anyone who has access to the spreadsheet can enter a $500,000 entry or adjustment." Because the consolidated spreadsheet was on a shared drive, a junior accountant who hypothetically might want to conceal that $25,000 was missing from the

entity s/he is responsible for, could change that line item in the spreadsheet without anyone detecting the change. Indeed, the Senior Auditor recalled multiple times in 2013 when accountants changed numbers in order to cover disappeared funds of approximately $25,000 involving bank reconciliations amounts. FE 3 confirms that the Excel spreadsheets were kept on a shared drive to which even the most junior accounting clerk had access. As a result, according to FE 3, anyone, even the most junior accountant could make material modifications in SunEdison's financial entries—and no one would know.

143.    Likewise, FE 2 described the situation with SunEdison's access controls as "they gave authority to the lowest level employee, like call center people, who could go in and change the economics of any deal." During the Class Period, SunEdison's access controls were so defective with such "insanely bad data integrity" that, until at least July 2016, FE 2, using his installer/partner credentials, could access SunEdison's consolidated financial data and make changes. Since FE 2 was the CEO of a SunEdison vendor, Bright Planet Solar, FE 2 could have (but did not) changed SunEdison's accounting records to show that SunEdison owed, say, $10 million to Bright Planet Solar. According to the SunEdison Investor Complaint, FE 2 is far from the only former SunEdison employee, who, months after having left SunEdison, still had access to and could change SunEdison's consolidated financial information. According to the SunEdison Investor Complaint, a Project Coordinator & A/P Analyst, who worked at SunEdison from May 2013 to May 2016 and reported directly to Justin Tomljanovic, the CFO of SunEdison North America, explained that she also still had access to SunEdison's financial data and could review project line items weeks after she left SunEdison. Likewise, FE 3 confirms that he is aware of individuals who continued to have access to the SunEdison shared drive after separating from SunEdison.

144.    FE 2 confirmed that SunEdison continued to use its Excel spreadsheet as its method of consolidating its financials before and during the Class Period. This process was so complicated and so time-consuming, that FE 2 explained that this consolidated Excel spreadsheet was "literally the most complicated spreadsheet" he had ever seen and was known internally as the "Brain Damage" spreadsheet. As a result of this process, FE 2 recalled that SunEdison's internal controls were a "web of chaos and confusion" and "the biggest mess ever" and that SunEdison's system of financial reporting was so "mind bogglingly" poor that FE 2 thought it had to have been "intentional" because it typically led to "massive underpayment" to SunEdison's creditors.

145.    Indeed, these problems were so long-standing, so obvious, and so detrimental that FE 2 explained that he reported these issues to his supervisors, Gokul Krishnan, the COO, Global Residential & Small Commercial Solar, who reported directly to Vikas Desai, the Senior Vice-President and Global General Manager for the Residential and Small Commercial Business. Desai reported directly to Defendant Chatila. FE 2 would report these issues in meetings three to four times a month with Krishnan and was told that resolving SunEdison's internal controls problems was "priority number 1" and that the executive team, including Defendant Wuebbels, was in the process of dealing with it.

146.    These problems extended even to issues like cash. FE 10, who was responsible for cash reports, said he had to invent the figures in cash reports from whole cloth.[6] According to FE 10, nobody at SunEdison (including him) knew how to produce proper financial reports, or even cash reports.

---

[6] This paraphrases FE 10's statement, which was that he had to "pull different cash reports out of my butt."

49

147.    As a result, costs were never uniform, and never reconciled. As FE 2 explained, hundreds of millions of dollars was impacted and the numbers were "insanely inaccurate." For example, in late 2015, SunEdison engaged the solar contracting company Bright Planet Solar, for which FE 2 worked after he left SunEdison, and SunEdison, based on its accounting, claimed that it owed Bright Planet only $800,000. In reality, based on emails exchanged between Bright Planet and SunEdison, dated May 6, 2016 and June 6, 2016, SunEdison owed Bright Planet over $2 million. According to the SunEdison Investor Complaint, the Senior Auditor likewise discovered massive payment swings such as these in his first month with SunEdison, in September 2012, and it persisted throughout the entirety of his tenure with SunEdison through September 2014. And according to FE 1, SunEdison "discovered" in 2016 that its intercompany balances had been off by hundreds of millions of dollars—an altogether typical mistake.

148.    In fact, financial data was also entered incorrectly on purpose—to manipulate the value of SunEdison's projects and burnish its financial statement entries. For example, FE 2 reported that there was always "massive pressure" from SunEdison executives to show progress on all projects and accounts. Every month, as FE 2 reported, there would be meetings to update the sales and operations executives on the status and finances of SunEdison's projects. In preparation for these meetings, in order to show purported project progress, sales employees engaged in "massive cleanups"—which included account managers improperly changing financial numbers on projects to make the projects look more favorable. As FE 2 explained, prior to the monthly meetings, there was a "mad dash" to improperly manipulate the numbers and show progress.

149.    And according to FE 3, manipulation was rampant. SunEdison kept many financials in Excel and these files "would go through the company and they [SunEdison

employees] would manipulate the documents." According to FE 3, SunEdison employees would receive instructions to generate Excel reports (or take existing Excel reports), modify numbers, and then replace the Excel spreadsheets on the shared drives. The instructions often came by executive orders from SunEdison's highest officers. FE 3 is aware of several instances in 2015 where the instructions came directly from Chatila and Wuebbels. But others, including project managers and other senior executives, also ordered manipulations. According to FE 3, these modifications would have the impact of making SunEdison's finances look better, such as by increasing net income for a given quarter or increasing SunEdison's cash position. Moreover, FE 3 reports that as SunEdison's cash position worsened in 2015, manipulation dramatically increased, as SunEdison made more and more efforts to appear liquid.

150.    According to FE 3, SunEdison was careful not to leave a paper trail of the instructions. "[The orders] wouldn't be in an email. It would be [through a] handwritten note. If you wanted to make changes to the Excel spreadsheet and you wanted to change the numbers, it wouldn't have been through an email because they didn't want any record." Similarly, FE 10 confirms that the Excel reports were on the shared drives, and could easily be manipulated.

151.    FE 10 likewise reports that SunEdison "constantly" brought in consultants to manipulate its cash flow reports. "We would have one cash report and we would start to be adopting it and then they would bring a consultant in—just to make something look more positive than it really was." Indeed, according to FE 10, it was apparent that SunEdison only wanted to produce reports that were aligned with the financial projections it had previously made, regardless of the actual figures.

**Double Billing**

152.     In April 2015, FE 4 was assigned to lead an audit into why SunEdison did not pay

its obligations as they came due. FE 4's team completed the audit around July 2015, and

produced a report, which she submitted to her manager, Martha Hernandez (the "A/P Audit

Report"). The A/P Audit was requested directly by SunEdison's executives, and was completed

by July 2015.

153.     The A/P Audit Report showed that SunEdison had two major problems, neither of

which was news to SunEdison. First, the A/P Audit Report stated that payments to vendors were

frequently considerably delayed. As a result, the vendors became irate, and called regularly to

complain.

154.     Second, vendor calls, coupled with SunEdison's poor internal controls, caused

SunEdison frequently to pay vendors twice or three times. Specifically, vendors who did

business with the YieldCos would call both the YieldCos and SunEdison. While the

contemplated procedure was for the YieldCos to submit both their cash and their invoices to

SunEdison for payment, SunEdison refused to pay the YieldCos' invoices, no matter how many

times they begged or pleaded. Eventually, the YieldCos began simply withholding cash and

paying the vendors directly. Then, because of SunEdison and the YieldCos' poor

communications, SunEdison did not become aware that the YieldCos had already paid the

vendors, and SunEdison paid the vendors again. Some vendors returned the duplicate

payments—but some vendors kept them.

155.     In her work, FE 4 also discovered other examples of misreported financing. FE 4

cites as an example an $11 million invoice that was reported in SunEdison's financial records as

having been paid. In fact, though, the financial statements were not accurate, because SunEdison

had decided not to pay the $11 million, and had not paid it. The $11 million payment therefore did not appear in SunEdison's bank statements. At the time of the misreporting, a SunEdison accountant who was in charge of reconciling bank statements repeatedly advised her supervisors that the $11 million had not been paid, citing the bank statements. Yet SunEdison nevertheless recorded the $11 million as an expense in its financial records. According to FE 4, the accountant "mentioned she spoke to middle management as well, but nobody cares."

### Cash Management

156.    SunEdison's poor internal controls also made it impossible to budget appropriately. According to FE 5, the project budgets TerraForm actually used were frequently inaccurate, and produced from boilerplate functions of the particular software being used at a particular facility. They were more like "mock-up trial budgets" with poorly organized elements "pulled from all these locations." TerraForm regularly went over budget, frequently by 100 percent. According to FE 5, when SunEdison went over budget, "there was no way to trace [the reason]. What was going on? We didn't know." According to FE 5, when TerraForm executives were informed, they didn't care.

157.    SunEdison employees exploited the chaos. SunEdison allowed its employees unfettered use of SunEdison's American Express card for outrageous personal expenses. For example, FE 2 explained that in or around February 2016, a Partner Support Manager employed by SunEdison used his company-issued American Express card to purchase for himself a boat, and also had charged around an additional $180,000 of personal expenses. As such, FE 2 described SunEdison as a place of "massive misappropriation of funds." Likewise, the Senior Auditor discovered in late 2013 that a Company employee had bought airfare, hotel rooms, and tickets to the 2010 World Cup in South Africa for himself and his friends on SunEdison-issued

American Express card, expenses which were clearly not business related. FE 1 confirmed the story, and adds that "lavish dinners"—such as a $1,000 dinner for 4 people—were neither unusual nor frowned upon.

158.    According to the SunEdison Investor Complaint, the Senior Auditor explained that companies should have a travel & expense ("T&E") policy dictating how corporate credit cards may be used. At SunEdison, employees were allowed to use the corporate cards for personal expenses, but they had to mark those expenses as "personal" on their expense reports. However, as the Senior Auditor explained, employees marked many expenses business were which in reality personal and that would have "brought up a lot of red flags if we reviewed all of management's T&E." In fact, Internal Audit would normally review management's T&E, a review which was done periodically throughout the fiscal year. However, in 2014 the T&E audit "just disappeared. When 2014 rolled around and we were to look at expenses for 2013, somehow the [T&E] audit was removed from our list of projects for the year." The Senior Auditor explained that the T&E audit was stopped by management because management did not want to invite greater scrutiny from SunEdison's auditors.

159.    Related to both SunEdison's lack of effective input and access controls, SunEdison employees intentionally exploited its flawed internal controls in order to increase the number of projects it kept on its books. For example, FE 2 explained that in the residential solar energy business, there is a cancellation rate of projects of around 50%. At SunEdison, during FE 2's tenure with SunEdison, the cancellation rate was significantly higher, approximately 75-80%. However, this higher rate was not the rate that SunEdison kept on its books. This is because SunEdison would receive project payments upon various project milestones, which included the customer's initial acceptance of the project and then the Operations team's budget and estimate

of the project. As FE 2 explained, SunEdison intentionally refused to record as cancelled jobs on its books as required, even where that was "indisputable evidence" that there was a cancellation, in order to show that a job was still active and thus continue to record milestone payments on those projects, an issue which the FE 2 discovered only a month into his employment with SunEdison in May 2015. Indeed, FE 2 reported that SunEdison's Director of Global Sales and Operation, who was responsible for job cancellations, would routinely fail to record projects as "cancelled" in order to improve SunEdison's sales statistics. He believed this was intentional so the sales team would get their bonuses. Accordingly, every project that was in the RSC system was reported as active, and SunEdison would continue to record milestone payments on those projects. Because SunEdison intentionally kept cancelled projects on its books as active in order to continue to recognize revenues from those projects, even if the customer was not required to pay because it had cancelled, FE 2 described SunEdison as a "Ponzi scheme" and a "house of cards" just waiting to collapse.

160.    Taking advantage of SunEdison's materially flawed internal controls, manager and top level executives at SunEdison also issued multiple purchase orders for their expenses in order to avoid triggering scrutiny on the amounts these employees requested from SunEdison's Finance Department. According to the SunEdison Investor Complaint, the Senior Auditor explained that every level of management has a spending threshold, called a "delegation of authority" by which that level employee could request funds without drawing scrutiny or raising red flags to SunEdison's auditors or the Finance Department. For example, hypothetically, the CFO could spend $10 million a month while a corporate controller could spend $1 million. If the employee spends more than her delegated amount, that employee needs approval from her supervisor or someone with a higher spending limit. In order to circumvent this process, as the

Senior Auditor explained, employees would often split purchase orders—circumventing the delegation of authority controls and avoiding triggering audit scrutiny by splitting requested sums into multiple purchase orders. The Senior Auditor recalled an experience in late 2013 and early 2014 when this happened: he was reviewing purchase orders from Manavendra Sial, then SunEdison's CFO of Solar Energy (and later SunEdison's Senior Vice President of Finance and Interim Chief Financial Officer) who reported directly to Defendant Wuebbels, and discovered that Sial had issued multiple purchase orders for the same invoice, a circumvention of SunEdison's delegation of authority controls. Moreover, this circumvention of SunEdison's authority controls existed at all levels of SunEdison, as the Senior Auditor & Accountant explained that: "If you know someone at [Sial's] level, who reports to the CFO, is circumventing the controls or splitting a PO to circumvent delegation of authority, what's to prevent a person reporting to him from doing the same thing? If management sets a specific tone, who's to say people who report to management are not going to do the same thing? If management is doing certain things, then without a doubt, people who report to management are doing the same thing, if not worse." Similarly, FE 3 reports that certain other SunEdison could only approve purchase orders for a given dollar amount or less—say, $100,000. These employees would routinely circumvent this limit by telling vendors to split up larger purchase orders into a series of smaller ones—for example, by telling a vendor with a purchase order of $600,000 to issue 6 purchase orders for $100,000 instead. The employee would then pay each of the six $100,000 invoices. According to FE 3, this form of abuse was so widespread at SunEdison that its use was neither remarkable nor remarked upon. It was an accepted practice.

161.    SunEdison also suffered from multiple "significant deficiencies" in its internal controls prior to the Class Period that were not corrected in the Class Period. According to the

SunEdison Investor Complaint, the Senior Auditor was responsible for detecting and investigating these significant deficiencies, and explained that anything having to do with SOX or financial reporting which did or could cause a $500,000 gap in SunEdison's finances would trigger a significant deficiency—for which an investigation would be conducted, an internal report would be generated, and that report would be circulated to SunEdison's Board and top management, including Defendants Chatila and Wuebbels. Once identified as a significant deficiency, and if the significant deficiency was also identified by SunEdison's outside auditor, KPMG, SunEdison was responsible for reporting the deficiency, and continuing to do so until the deficiency was remediated and report when that remediation was effective. The Senior Auditor was responsible for investigating numerous significant deficiencies, all of which were brought to the attention of Chatila and Wuebbels. One such significant deficiency involved the fact that Company employees or subsidiary entities, without the permission or knowledge of SunEdison's accountants, could open up bank accounts and draw money directly from SunEdison. For example, in late 2013, the Senior Auditor discovered that individuals and affiliated entities had opened bank accounts and were withdrawing cash of over $500,000. Because the amount drawn from SunEdison was over $500,000, the amount triggered the significant deficiency threshold. As a result of the inquiry initiated by this $500,000 bank account draw, the Senior Auditor discovered that the opening of bank accounts for the purpose of withdrawing SunEdison funds "happened a lot" while he was at SunEdison. In response to this $500,000 draw on SunEdison, the Senior Auditor wrote the significant deficiency report, which was passed on directly to Jenny Cooper, CFO of Global Operations and Director of Accounting and Solar Energy Controller, and Marcie Washburn, SunEdison Controller and Global Services Controller, and was distrubted to Chatila, Wuebbels, and the Board of Directors. As the Senior Auditor explained the discovery,

"When we learned it was possible that there were bank accounts all across the globe, and cash could be flowing through, and [the Assistant Director of Financial Reporting] had no idea what that cash position was …We were trying to wrap our minds around, okay, how big could this issue be? And once we'd passed the $500,000 threshold it was a significant deficiency. We were freaked out." The Senior Auditor continued, "This is basic: cash. Not left to any judgment or guesswork, this is just cash in the bank. If you have no control over that, you have problems overall." While the Senior Auditor investigated and generated his report on this significant deficiency in the fourth quarter of 2013, by the third quarter of 2014, SunEdison had failed to remediate the issue. Moreover, SunEdison failed to disclose this deficiency in any public filings.

162.    As late as the fall of 2015, a senior-level "Working Group" led by TERP CEO Domenech—convened specifically to assess and understand SunEdison's true cash position and access to available liquidity—"was having considerable difficulty obtaining current information from SUNE's finance department" and so was only able to provide an "approximation" of SunEdison's available cash.[7]

### SunEdison Later Admitted Its Internal Controls Were Materially Deficient

163.    On April 14, 2016, SunEdison revealed that its internal controls over financial reporting were materially deficient. In a Form 8-K filed that day, SunEdison admitted that an internal investigation had "identified several specific issues regarding SunEdison's cash forecasting and liquidity management practices," including "extensions of accounts payable" and the "use of cash committed for projects." Among other things, SunEdison admitted that:

---

[7] Compl. ¶57, *Carlos Domenech Zornoza et al. v. TerraForm Global, Inc. et al.*, 17-cv-00515-GJH (D. Md. Feb. 21, 2017) ("Domenech Complaint"); *accord* Compl. ¶58, *Francisco J. Perez Gundin et al. v. TerraForm Global, Inc. et al.*, 17-cv-00516-GJH (D. Md. Feb. 21, 2017) ("Perez Complaint").

(a)      its "cash forecasting efforts lack sufficient controls and processes";

(b)      "certain assumptions underlying the cash forecasts provided to the Board by [SunEdison's] management were overly optimistic and a more fulsome discussion of risks and adjustments with the Board was warranted";

(c)      "[SunEdison's] management has not responded appropriately when forecasted targets were not met"; and

(d)      "[SunEdison] lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis."

164.    On May 12, 2016—in one of SunEdison's final SEC filings before bankruptcy—SunEdison admitted:

> [The filing of SunEdison's Form 10-K for 2015] continues to be delayed due to the previously disclosed identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems. Because of these material weaknesses, additional procedures are necessary for management to complete the Company's annual financial statements and related disclosures, and for the finalization of the audit of the Company's annual financial statements and the effectiveness of internal controls over financial reporting as of December 31, 2015.

165.    For similar reasons, the Bankruptcy Court overseeing SunEdison's bankruptcy itself concluded on August 11, 2016 that "SunEdison's prepetition financial statements…are unreliable." *In re Sunedison, Inc*., 556 B.R. 94, 104 (Bankr. S.D.N.Y. 2016).

166.    In addition, both TerraForm Power and TerraForm Global admitted that their own internal controls were materially deficient. Notably, pursuant to their Management Agreements,

SunEdison was responsible for the YieldCos' internal controls. Thus, as each acknowledged, the reason their internal controls were deficient was that SunEdison's were as well.

167.    Specifically, both TerraForm Power and TerraForm Global, in their Forms 10-K for 2015 (filed December 5, 2016 and December 21, 2016, respectively), admitted that:

> As of December 31, 2015, management conducted an assessment of the effectiveness of our internal control over financial reporting based upon the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013) (COSO 2013 Framework). Based on management's assessment using these criteria, our management concluded that, as of December 31, 2015, our internal control over financial reporting was not effective as further described below.

> A material weakness is a deficiency or a combination of deficiencies in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in our annual or interim financial statements will not be prevented or detected on a timely basis. As of December 31, 2015, we identified the following material weaknesses:

> - The Company, and SunEdison as our service provider for all matters related to financial reporting processes and controls, did not maintain an effective control environment, risk assessment process, information and communication process and monitoring activities based on the following:

> - The Company did not have effective Board oversight and management monitoring activities over the information technology system development and implementation of financial reporting processes and internal controls established by the parent company service provider;

> - The Company did not have a sufficient number of trained resources with assigned responsibility and accountability for financial reporting processes and the design and effective operation of internal controls conducted by the parent company service provider;

> - The Company did not have an effective risk assessment process that identified and assessed necessary changes in generally accepted accounting principles, financial reporting processes and internal controls, in response to risks of fraud and error impacted by changes in the business model resulting from rapid growth from acquisitions, changes in information systems, changes at SunEdison, and transition of key personnel;

- The Company did not have effective information and communication processes that ensured appropriate and accurate information was available to financial reporting personnel on a timely basis in order that they could fulfill their roles and responsibilities; and

- The Company did not have effective monitoring activities in place to assess whether the components of internal control were present and functioning.

Accordingly, the Company, and SunEdison as our service provider for all matters related to financial reporting processes and controls, did not have effective control activities over the following:

- The Company did not have effective general information technology controls (GITCs), specifically, system development, program change, and access GITCs over the consolidation and Solar segment operating systems, databases, and IT applications. Also, the Company did not have effective access controls over the Wind Segment operating system, databases, and IT applications. Accordingly, process level automated controls and compensating manual controls that were dependent upon the information derived from IT systems were also deemed ineffective.

- The Company did not have effective controls over the completeness, existence, and accuracy of revenues, specifically, process level controls over the price and quantity inputs to revenue and accounts receivable transactions were not adequately designed and performed.

- The Company did not have effective operation of reconciliation controls over the completeness, existence and accuracy of various balance sheet accounts. Specifically, the reconciliation controls did not adequately investigate, resolve and correct reconciling items on a timely basis.

- The Company did not have effective controls over the completeness, existence and accuracy of allocated general and administrative expenses including payroll and other costs shared with SunEdison.

- The Company did not have effective controls over the completeness, existence and accuracy of the transfer of historical costs related to renewable energy facilities acquired from SunEdison.

- The Company did not have effective controls over the completeness and presentation of restricted cash. Specifically, the Company's policies and procedures to record restricted cash were not applied consistently across accounts.

- The Company did not have effective controls over the completeness and accuracy of information used in goodwill impairment, business combinations, hypothetical liquidation of book value, debt covenant compliance and going concern processes.

These control deficiencies resulted in several material misstatements to the preliminary consolidated financial statements that were corrected prior to the issuance of the audited consolidated financial statements. These control deficiencies create a reasonable possibility that a material misstatement to the consolidated financial statements will not be prevented or detected on a timely basis, and therefore we concluded that the deficiencies represent material weaknesses in the Company's internal control over financial reporting and our internal control over financial reporting was not effective as of December 31, 2015.

168.    At least five of the material deficiencies identified in the YieldCos' reports were the same material deficiencies identified by SunEdison's former employees as having existed long before December 31, 2015:

(a)    "The Company did not have a sufficient number of trained resources with assigned responsibility and accountability for financial reporting processes and the design and effective operation of internal controls conducted by the parent company service provider". As set out above in ¶¶113–122, former employees reported that SunEdison internal accounting and audit staff were overworked, untrained, and inexperienced due to high turnover.

(b)    "The Company did not have an effective risk assessment process that identified and assessed necessary changes in generally accepted accounting principles, financial reporting processes and internal controls, in response to risks of fraud and error impacted by changes in the business model resulting from rapid growth from acquisitions, changes in information systems, changes at SunEdison, and transition of key personnel." As set

out above in ¶¶131–139, former employees reported that SunEdison did not change its subsidiaries' accounting and other systems after acquisitions.

(c)      "The Company did not have effective general information technology controls (GITCs), specifically, system development, program change, and access GITCs over the consolidation and Solar segment operating systems, databases, and IT applications. Also, the Company did not have effective access controls over the Wind Segment operating system, databases, and IT applications. Accordingly, process level automated controls and compensating manual controls that were dependent upon the information derived from IT systems were also deemed ineffective." As set out above in ¶¶140–151, former employees reported that SunEdison did not have access controls over the Excel spreadsheets used to prepare its financial statements.

(d)      "The Company did not have effective operation of reconciliation controls over the completeness, existence and accuracy of various balance sheet accounts. Specifically, the reconciliation controls did not adequately investigate, resolve and correct reconciling items on a timely basis." As set out above in ¶¶140–162, former employees reported that SunEdison did not timely reconcile its intercompany accounts, and did not reconcile its accounts with its vendors and creditors, both of which routinely contained errors sand discrepancies.

(e)      "The Company did not have effective controls over the completeness and presentation of restricted cash. Specifically, the Company's policies and procedures to record restricted cash were not applied consistently across accounts." As set out above in ¶¶140–151, former employees reported that SunEdison manipulated Excel financial

statements with the goal of showing more cash, while SunEdison employees tasked with generating cash reports, at times, simply made up accounting designations.

169.    Accordingly, there were at least five material deficiencies in SunEdison's internal controls over financial reporting at the time it filed its 2014 10-K.

## AS THE TRUTH GRADUALLY EMERGES, DEFENDANTS' MISREPRESENTATIONS CONTINUE

### Defendants Falsely Reassure Investors that SunEdison is Flush With Cash While Secretly Scrambling to Generate Liquidity

170.    Following the July 20, 2015 announcement of the Vivint Acquisition, the price of both SunEdison and TERP shares declined significantly. SunEdison's share price dropped from $31.66 on July 20, 2015 to $10.40 on August 31, 2015, and TERP fell from $34.90 on July 20, 2015 to $22.50 on August 31, 2015.

171.    On August 5, 2015, SunEdison completed Global's IPO, selling 45 million shares for $15 each. SunEdison had expected the IPO to raise additional capital, but demand was so limited that, to complete the offering, SunEdison itself had to buy $30 million of Global's Class A common stock that it had expected public shareholders to purchase. This unexpected outlay of cash put further strain on SunEdison's liquidity.

172.    Undeterred, on August 6, 2015, SunEdison filed its Form 10-Q for the second quarter of 2015 (the "2Q 2015 10-Q"), which included SOX certifications signed by Defendants Chatila and Wuebbels attesting to the accuracy of the financial statements and effectiveness of internal controls. The 2Q 2015 10-Q also discussed SunEdison's liquidity, stating in relevant part that "[w]*e believe our liquidity will be sufficient to support our operations for the next twelve months*."

173.     SunEdison held a conference call on August 6, 2015, during which Defendants assured investors that SunEdison's liquidity remained robust. For example, after repeated questions by analysts as to whether SunEdison would need to issue debt or take out loans to meet forecasted growth, Defendant Wuebbels did not disclose the Goldman Sachs Loan (defined below), which SunEdison was in the process of negotiating at the time and would close just four days later. Instead, he falsely claimed that SunEdison would not require any additional corporate financing, noting that "we don't see any additional financings to be able to achieve this growth."

174.     SunEdison also issued an investor presentation on August 6, 2015, which stated that SunEdison had "Greater than $1 Billion of Cash at DevCo … Sufficient Liquidity to Grow Platform"—i.e. that SunEdison had $1 billion in available cash, without counting cash held at TERP and Global.

175.     However, as investors later learned from the *Wall Street Journal* on March 28, 2016, that "$1 Billion of Cash at DevCo" consisted "largely of cash that SunEdison couldn't access," including "a roughly $500 million [warehouse] credit facility, whose funds could only be accessed by delivering projects that met certain criteria, of which SunEdison had few" (the "Inaccessible Warehouse Facility").[8]

176.     The *Wall Street Journal* specifically stated that Defendants improperly included the Inaccessible Warehouse Facility when they claimed on November 10, 2015 that SunEdison had $1.4 billion in cash. Moreover, simple math illustrates that SunEdison also improperly

---

[8] Liz Hoffman & Aruna Viswanatha, *SEC Investigating SunEdison's Disclosures To Investors About Its Liquidity*, Wall St. J., Mar. 28, 2016, at C1 (available at http://www.wsj.com/articles/sec-investigating-sunedisons-disclosures-to-investors-about-its-liquidity-1459207385).

included the Inaccessible Warehouse Facility when it claimed on August 6, 2015 to have "$1 Billion of Cash at DevCo."

177.    The November 10, 2015 investor presentation contained a "Cash Walk" slide (the "3Q 2015 Cash Walk"), which displayed SunEdison's cash balance at the beginning of the quarter, material events that increased or decreased the cash balance during the quarter, and then the cash balance at the end of the quarter.

178.    According to the 3Q 2015 Cash Walk, SunEdison added no new warehouse funds to its cash balance in the third quarter of 2015. So the $500 million Inaccessible Warehouse Facility must have been added to SunEdison's purported cash balance before the third quarter.

179.    According to the "Cash Walk" slide in the August 6, 2015 investor presentation (the "2Q 2015 Cash Walk"), SunEdison's cash balance during the quarter increased by $673 million for "warehouses, net." Defendant Wuebbels even touted the warehouse credit facility during the 2Q 2015 earnings call, claiming that it "offset" certain "organic construction expenses" that would otherwise decrease SunEdison's cash balance, "further illustrating the strong liquidity position in SunEdison." That means the $500 million Inaccessible Warehouse Facility must have been part of the $673 million that was added to SunEdison's cash balance in the 2Q 2015 Cash Walk—and that the sum was improperly included in SunEdison's reported cash balances for both the second and the third quarters of 2015.

180.    By reporting "$1 Billion of Cash" even though SunEdison could not actually access at least $500 million of that sum, Defendants falsely portrayed SunEdison's available cash balance as twice as large as it really was. But analysts were assuaged. For example, UBS wrote in an August 6, 2015 report that SunEdison's cash balance indicated that "Management can fully execute on plan as it stands. Given concerns over cash funding . . . Management appears able to

persist as a developer for quite some time should equity market appear depressed." The next day, UBS wrote that liquidity concerns "appear [] more of a perception than a reality" and that "liquidity build in 2Q helps dramatically."

### The Margin Call and the 15% Goldman Sachs Loan

181.    On August 7, 2015, TERP's stock price fell to $24.24. As the Loan-To-Value Trigger was approximately $25.24, this decline either triggered or caused an imminent risk of triggering a substantial margin call on the Margin Loan—which SunEdison had consistently falsely described to investors as non-recourse.

182.    As the margin call loomed, SunEdison secretly negotiated a second-lien loan with Goldman Sachs Bank USA for $169 million at a rate of 9.25%, with an origination fee of $9 million (5.3%), equating to an effective interest rate of 15% (the "Goldman Sachs Loan"). This effective 15% interest rate far exceeded— by nearly 500%—the 2.68% weighted average annual interest rate of SunEdison's other debt reported in its 2Q 2015 10-Q. This enormously high rate meant that SunEdison would pay Goldman Sachs $25 million over the one-year life of the loan, just in fees and interest.

183.    The loan was finalized on August 11, 2015, but was not disclosed until November 10, 2015. As analysts commented when it became public, the onerous terms of the Goldman Sachs Loan—plus the fact that it was a *second-lien* loan, which meant that all of SunEdison's assets already had first-lien loans against them—made clear that SunEdison was so cash-strapped that it had no choice other than to pay this extraordinary interest rate.

184.    FE 3 confirmed that SunEdison's internal financial reports showed that SunEdison did not have access to any other liquidity at the time.

185.     SunEdison needed the Goldman Sachs Loan precisely because it had triggered a

margin call on the Margin Loan. According to a UBS report issued on August 25, 2015,

SunEdison management admitted that a margin call had taken place by that date:

**Call on margin loan but still appears to be sufficient collateral**

Details on the $410Mn margin loan secured by SUNE's TERP LP and GP interest
remain scarce but ***we understand that there has been a margin call made which
management has satisfied***. SUNE has taken steps to restructure the loan (we
suspect increasing TERP collateral) which it believes will prevent any disruptions
to the business going forward. The original loan agreement requires a 50%
minimum loan-to value ratio implying $205Mn TERP value must be maintained
(- 9Mn LP shares).

186.     In addition, as Defendant Wuebbels admitted in a conference call on October 7,

2015, SunEdison had to post $152 million in additional collateral to the Margin Loan at some

point before that date. Together, these facts strongly suggest that SunEdison's desperate need for

a $169 million loan was in part because it needed to post $152 million in additional collateral.

**SunEdison Slow-Walks the Vivint Acquisition Because It Lacked Liquidity**

187.     SunEdison's undisclosed liquidity problems hampered its ability to close the

Vivint Acquisition.

188.     Under the Original Merger Agreement, the anticipated closing date of the Vivint

Acquisition was September 30, 2015.

189.     Yet a condition precedent to the closing was SunEdison's filing of a Registration

Statement on Form S-4, registering for public sale the stocks and notes portion of the Vivint

Acquisition consideration (the "S-4"). The Original Merger Agreement expressly obligated

SunEdison to file the S-4 promptly. According to the verified complaint Vivint later filed in its

lawsuit against SunEdison, the parties had originally contemplated that the S-4 would be filed by

September 15, 2015. Yet SunEdison continually raised minor issues, ranging from "drafting

68

delays to audit committee concerns to belatedly conveyed 'issues' that were minor and readily addressable," and as a result, SunEdison had not filed the S-4 by late October.[9]

190.    FE 1's responsibilities included being the Integration Lead for the Vivint Acquisition. FE 1 confirms that Vivint's verified allegations are "110%" accurate. FE 1 reports that SunEdison would cite "drafting errors" for protracted delays in completing the Registration Statements, though on other deals, SunEdison's lawyers would quickly fix any drafting errors. "We were just dragging our feet. I saw how fast we had worked in the past." According to FE 1, in other deals, he could quickly secure approval from Chatila or other executives for necessary actions. On the Vivint Acquisition, he never even got responses. SunEdison executives would also show up to meetings with Vivint either actually unprepared or feigning unpreparedness, resulting in further delays. According to FE 1, SunEdison thereby "slow-walked" the Vivint Acquisition.

191.    FE 3 confirms that SunEdison engaged in a series of tricks to delay completing the Vivint Acquisition because it was concerned about its poor liquidity. FE 3 bases his knowledge on, *inter alia*, emails he received copying Defendants Wuebbels and Chatila and conference calls he attended that were also attended by Defendants Wuebbels and Chatila.

192.    Indeed, as set out in ¶243 below, the deliberate delay and the excuses Vivint, FE 1, and FE 3 report SunEdison made to Vivint are remarkably similar to the excuses SunEdison contemporaneously provided to the LAP Plaintiffs (defined below), whose interest SunEdison had agreed to acquire.

---

[9] Verified Compl. ¶ 23, *Vivint Solar, Inc. v. SunEdison, Inc*., No. 12088-VCL (Del. Ch. Mar. 8, 2015).

193.    In late October, according to Vivint's verified complaint, Chatila finally admitted to Vivint that the delays had not been because of any open issues preventing SunEdison from filing the S-4. Rather, Chatila told Vivint's CEO, SunEdison did not want to go forward with the merger under the terms of the Merger Agreement. Chatila also asked Vivint's CEO for help in seeking financing from the Blackstone Group to help address SunEdison's own capital issues.[10]

### Senior SunEdison Executives Raise Internal Concerns About "The Accuracy of SunEdison's Public Statements Regarding Its Financial Condition"

194.    In mid-September 2015, Domenech and Perez raised concerns to Defendant Chatila about the truthfulness of recent presentations by Chatila and Wuebbels about SunEdison's cash holdings and liquidity. In response, Defendant Chatila agreed that Domenech and Defendant Wuebbels could "co-lead" a "working group" to examine the Company's "end-to-end cash cycle."[11]

195.    To determine how much cash was truly available to the Company, the Working Group classified SunEdison's cash into two categories: (i) cash that was already committed and thus unavailable for current business needs as they arose; and (ii) cash that was not already committed or restricted, and was immediately available.[12]

196.    On October 5, 2015, Domenech explained to Defendant Chatila that the Working Group had "considerable difficulty obtaining current information from SUNE's finance

---

[10] *Id.* ¶ 24.

[11] Domenech Complaint ¶ 55.

[12] *Id.* ¶ 56.

department" and that its best estimate was that SunEdison had *only $342 million* in unrestricted cash.[13]

197.    Nevertheless, during a public webcast on October 7, 2015, Chatila stated that SunEdison "remains well capitalized with adequate liquidity," and Defendant Wuebbels stated that SunEdison had "approximately $1.4 billion" in "available" cash.

198.    On October 8, 2015, Perez and Domenech spoke with SunEdison directors Emmanuel Hernandez (Chair of SunEdison's Board) and Steven Tesoriere (Chair of its Finance and Investment Committee) and informed them about the Working Group's investigation, identified inconsistencies between Chatila's and Wuebbels' internal reports about SunEdison's cash position and their public statements, and explained why they believed that SunEdison's unrestricted cash was far less than $1.4 billion. Moreover, they demanded that the Board investigate the Company's liquidity position and the accuracy of its public reporting about its liquidity. In response, Emmanuel Hernandez instructed Defendants Chatila and Wuebbels to give a "presentation" about the Company's liquidity to the Board on October 23, 2015 (which was later postponed to October 26, 2015).[14]

199.    On October 19, 2015, at a SunEdison "Quarterly Business Review" ("QBR") attended by senior management of SunEdison and the YieldCos, Defendants Chatila and Wuebbels projected a "cash-burn rate"—i.e., a net reduction in available cash—of $801 million for the fourth quarter of 2015, $521 million for the first quarter of 2016, and a cumulative rate of $1.075 billion over the next six quarters.[15]

---

[13] *Id*. ¶ 57.

[14] *Id*. ¶¶ 59–60.

[15] *Id*. ¶ 66.

200.    But both before and after the QBR, Defendant Chatila met individually with senior executives and managers of SunEdison and the YieldCos to pressure them to alter their financial forecasts so SunEdison could report a lower cash-burn rate. During one such meeting, Perez told Chatila that he knew of no basis to lower the projected cash-burn rate of any SunEdison business segment and that the Company would be better served by addressing its liquidity crisis. Defendant Chatila reacted angrily and told Perez, in a "profanity-laced tirade," his job was to follow Chatila's directions.[16]

201.    On October 21, 2015, Domenech told Emmanuel Hernandez about the cash-burn rates that Chatila and Wuebbels had projected at the QBR, suggested that Chatila and Wuebbels were preparing falsely positive forecasts to present to the Board, and suggested that the Board replace both Chatila and Wuebbels.[17]

202.    When the Board meeting took place on October 26, 2015, Defendants Chatila and Wuebbels presented forecasts that differed substantially from the forecasts they presented just one week earlier at the QBR. Specifically, they forecasted a burn rate of $256 million in the fourth quarter of 2015, $394 million in the first quarter of 2016, and a cumulative rate of $643 million over the next six quarters.[18]

203.    Afterwards, Perez told the Board that he "completely disagreed" with the forecasted figures because they were inconsistent with the QBR presentation and also based on unrealistic and problematic assumptions, particularly because, in his estimation, the 2015 burn rates of SunEdison's Materials Division and Residential Division were $500 million and $200

---

[16] Perez Complaint ¶ 67.

[17] Domenech Complaint ¶ 68.

[18] *Id*. ¶ 71.

million respectively. He stated that the Company faced a severe liquidity crisis, with less than $90 million of unrestricted cash on hand, nearly $3 billion committed to projects under construction, and over 2,700 employees on payroll. Finally, he stated that SunEdison needed a significant cash infusion in order to meet its financial commitments presently and in the near future, that he did not believe the Company's financial reporting was transparent or reliable, and that he was alarmed by SunEdison's failure to investigate its cash reporting and forecasting.[19]

204.    Domenech, Gaynor, and Alejandro Hernandez then echoed Perez's concerns. Domenech also added that Defendants Chatila's and Wuebbels's forecasted revenues improperly included $49 million ostensibly to be paid by Global for the India Projects, even though the India Projects were not yet sufficiently developed and Global's Conflicts Committee had not approved their acquisition. Domenech further recommended that SunEdison seek an outside investor or partner to supply the cash needed to forestall SunEdison's liquidity crisis.[20]

205.    Immediately after the Board meeting, Domenech directly told two SunEdison Board members, James Williams and Randy Zwirn, that the Board should force Defendant Chatila to resign and that he was concerned that Chatila, Wuebbels, and the Board would retaliate against him for expressing his concerns and contradicting Chatila's and Wuebbels's reports on the Company's liquidity.[21]

---

[19] Perez Complaint ¶ 73.

[20] Domenech Complaint ¶¶ 74–76.

[21] *Id.* ¶ 77.

206.    Meanwhile, Perez told Board member Peter Blackmore that he could not work effectively with Defendants Chatila and Wuebbels due to their misrepresentations to investors about SunEdison's liquidity.[22]

### 3Q 2015 Earnings Releases

207.    On November 9, 2015, SunEdison filed its 10-Q for the quarter ended September 30, 2015 (the "3Q 2015 10-Q"). The 3Q 2015 10-Q disclosed the Goldman Sachs Loan and its 15% interest rate.

208.    The disclosure that SunEdison had taken a $169 million loan at a very high interest rate suggested that it both badly needed cash and was unable to get it at reasonable rates. The poor loan terms not only hurt SunEdison by forcing it to pay significant interest, it also indicated that SunEdison might not be able to obtain cash quickly at all, increasing the risk of bankruptcy.

209.    SunEdison's liquidity was important to Vivint shareholders for two reasons. First, SunEdison needed enough cash to finance the cash portion of the Vivint Acquisition—otherwise, it could not acquire Vivint. Second, part of the consideration for the Vivint Acquisition was convertible SunEdison notes and SunEdison stock. If SunEdison was not in sound financial condition or filed for bankruptcy soon after the Vivint Acquisition, then that consideration would become worthless.

210.    Indeed, analysts were suspicious of the Goldman Sachs Loan for these very reasons. For example, a November 13, 2015 UBS analyst report noted that the Goldman Sachs

---

[22] Perez Complaint ¶ 77.

Loan pointed to higher borrowing costs for SunEdison and that "the limited liquidity raised for

such a short period is unusual given mgmt's large cash balance."

211.    SunEdison also disclosed, by way of a footnote in its 3Q 2015 10-Q and an

adjustment on slide 20 of the accompanying investor presentation, that it had reclassified the

$740 million of debt under the Margin Loan and Exchangeable Notes from non-recourse to

recourse debt, meaning that lenders could now recover those loans directly from SunEdison.

Collectively, these newly-reclassified loans increased SunEdison's total recourse debt from $2.3

billion to $3.0 billion, or by almost one third.

212.    The reclassification cast further doubt on SunEdison's liquidity, as SunEdison

found itself with another $740 million in liabilities that SunEdison conceivably would have to

find a way to pay. Further, the reclassification cast doubt on the ability of SunEdison's financial

statements to accurately portray its financial position.

213.    On November 10, 2015, before trading, SunEdison held its 3Q 2015 earnings call.

On the call, an analyst asked Defendants why the Vivint Acquisition was taking so long to move

forward. Defendant Chatila denied anything was amiss:

> So just with the Vivint deal and the delay, could you talk a little bit about what's
> driving the close date? And are there any sorts of—is there a possibility that terms
> change at all within that structure or is there any horse-trading right now to try
> and get that done just as you guys work through your cash flow needs?
>
> []
>
> **Defendant Chatila:**
>
> Yeah, so I'll take that one, Brian. So look, we have signed an agreement with
> Vivint; we intend to abide by it. And we can't mention more because we are filing
> with the SEC. So let's rest assured, we are going to abide by the terms.
>
> Now why is it taking so long? Because just so many things going on in the
> company. We went through a dislocation starting July 22, July 23 something like
> that. So now we're, three and a half months later, trying to restructure the
> company, close several deals, did an IPO on TerraForm Global, redesigning deals
> that are not closed with LAP and other in Continuum really is taking a toll. And

because of that, we recognize that it's taking a little bit longer than it should. But don't read too much into it, there's not much more in here.

214.    However, the true reason for the delay was that SunEdison could not secure enough cash to finance both its daily operations and the Vivint Acquisition, so it was deliberately delaying the Vivint Acquisition.

215.    On this news, on November 10, 2015, Vivint's stock price fell from its previous close of $10.73/share to close at $10.22/share, or 4.8%, on heavy volume. It fell further on November 11, 2015, to close at $9.52, or 6.9%, on heavy volume, further damaging investors. All told, Vivint's stock price fell by 11.3% following SunEdison's 3Q 2015 earnings announcements.[23]

216.    On November 16, 2015, after markets closed, Vivint filed its 10-Q for the quarter ending September 30, 2015 (the "3Q 2015 Vivint 10-Q"), disclosing unexpectedly poor results. Vivint attributed the poor results to the "distraction" caused by the arduous Vivint Acquisition:

> Solar energy system installations and megawatts installed during the three months ended September 30, 2015 were lower than expected, ***which we believe was due in large part to the distraction from the proposed acquisition by SunEdison***. This distraction has exacerbated existing challenges faced by us, including competition in certain markets, particularly California—the largest market for solar energy systems, and the strains that our rapid growth has placed on our ability to achieve desired sales productivity.

217.    Vivint thus claimed that the poor results were due to the SunEdison acquisition. On November 17, 2015, Vivint's stock price fell from its previous close of $9.57/share to close at $7.34/share, or 23.3%, on heavy volume, damaging investors.

---

[23] SunEdison's stock price fell 33.8%, from $7.40/share to $4.90/share, over these same two trading days, demonstrating that the fall in Vivint's stock price was due to SunEdison's disclosures.

218.     But the "distraction," in fact, resulted from SunEdison's slow-walking the Vivint Acquisition. FE 3 reports that the delay in closing the Vivint Acquisition severely strained Vivint's resources. For example, Vivint was unable to raise capital during this time.

219.     FE 1 confirms that the delay in closing the Vivint Acquisition and SunEdison's slow-walking the acquisition was a potent distraction. FE 1 flew out to Vivint's headquarters every week from mid-August to November for two days. While there, he would take up much of the Vivint executives' time. Vivint would also have to continuously create reports and projections for FE 1 and other SunEdison employees, taking up further time and resources. FE 1 and other SunEdison employees created such a strain on Vivint resources that Vivint eventually instructed them not to return, even though Vivint's relationship with SunEdison obviously was critical to Vivint. According to FE 1, Vivint executives repeatedly told SunEdison it was not holding up its end of the bargain: "Dana [Russell, Vivint's CFO] told me that [as well as] Tessa White, head of Human Resources. They got to the point where they were putting in so much effort they just got frustrated." So did Jared Fitch, Vivint's head of marketing.

220.     As set out above in ¶¶187–193, SunEdison delayed the Vivint Acquisition because of its liquidity crisis. Accordingly, Vivint's poor 3Q 2015 results were the materialization of the undisclosed risk of SunEdison's poor liquidity.

### The "Friday Night Massacre"

221.     As SunEdison admitted to the Bankruptcy Court on April 21, 2016:

The terms of the Margin Loan incurred in connection with the First Wind acquisition were integral to SunEdison's liquidity position. The Margin Loan, which was scheduled to mature on January 29, 2017, included provisions requiring cash collateralization and/or prepayments if the share price of TERP dropped below certain thresholds. Beginning in September 2015, the share price of TERP fell below all of these thresholds, and *in October 2015 the entire Margin Loan became mandatorily prepayable*. This prepayment, which

amounted to $439 million, drained SunEdison's cash reserves and fundamentally changed its and the YieldCos' financial outlook.[24]

222.    According to SunEdison's Form 8-K dated November 23, 2015, SunEdison paid $328 million of the Margin Loan on November 17, 2015. However, according to a verified complaint later filed by Global against SunEdison, SunEdison was unable to find the remaining $100 million—and if it failed to pay that $100 million by November 20, it "would make the entire margin loan balance become immediately due and payable, and cause the cross default of various other of SunEdison's nearly $8 billion in debt."[25]

223.    Meanwhile, SunEdison's cash position deteriorated quickly. An internal non-public report circulated within SunEdison on November 9, 2015 that showed that SunEdison had only $90 million in available cash.[26] On November 18, 2015, SunEdison and its subsidiaries had only $74 million in available cash.[27]

224.    Scrambling for cash to avoid a catastrophic default, SunEdison turned to the YieldCos. On or around November 10, 2015, Defendant Chatila had asked Perez to "find a way" for the Yieldcos to lend $100 million to SunEdison without informing their Conflict Committees.[28] Perez refused, and Global's Corporate Governance and Conflicts Committee determined that they could not make the $100 million available to SunEdison.

---

[24] First Day Motion ¶ 60, *In re Sunedison, Inc*., No. 16-10992-smb (Bankr. S.D.N.Y. Apr. 21, 2016), ECF No. 4.

[25] Verified Compl. ¶ 41, *TerraForm Global, Inc. v. SunEdison, Inc., et al*., No. 12159 (Del. Ch. Apr. 3, 2016).

[26] Liz Hoffman, *Inside the Fall of SunEdison, Once a Darling of the Clean-Energy World*, Wall St. J., Apr. 14, 2016, http://www.wsj.com/articles/inside-the-fall-of-sunedison-once-a-darling-of-the-clean-energy-world-1460656000.

[27] Domenech Complaint ¶ 83.

[28] Perez Complaint ¶ 81.

225.    By November 19, 2015—as further corroborated during a February 16, 2016 oral argument in a derivative lawsuit attempting to enjoin TERP from completing the Vivint Acquisition— SunEdison was actively exploring bankruptcy. TERP had been told by its financial advisor Lazard that "there was a real insolvency risk" if SunEdison did not obtain funds from the YieldCos to pay off the Margin Loan. And according to the Perez Complaint, Perez recommended to Defendant Chatila on November 18, 2015 that SunEdison consider filing for bankruptcy—to which ***Chatila responded that he was seriously considering bankruptcy*** to resolve the liquidity crisis.[29]

226.    By the morning of November 20, 2015, SunEdison and its subsidiaries' unrestricted cash balance was only $16 million, and SunEdison itself had only $700,000 in unrestricted cash.[30]

227.    So, in what was later called the "Friday Night Massacre." SunEdison simply dispensed with Global's management and replaced both YieldCos' Boards of Directors. Defendants then demanded $100 million from Global's new board—but instead of telling them about the margin call, "Wuebbels made the intentionally misleading statement that Global's advancement of the $231 million India project purchase price was essential to secure—and would secure" certain projects in India that SunEdison had been developing and had earmarked for Global.

---

[29] Perez Complaint ¶ 82.

[30] Perez Complaint ¶ 84.

## The Amended Merger Agreement

228.    On December 9, 2015, SunEdison and Vivint released a joint press release stating that they had agreed to amend the Original Merger Agreement.

229.    Under the Amended Merger Agreement, a "Blackstone-sponsored vehicle" called "313 Acquisition LLC" would "become a leading shareholder of SunEdison" and commit to provide a $250 million credit facility. The parties agreed to reduce the per-share cash consideration by $2.00 while increasing the stock consideration by $0.75. Accordingly, at closing, each Vivint share would receive $7.89 in cash, $3.30 principal amount of a convertible note, and $3.31 in SunEdison stock.

230.    The Amended Merger Agreement also provided Vivint the "option, with the consent of the Blackstone-sponsored vehicle," for Vivint shareholders to be "paid all cash consideration," in which case the "Blackstone-sponsored vehicle will accept stock and convertible notes of SunEdison in lieu of a substantial portion of the cash it would have otherwise been entitled to receive in the merger." According to the Vivint lawsuit, Vivint's board had negotiated for this option in order to "eliminate SunEdison's ability to further stonewall the closing of the Merger Agreement by obviating the need for SunEdison to register with the SEC the securities comprising part of the merger consideration since they would be going exclusively to 313 in a transaction not requiring registration." In fact, Vivint's board met and approved the exercise of the option on December 11, 2015.[31]

231.    SUNE and TERP also had amended the TERP Purchase Agreement and had also entered into a separate agreement under which SUNE would "use its reasonable best efforts to

---

[31] Verified Compl. ¶ 4, *Vivint Solar, Inc. v. SunEdison, Inc.*, No. 12088-VCL (Del. Ch. Mar. 8, 2015).

sell to third-party purchasers (x) certain solar residential systems expected to be sold to

TerraForm Power pursuant to a take/pay agreement to be entered into and (y) Purchased

Subsidiaries…to be acquired from Vivint Solar and expected to be sold to TerraForm Power

pursuant to the Amended TERP Purchase Agreement." If SUNE succeeded and sold any

Purchased Subsidiary to a third party, TERP would be "relieved of its obligation to purchase the

Purchased Subsidiaries."

232.    Although the transaction was now "expected to close in the first quarter of 2016,"

the Amended Merger Agreement explicitly provided that "in no event will SunEdison be

required to complete the merger or consummate the transactions contemplated thereby prior to

January 29, 2016."

233.    The press release described how SUNE intended to finance the deal:

SunEdison intends to fund the cash portion of the merger consideration primarily
from the proceeds of *a new $300 million secured debt facility described below
and the completion of the sale of assets to TerraForm Power pursuant to the
Amended TERP Purchase Agreement*. However, completion of the merger is not
conditioned on consummation of the new debt facility or of any other third-party
financing or the completion of the asset purchase by TerraForm Power. If
SunEdison is unable to obtain the funding needed to complete the merger at a
time when all other conditions to the merger are satisfied, SunEdison could be
liable for breach and be subject to remedies described in the amended merger
agreement, including contract damages based on the economic terms of the
original merger agreement.

To support the merger transaction, SunEdison has entered into a second amended
and restated commitment letter with Goldman Sachs Bank USA, Barclays Bank
PLC, Citigroup Global Markets Inc. and UBS Securities LLC for *a $300 million
secured term loan facility (the "Term Facility") to be provided to a wholly-
owned, indirect subsidiary of SunEdison (the "Term Borrower")* that will hold
certain development assets of the expanded SunEdison residential and small
commercial platform following the merger with Vivint Solar. The funding of the
Term Facility is subject to customary conditions, including the negotiation of
definitive documentation and other customary closing conditions.

81

TerraForm Power has entered into a second amended and restated debt commitment letter with Goldman Sachs Bank USA, Citigroup Global Markets Inc., Barclays Bank PLC and UBS AG, Stamford Branch for a ***$795 million unsecured bridge facility***. The funding of the bridge facility is subject to the negotiation of definitive documentation and other customary closing conditions. The Amended TERP Purchase Agreement is not conditioned on TerraForm Power's receipt of the new unsecured bridge facility or any other third-party financing.

234.     The renegotiated terms successfully reassured the market that the Vivint Acquisition would close. On December 9, 2015, Vivint's stock price increased from its previous close of $8.39/share to close at $9.68/share, an increase of 15.4%, while SunEdison's stock price increased from $3.45/share to close at $3.96/share, an increase of 14.8%.

235.     Yet internally, the doubts continued even after SunEdison renegotiated the deal terms. According to FE 1, in January 2016, SunEdison held an all-hands meeting of every SunEdison employee. These all-hands meetings were usually uploaded internally and the information discussed was also reported in 8-Ks filed with the SEC. In this case, however, SunEdison purposefully did not record the meeting. According to FE 1, "We purposefully didn't [tape] it and put it on our internet because we wanted to make sure it didn't have to be filed with an 8K. There was a conscious decision we would not tape it so it would never go public."

236.     The reason SunEdison tried to conceal the meeting from investors was that, at the meeting, Chatila admitted that "he wished we hadn't done the deal."

**Lawsuits And a Desperate Loan**

237.     On December 22, 2015, during trading hours, Appaloosa Management L.P. ("Appaloosa"), an investment adviser to several large funds, publicly filed a demand for inspection of books and records that it had served on TerraForm Power. The stated purpose of the Demand was to enable Appaloosa to "investigate breaches of Delaware common and

statutory law and breaches of fiduciary duties perpetrated on the Funds and other stockholders of the Company by the Company, the Board and certain of its officers arising out of recent business decisions and corporate actions." Appaloosa demanded, among other things, documents concerning the TerraForm board's approval of the Vivint Acquisition and an analysis of the benefits for TERP. Further, Appaloosa senior partner James Bolin had recently published a letter sent to Defendant Wuebbels insisting that "[t]he Vivint transaction poses a serious threat to the Company's prospects and should be vigorously resisted by you, as CEO, and the Governance and Conflicts Committee, as the unaffiliated shareholders' advocate. We look to the both of you to fulfill your obligations and expect to see clear evidence of the steps you will take toward this end." Accordingly, it was plain that Appaloosa's purpose was to obtain documents necessary to block the Vivint Acquisition.

238.     On December 22, 2015, Vivint's stock price fell from its previous close of $10.40/share to close at $9.74/share, or 6.4%, damaging investors.[32]

239.     On January 7, 2016, SunEdison announced that it had obtained $725 million in Second Lien funding at an interest rate of LIBOR + 10% maturing in July 2018. To secure the loan, SunEdison issued 28.7 million shares to the lenders. Using SunEdison's January 6, 2016 closing price, the estimated value of the shares issued was $158 million, or about 21.8% of the total loan.

240.     These unfavorable terms cast further doubt on SunEdison's claims that its liquidity was adequate. On January 7, 2016, a report titled *SunEdison Management Getting Desperate: A Look At The Capital Measures Announced Today* was published on Seeking Alpha, charging that "There's no other word than desperation that comes to my mind here. The

---

[32] That same day, SunEdison's stock price also fell from $6.74/share to $5.31/share, or 21.2%.

company has become a pawn in the hands of its lenders with seemingly very little bargaining power left."

241.   On January 7, 2016, Vivint's stock price fell from its previous close of $10.07 to close at $9.41, or 6.6%, damaging investors.[33]

242.   On February 10, 2016, shareholders of Latin America Power Holding B.V. (the "LAP Plaintiffs") sued SunEdison in New York State Court after it failed to consummate its agreed acquisition of LAP. SunEdison had claimed on October 7 that the LAP transaction had fallen apart because of the LAP Plaintiffs' failure to honor their agreement. But in truth, the LAP Plaintiffs' complaint revealed that they had been ready and able to perform, but that SunEdison had never funded the transaction, in violation of its obligations.

243.   Specifically, the parties were ready to close on September 23, 2015, and signature pages had been placed into escrow. About $400 million was due to the LAP Plaintiffs on closing. That night, SunEdison's counsel stated that treasury personnel would coordinate "internally in the morning" of September 24 to "initiate the wire." No payments were made on September 24, and no payment had been made by October 1, when the LAP Plaintiffs were forced to cancel the deal.[34] Along the way, SunEdison offered laughable false assurances, such as that it was "chasing down wire personnel," implying that it would pay as soon as it found the right clerk.

244.   The LAP Plaintiffs' complaint also revealed that, among other things, SunEdison had asked the LAP Plaintiffs to delay a payment of $125 million from September 30, 2015, to October 2—thus burnishing SunEdison's 3Q 2015 balance sheet—in violation of contractual terms.

---

[33] That same day, SunEdison's stock price fell from $5.51 to $3.34, or 39.3%.

[34] Materially adverse tax law changes took effect on October 1, 2015.

245.    LAP publicly filed its lawsuit during trading hours on February 10, 2016. On that day, Vivint's stock price fell from a previous close of $7.77/share to close at $7.19/share, or 7.4%. The lawsuit was first publicly reported in the mainstream press in a Bloomberg article at 5:33 PM, after trading hours. On February 11, Vivint's stock price fell to $6.27/share, a further 12.8%, and continued to fall to $5.45/share on February 12, 2016, a further 13.1%. In total, the revelations in the LAP Plaintiffs' lawsuit caused Vivint's stock price to fall $2.32/share, or 29.9%.[35]

## Termination of the Vivint Acquisition

246.    On February 26, 2016, the Delaware Court of Chancery denied Appaloosa's motion to enjoin the Vivint Acquisition. Investors in both Vivint and SunEdison were heartened. Vivint's stock price rose from a previous close of $5.89/share to close at $7.93/share, an increase of 34.6%, while SunEdison's stock price rose from its previous close of $1.72/share to close at $2.26/share, an increase of 31.3%.

247.    However, these briefly-renewed hopes quickly came crashing down.

248.    On February 29, 2016, after the market closed, SunEdison filed a Notification of Late Filing on Form 12b-25, disclosing that SunEdison would be unable to timely file its 2015 Annual Report on Form 10-K. The Notification of Late Filing included information that in late 2015, former executives made allegations concerning the accuracy of SunEdison's financial position, stating in relevant part:

> [B]ased on ***allegations made by former executives of the Company concerning the accuracy of the Company's anticipated financial position*** previously disclosed to the Company's Board of Directors (the "Board"). [...]The Audit

---

[35] The corresponding figures for SunEdison are a fall from $2.63/share on February 9, 2016, to $1.41/share on February 12, 2016, or $1.22/share, or 46.3%.

Committee, mindful of the current challenges faced by the industry and the Company, has also recently ***initiated an investigation concerning the accuracy of the Company's anticipated financial position*** based on certain additional issues raised by a current and a former employee of the Company.

249.   On March 1, 2016, the price of Vivint's shares fell $1.37 per share, or 17.4%, from the previous close of $7.89/share to close at $6.52/share, damaging investors.

250.   On March 2, 2016, during trading hours, the *Wall Street Journal* published an article entitled, "*SunEdison's Takeover of Vivint Solar in Jeopardy as Banks Balk*" stating that the merger was in jeopardy. In relevant part:

> ***SunEdison Inc.'s mounting financial woes have jeopardized its purchase of rooftop-solar company Vivint Solar Inc.***
>
> ***Goldman Sachs Group Inc., Barclays PLC, Citigroup Inc. and UBS Group AG have balked at providing loans they had committed to fund the takeover, according to people familiar with the matter. The banks have told SunEdison its failure to provide them with up-to-date financial statements mean it hasn't fulfilled a condition of the loan agreement, the people said.***
>
> SunEdison said in a regulatory filing Monday that it would delay its 2015 earnings report while its board investigates claims from a former and a current employee challenging the accuracy of the company's financial disclosures.
>
> SunEdison said it has found no wrongdoing. The review is still under way and could require the company to "reassess its liquidity position," SunEdison said. A company spokesman declined to comment further Wednesday.
>
> If the Vivint deal hasn't closed by March 18, either side could walk away. SunEdison could line up alternative financing sources for the deal, though its sunken stock price could make it difficult to do so.
>
> SunEdison shares plunged 23% Tuesday before regaining ground Wednesday, recently trading at around $1.70. The stock has lost more than 90% of its value since midsummer on investor concerns about the Vivint transaction and a slide in oil prices that has dragged down energy stocks.
>
> When the deal was announced in July 2015, it was worth $1.9 billion. SunEdison and Vivint later renegotiated the deal, reducing the cash portion. And Vivint's majority shareholder, Blackstone Group LP, agreed to take stock in lieu of cash and to provide SunEdison with a $250 million credit line.

Vivint stockholders, who approved the deal last week, would receive $7.89 a share in cash plus other securities. Its shares were trading around $6.81 Wednesday afternoon.

251.    On March 2, 2016, the price of Vivint's shares fell $1.63, or 25.0%, to close at $4.89, damaging investors.

252.    On March 8, 2016, Vivint announced that it was terminating the Merger Agreement, stating in relevant part:

**Vivint Solar Terminates Merger Agreement for SunEdison's Breach**

LEHI, Utah, March 8, 2016 /PRNewswire/ -- Vivint Solar (NYSE: VSLR) announced this morning that it had delivered a letter to SunEdison, Inc. last night notifying it that, *as a result of SunEdison's failure to meet its obligations under the merger agreement pursuant to which the Company was to have been acquired by SunEdison, Vivint Solar has terminated such agreement*. Vivint Solar reserves all rights under the merger agreement. In particular, SunEdison's failure to consummate the merger when required pursuant to the terms of the merger agreement constitutes a willful breach of the merger agreement, and Vivint Solar intends to seek all legal remedies available to it in respect of such willful breach.

253.    The same day, Vivint sued SunEdison and a merger sub in the Delaware Court of Chancery for breach of contract in connection with the termination of the Vivint Acquisition. Vivint sought damages estimated to be over $1 billion.

254.    On March 8, 2016, the price of Vivint's shares fell from its previous close of $5.21/share to close at $4.17/share, or 20.0%, damaging investors.

255.    On March 14, 2016, after close of trading, Vivint announced its Q4 and Full Year 2015 results. The results were poor, with a Credit Suisse analyst reporting in a March 16, 2016 report that they "reinforced the uncertainty of the company's outlook after the breakup of its merger with SUNE." In fact, as reported in Vivint's 10-K filed that day, the poor results were attributed largely to "distractions from the proposed SunEdison acquisition."

256.    On March 15, 2016, Vivint's stock price fell from its previous close of $3.96/share to close at $3.65/share, down 7.8%, damaging investors.

257.    On March 22, 2016, Debtwire reported that SunEdison was in talks with holders of its second-lien loans to fund a debtor-in-possession financing facility—suggesting an imminent bankruptcy. SunEdison's bankruptcy would make it much more difficult for Vivint to recover damages in its lawsuit over the Vivint Acquisition. On March 23, 2016, Vivint's stock price fell from its previous close of $3.32/share to close at $2.96/share, damaging investors.

258.    On March 31, 2016, after the market closed, SunEdison announced in a Form 8-K that it had received a subpoena from the U.S. Department of Justice and a similar inquiry from the SEC concerning the Vivint Acquisition. The 8-K states in relevant part:

> On March 28, 2016, SunEdison, Inc. (the "Company") received a subpoena from the U.S. Department of Justice (the "DOJ") seeking information and documentation relating to: (i) *certain financing activities in connection with the Company's acquisition of Vivint Solar, Inc., (ii) the conduct of a former non-executive employee who is alleged to have committed wrongdoing in connection with the Vivint termination negotiations*, (iii) the previously disclosed investigations by the Company's audit committee, (iv) intercompany transactions involving the Company and each of TerraForm Power Inc. and TerraForm Global Inc. and (v) the financing of the Company's Uruguay projects in connection with project costs and equity contributions that remain to be contributed by the Company and the DOJ may have additional requests. *Also, the Company has received a nonpublic, informal inquiry from Securities and Exchange Commission (the "SEC") covering similar areas*. The Company and the board of directors intend to cooperate with the DOJ's inquiry and the SEC investigation.

259.    On April 1, 2016, the price of Vivint's stock fell from $2.65/share to $2.55/share, or about 3.8%, damaging investors.

260.    On April 3, 2016, a Sunday, TerraForm Global filed a lawsuit against SunEdison, Defendant Chatila, and others for breach of fiduciary duty, breach of contract, and unjust enrichment. The verified complaint alleged that SunEdison misappropriated $231 million in cash

from Global, supposedly to facilitate SunEdison's completion of renewable-energy projects in India and then to transfer SunEdison's equity interests in these projects to TerraForm Global, but that SunEdison had actually "diverted the funds to prop up its flagging liquidity position."[36]

261.    On news of the TerraForm Global lawsuit, the price of Vivint's stock fell from $2.55/share to close on April 4, 2016 at $2.42/share (a decline of around 5.1%), damaging investors.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

262.    Throughout the Class Period, Defendants made materially false and misleading statements and omissions concerning, among other things: (i) SunEdison's liquidity, including the sufficiency of its cash position and the amount of cash available to SunEdison; (ii) SunEdison's debts; and (iii) the effectiveness of SunEdison's internal controls over financial reporting.

### Misrepresentations about Liquidity in the 2014 10-K, 1Q 2015 10-Q, and 2Q 2015 10-Q

263.    On March 2, 2015, SunEdison filed its 2014 10-K, which was signed by Defendants Chatila and Wuebbels. In the 2014 10-K, Defendants falsely and misleadingly misrepresented the strength of SunEdison's liquidity. For example, it stated that:

> *Liquidity*
>
> Cash and cash equivalents, plus cash committed for construction projects, at December 31, 2014 totaled $1,074.4 million, compared to $831.5 million at December 31, 2013.
>
>                             * * *

---

[36] Verified Compl. ¶ 41, *TerraForm Global, Inc. v. SunEdison, Inc.,* No. 12159-VCL (Del. Ch. Apr. 3, 2016), dkt. #1. The TerraForm Global complaint is incorporated by reference.

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

* * *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Solar Energy credit facility, the TerraForm term loan and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

264.    On May 7, 2015, SunEdison filed its 10-Q for the first quarter of 2015 (the "1Q 2015 10-Q"), which was signed by Defendant Wuebbels. In the 1Q 2015 10-Q, SunEdison falsely and misleadingly misrepresented the strength of SunEdison's liquidity, stating:

*Liquidity*

Cash and cash equivalents, plus cash committed for construction projects, at March 31, 2015 totaled $919 million, compared to $987 million at December 31, 2014.

* * *

We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

* * *

We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015.

265.    On August 6, 2015, SunEdison filed its 2Q 2015 10-Q, which was signed by Defendant Wuebbels. In the 2Q 2015 10-Q, SunEdison falsely and misleadingly misrepresented SunEdison's liquidity, stating:

*Liquidity*

**Cash and cash equivalents, plus cash committed for construction projects, at June 30, 2015 totaled $1,998 million**, compared to $987 million at December 31, 2014.

\* \* \*

**We believe our liquidity will be sufficient to support our operations for the next twelve months**, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan.

\* \* \*

**We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases of our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015**. The Global IPO and related private placement transactions and our recently completed warehouse financing structures have also contributed to our capital resources.

266.     The foregoing statements by Defendants concerning SunEdison's liquidity and available cash were materially false and misleading because, at least by the first quarter of 2015, SunEdison was already suffering a liquidity crisis, exemplified by systemic and ongoing problems paying vendors for basic utilities and necessary services, including telephone and electricity bills and necessary payments to regulatory entities. SunEdison even failed to pay vendors whose services were irreplaceable and core to its growth model. When SunEdison did pay its bills, SunEdison did so by improperly shuffling around cash from dedicated project funds, further jeopardizing the success of those projects. During this time, Defendants Wuebbels and Chatila led weekly conference calls with SunEdison management, during which they discussed SunEdison's cash shortage and inability to pay key vendors.

267.     Moreover, SunEdison later admitted that its "cash forecasting and liquidity management" procedures suffered from material flaws, including that it "lacked sufficient

controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable." These fundamental flaws in SunEdison's controls rendered Defendants' statements that they "believe[d]" and "expect[ed]" cash on hand to be sufficient for SunEdison's growth plans, and Wuebbels' statement that he and other SunEdison executives were "comfortable" with SunEdison's liquidity position, misleading in light of the true underlying facts. Investors understood these statements to indicate that SunEdison and Wuebbels had undertaken the investigation necessary to support such a belief and that the facts supported such a belief. However, this was not the case.

### Misrepresentations About SunEdison's Available Cash on August 6, 2015

268.     On August 6, 2015, Defendants held a conference call with analysts and investors, during which Defendant Wuebbels made materially false and misleading statements about SunEdison's available cash and the adequacy of SunEdison's liquidity. Specifically, Defendant Wuebbels stated: "Of the $2 billion in cash at the end of the quarter, roughly $400 million was in TerraForm Power and $620 million related to TerraForm Global, leaving SunEdison, the development company, with ***greater than $1 billion of cash*** and ***sufficient liquidity to support the future growth*** of the platform." SunEdison's accompanying investor presentation made the same misrepresentation, claiming that SunEdison had "***Greater than $1 Billion of Cash at DevCo***" and "Sufficient Liquidity to Grow Platform." Defendant Wuebbels also stated, later in the call: "If you look at the capital and the liquidity that's in the business, as well as the dividend forbearance that the parent has done through 2016 on that, ***there's sufficient capital within the vehicle to be able to grow that business for the first 12 to 18 months*** at its 20% stated dividend rate."

269.    Defendants' statements about "$1 billion of cash" were materially false and misleading because, as discussed above at ¶¶174–180, those sums improperly included the $500 million Inaccessible Warehouse Facility, which SunEdison could not access because it lacked projects satisfying the requisite criteria. Without that $500 million warehouse facility, SunEdison's cash at DevCo was half what Defendants claimed in August 2015.

### Misrepresentations About SunEdison's Debts in the 2Q 2015 10-Q

270.    SunEdison also misled investors on August 6, 2015 by omitting material information concerning the Margin Loan and by failing to disclose the Goldman Sachs Loan.

271.    The 2Q 2015 10-Q stated the following about the Margin Loan:

The Margin Loan Agreement requires the subsidiary to maintain a loan to value ratio not to exceed 50% (based on the value of the Class A common stock of TerraForm ("TerraForm Class A Common Stock"), which certain of the collateral may be exchanged for). In the event that this ratio is not maintained, the subsidiary must post additional cash collateral under the Margin Loan Agreement and/or elect to repay a portion of the term loans thereunder. In addition, the Margin Loan Agreement requires the repayment of all or a portion of the term loans made thereunder upon the occurrence of certain events customary for financings of this nature, including other events relating to the price, liquidity or value of TerraForm Class A Common Stock, certain events or extraordinary transactions related to TerraForm and certain events related to SunEdison.

272.    However, Defendants knew and failed to disclose that SunEdison had already or would imminently face a significant margin call on the Margin Loan—not to mention that it had already sought additional financing to pay down the margin call and was in the process of negotiating the Goldman Sachs Loan, which SunEdison secretly finalized five days later on August 11, 2015 but did not disclose until November 2015. As discussed above at ¶¶67–70, 221–227, the "terms of the Margin Loan…were integral to SunEdison's liquidity position" because, if TERP's share price fell below certain thresholds, the entire Margin Loan would become

mandatorily prepayable—which ultimately happened in October 2015, "drain[ing] SunEdison's cash reserves and fundamentally chang[ing] its and the YieldCos' financial outlook."

273.     Instead of disclosing the imminent margin call or the onerous Goldman Sachs Loan—which would have revealed that SunEdison did not have enough liquidity for its immediate needs and certainly did not have $1.3 billion in accessible cash—Defendants made false assurances to investors about SunEdison's financing needs. Specifically, in response to an analyst's question about the capital raises SunEdison might need to maintain its growth rate, Defendant Wuebbels stated that SunEdison might continue to do "one-off construction financing," but "*as far as corporate financing, we don't see any additional financings* to be able to achieve this growth."

274.     Defendants also falsely and misleadingly classified over $700 million of SunEdison's debt. Specifically, when listing SunEdison's "LONG-TERM DEBT," the 2Q 2015 10-Q described the $410 million due in 2017 under the Margin Loan and $328 million in Exchangeable notes due in 2020 as "Non-recourse to SunEdison." Similarly, in the August 6, 2015 investor presentation accompanying the conference call, Defendants listed both the $410 million and the $328 million liabilities as "Non-Recourse Obligations." These statements were false and misleading because, as SunEdison later admitted on November 9, 2015, the Margin Loan and the Exchangeable Notes were actually recourse debt—meaning that lenders could recover these loans, over $700 million, directly from SunEdison. Had SunEdison properly categorized this debt, it would have increased the amount of debt applicable to its credit facility covenants in the second quarter by 131%.

**August 18, 2015 Preferred Offering**

275.     On August 17, 2015, SunEdison announced that it intended to conduct an offering

of 500,000 shares of convertible preferred securities to raise funds "for general corporate

purposes," including "funding working capital and growth initiatives" (the "Preferred Offering").

On August 18, SunEdison filed the Offering Documents.

276.     The Offering Documents incorporated by reference SunEdison's 2014 10-K, 1Q

2015 10-Q, and 2Q 2015 10-Q, including all of the materially false and misleading statements

and omissions therein alleged above.

277.     The Offering Documents also misled investors by failing to disclose the highly

material Goldman Sachs Loan—which had closed seven days before the Preferred Offering—

even while purporting to disclose material "Recent Events." For example, the Offering

Documents stated:

> Certain of the underwriters and their respective affiliates have provided, from
> time to time in the past, and may in the future provide, investment banking,
> financial and other services to us. They receive customary fees and commissions
> for these services. The underwriters and their respective affiliates are full service
> financial institutions engaged in various activities, which may include sales and
> trading, commercial and investment banking, advisory, investment management,
> investment research, principal investment, hedging, market making, brokerage,
> tax equity financing and other financial and non-financial activities and services.
> Certain of the underwriters and their affiliates have provided, and may in the
> future provide, a variety of these services to us and to persons and entities with
> relationships with us, for which they received or will receive customary fees and
> expenses.
>
> In addition, certain of the underwriters or their respective affiliates are parties to
> the bridge financing commitments entered into in connection with the First Wind
> Acquisition and lenders under the $410 million margin loan secured by a portion
> of our equity stake in TerraForm that we incurred on January 29, 2015. Also,
> certain of the underwriters or their respective affiliates are parties to the senior
> secured letter of credit facility with us in an aggregate principal amount up to
> $750 million as of July 31, 2015. We have also entered into a commitment letter

with Goldman Sachs Bank USA for a $500 million secured term loan facility, and TerraForm Operating has entered into a debt commitment letter with Goldman Sachs Bank USA for a $960 million unsecured bridge facility pursuant to which certain of the underwriters or their affiliates will be lenders. The funding of the term facility and bridge facility is subject to the negotiation of definitive documentation and other customary closing conditions. We have also entered into a $150 million four-year term loan with Deutsche Bank in connection with our joint venture with Dominion for Four Brothers. In addition, certain investment funds managed by Goldman, Sachs & Co. (collectively, the "GS Funds") have entered into agreements with us to form a new warehouse for the construction and acquisition of utility-scale solar and wind projects (the "Warehouse"). Subject to certain conditions, the GS Funds have agreed to contribute up to $300 million of equity to the Warehouse, and a syndicate of banks, including certain of the underwriters or their respective affiliates, have agreed to provide debt financing to the Warehouse of up to $700 million in senior secured credit facilities.

Additionally, investment funds managed by an affiliate of MCS Capital Markets, LLC, are existing equity holders in our common stock and in our 0.25% Convertible Notes due 2020.

278.    Defendants' disclosure of these lending agreements was materially false and misleading. While listing numerous lending agreements, including at least two with Goldman Sachs (one of which SunEdison had entered into only the day before), Defendants failed to disclose the onerous terms or even the existence of the Goldman Sachs Loan, which SUNE had entered into on August 11, 2015—even though Goldman Sachs was one of the lead underwriters of the Preferred Stock Offering and earned over $5 million in fees, creating a significant conflict of interest.

279.    The Offering Documents were also materially false and misleading because they failed to disclose that SunEdison had likely breached the debt covenants under the Margin Loan, triggering the margin call on August 7, 2015, requiring SunEdison to post at least $159 million in cash collateral on the Margin Loan.

280.     The Offering Documents also included materially false and misleading statements about SunEdison's intentions for how to allocate the proceeds of the August 2015 Preferred Offering. Under the heading "USE OF PROCEEDS," SunEdison stated in the Offering Documents that:

> We estimate that the proceeds from this offering, after deducting the underwriters' discounts and commissions and estimated offering expenses payable by us, will total approximately $626.1 million. *We expect to use the net proceeds of this offering for general corporate purposes*, which we expect to include funding working capital and growth initiatives. At this time, *we have not specifically identified a large single use for which we intend to use the net proceeds*, and, accordingly, we are not able to allocate the net proceeds among any potential uses in light of the variety of factors that will impact how such net proceeds will ultimately be utilized by us. As a result, our management will retain broad discretion over the use of the net proceeds from this offering.

281.     This explanation for how SunEdison would use the net proceeds of the August 2015 Preferred Offering was materially false and misleading because SunEdison was planning to use the proceeds of the August 2015 Preferred Offering to meet existing liabilities and immediate needs arising out of its ongoing liquidity crisis—not simply to preserve its flexibility to take advantage of future opportunities as they arose, as portrayed to investors.

### Defendant Chatila's September 2, 2015 Statements To The Press

282.     On September 2, 2015, in a *Bloomberg* article titled "*SunEdison CEO Promises Cash Flows to Calm Investors by 2016*," Defendant Chatila made materially false and misleading statements concerning SunEdison's cash. Specifically, *Bloomberg* reported that Defendant Chatila had sought to reassure investors by stating that "The cash is coming." It quoting him as saying: "The most important question for investors is *when do we start generating cash* for a living. I have said it's at the end of 2016 or early 2017. But we've been signaling it's going to be a lot sooner than that, *probably early 2016 or late 2015*."

283.    These statements were materially false and misleading. As the *Wall Street Journal* reported on April 14, 2016: "Days earlier, an internal presentation to SunEdison's board showed **the company wouldn't have positive cash flow until at least the second quarter of 2016**"—and so, in response to Chatila's September 2, 2015 statements, "Senior [SunEdison] executives read the *Bloomberg* story agape."[37] According to a lawsuit filed by Paul J. Gaynor, formerly the CEO of First Wind and then Executive Vice President of SunEdison, the "internal presentation to SunEdison's board" was in fact *presented by Defendant Chatila himself*. Thus, "Mr. Chatila's public prediction in the Bloomberg interview that SUNE would generate positive cash flow directly contradicted his private assessment to the SUNE Board of Directors less than a week earlier."[38] This is further corroborated in the Domenech Complaint and Perez Complaint, which allege that Defendants Chatila and Wuebbels reported at a meeting of the SunEdison Board on August 27, 2015 that SunEdison would have a cash-burn rate of $425 million in the fourth quarter of 2015 and $32 million in the first quarter of 2016.[39]

## October 7, 2015 Conference Call And Business Update

284.    On October 5, 2015—the same day that Domenech informed Chatila that SunEdison only had approximately $342 million unrestricted cash—SunEdison issued a press release titled "SunEdison Announces Global Initiative To Optimally Position The Company For

---

[37] Liz Hoffman, *Inside the Fall of SunEdison, Once a Darling of the Clean-Energy World*, Wall St. J., Apr. 14, 2016, http://www.wsj.com/articles/inside-the-fall-of-sunedison-once-a-darling-of-the-clean-energy-world-1460656000.

[38] Compl. ¶ 9, *Gaynor v. Chatila & Wuebbels*, No. 3:16-cv-06305-WHO (N.D. Cal. Nov. 1, 2015).

[39] Domenech Complaint ¶ 52; Perez Complaint ¶ 53.

Long Term Profitable Growth," and announced a new restructuring effort "to optimize business operations" and "accelerate cash flow positive operations."

285.    Defendants Chatila and Wuebbels held a conference call with investors on October 7, 2015 to discuss SunEdison's new plan. During that call, Defendant Wuebbels misstated SunEdison's available cash. Specifically, Defendant Wuebbels stated: "Excluding the cash from TerraForm and Global, *the cash available at the standalone DevCo, was standing at approximately $1.4 billion at the end of the quarter*, up from $900 million at the end of the second quarter." Similarly, Defendants also misstated SunEdison's available cash in SunEdison's October 7, 2015 Business Update, which stated that SUNE had over $1.3 billion in available cash at the end of the third quarter.

286.    These statements were materially false and misleading because, as discussed above at ¶¶174–180, those sums improperly included the $500 million Inaccessible Warehouse Facility, which SunEdison could not access because it lacked projects satisfying the requisite criteria. Thus, SunEdison's ending cash was at most $800 million. And as discussed above, on October 5, 2015, Domenech informed Defendant Chatila that the Working Group's investigation demonstrated that SunEdison had $342 million in available cash, far less than the $1.4 billion that Wuebbels represented and far from "robust" or "strong."

287.    During the October 7, 2015 conference call, Defendant Chatila made further materially false and misleading statements about SunEdison's liquidity. Specifically, Defendant Chatila stated: that "the Company remains *well capitalized with adequate liquidity* and the new optimized economic engine positions us with *cash-generating ability that exceeds the liabilities of the business*, including acquisitions and converts."

288.    This statement was materially false and misleading because, as discussed above at ¶¶80–106, SunEdison was not well capitalized and did not have adequate liquidity.

289.    This statement was also false and misleading because Defendants failed to disclose that $439 million under the Margin Loan had become mandatorily prepayable by that date. As SunEdison admitted in the Bankruptcy Proceeding on April 21, 2016, all of the covenants under the Margin Loan were tripped in September, causing the Margin Loan to become mandatory prepayable in October. Because the terms for the mandatory prepayment were based on TERP's stock price—which closed at $14.16 per share on September 29, 2015 and then at $17.88 on October 6, 2015, but never again in October fell below $17.64 (on October 27, 2015)—the terms for the mandatory prepayment must have taken place before the October 7 conference call. And as SunEdison admitted in the Bankruptcy Proceeding on April 21, 2016, when the Margin Loan became "mandatorily prepayable," this "fundamentally altered" SunEdison's financial outlook—unbeknownst to investors.

290.    Although Defendants disclosed the $152 million margin call during the October 7, 2015 conference call, Defendant Wuebbels falsely reassured investors that there would not be a further margin call forthcoming because "we did complete an amendment with the existing bank group on the loan to adjust the triggers to a point that is significantly below the current market price." But as investors learned on November 10, 2015, SunEdison had suffered (at least) one other margin call of $91 million by that time. Thus, either SunEdison did not "adjust the triggers to a point that is significantly below the current market price [of TERP stock]" or it had already suffered the second margin call and failed to disclose that fact on the October 7, 2015 call.

291.    During the October 7, 2015 conference call, Defendant Chatila also made materially false and misleading statements concerning the LAP deal. In response to an analyst's

question concerning an October 6, 2015 *WSJ* article disclosing that SunEdison had failed to make a $400 million upfront cash payment necessary to close the deal and suggesting that failure caused the deal to fall through, Defendant Chatila rejected the claim and stated: "we're really disappointed with the result. We're still committed to Latin America. … The seller there did not satisfy the condition's precedent, the closing of the share purchase agreement. So instead of trying to fix it, remedying it, we're saying that the agreement is terminated." This statement was false and misleading because the deal fell through because SunEdison failed to make *even a single payment* to LAP, including the initial closing payment—not because LAP failed to satisfy the condition precedent.

292.   In response to Defendants' materially false and misleading statements and omissions concerning SunEdison's liquidity position and available cash and the purported reasons for the termination of the LAP acquisition, analysts touted SunEdison's growth rate and SunEdison's ability to generate cash. For example, in a report dated October 8, 2015, Macquarie Research responded to SunEdison's reassurances about its liquidity when it wrote that: "With US$1.4bn on the balance sheet, a 23% reduction to opex/watt guidance, and the promise of significantly clearer financial reporting coming soon, *we are optimistic that market sentiment towards SUNE should improve considerably*."

293.   SunEdison's stock price shot up following the conference call, from a close of $8.69 on October 6, 2015, to close at $9.72 on October 7, 2015—an increase of over 11%.

**3Q 2015 10-Q**

294.   In SunEdison's 3Q 2015 10-Q and in the conference call with analysts the next day, Defendants continued to falsely and misleadingly misrepresent the strength of SunEdison's liquidity position.

295.    Indeed, in the 3Q 2015 10-Q, SunEdison stated:

As of September 30, 2015, on a consolidated basis, SunEdison had **_$2.4 billion of cash and cash equivalents_** of which $1.1 billion was held by GLBL, $636 million was held by TERP and $207 million was held by foreign subsidiaries not part of TERP and GLBL. **_As of September 30, 2015, SunEdison had access to $1.3 billion in cash and cash equivalents, including cash committed for construction projects_**.

* * *

As of September 30, 2015, we had **_positive working capital of $655 million_**, compared to a working capital deficit of $356 million as of December 31, 2014. Our working capital is impacted by short-term borrowings and trade accounts payable used to construct renewable energy systems as well as the current portion of our long-term debt. For renewable energy systems that we intend to retain on our balance sheet, we intend to refinance these short-term construction borrowings with permanent capital, generally when these systems achieve commercial operations, which may include issuing long-term, non-recourse debt. Our working capital can also fluctuate significantly from period to period as a result of the timing of cash inflows and outflows associated with our development and construction activities.

While we continue to incur significant indebtedness to fund our operations and acquisitions and have significant pending obligations, **_we believe that the sources of liquidity described below will be sufficient to support our operations for the next twelve months_**, although various factors could affect our liquidity position, including changes in the anticipated timing and terms of pending and completed acquisitions and the availability of project capital. Accordingly, no assurances can be made that we will not require additional sources of liquidity to execute our business plan. Management continues to regularly monitor our ability to finance the needs of operating, financing and investing activities within the dictates of prudent balance sheet management as our long-term growth will require additional capital. Our ability to meet our debt service obligations and other capital requirements, including capital expenditures and acquisitions, will depend on various factors, including our future operating performance which, in turn, will be subject to general economic, financial, business, competitive, legislative, regulatory and other conditions, many of which are beyond our control.

296.    Defendants reiterated elsewhere in the 3Q 2015 10-Q that: "Total liquidity as of

September 30, 2015 was approximately $1.3 billion, comprised of cash and cash equivalents"

and that "The Renewable Energy Development segment's liquidity as of September 30, 2015 was $1.3 billion, comprised of cash and cash equivalents and cash committed for construction projects." Similarly, during SunEdison's November 10, 2015 conference call, Defendant Wuebbels stated: "we have sufficient liquidity … with approximately *$1.4 billion* as of the end of the quarter." Likewise, the investor presentation accompanying the conference call dated November 10, 2015 falsely stated that SunEdison had "$1.4 billion Cash at parent."

297.    These statements were materially false and misleading because, as discussed above in ¶¶174–180, this figure improperly included the $500 million Inaccessible Warehouse Facility, which SunEdison could not access because it lacked projects satisfying the requisite criteria. Indeed, an internal non-public report circulated within SunEdison that same day showed that SunEdison had only $90 million in available cash.[40] Moreover, according to the Domenech Complaint and Perez Complaint, as of September 30, 2015, SunEdison had only $497 million in available cash, far less than the $1.4 billion publicly reported.[41]

298.    Indeed, by this time: (i) SunEdison had triggered a margin call payment of $152 million on the Margin Loan, which it could not afford to pay; (ii) as a result of the payments under the Margin Loan, SunEdison's cash reserves were "drained" and its financial outlook was "fundamentally changed"—as SunEdison admitted on April 21, 2016 in the Bankruptcy Proceeding; (iii) to pay off the margin call, SunEdison had to borrow $169 million from Goldman Sachs at 15% interest, showing that SunEdison was a "distressed company" with "emergency cash needs"; and (iv) as discussed above at ¶283, SunEdison's August 2015 internal

---

[40] Liz Hoffman, *Inside the Fall of SunEdison, Once a Darling of the Clean-Energy World*, Wall St. J., Apr. 14, 2016, http://www.wsj.com/articles/inside-the-fall-of-sunedison-once-a-darling-of-the-clean-energy-world-1460656000.

[41] Domenech Complaint ¶ 80; Perez Complaint ¶ 79.

report indicated that SunEdison would not have positive cash flow until at least the second

quarter of 2016.

299.    In the 3Q 2015 10-Q, Defendants finally disclosed the Goldman Sachs Loan,

stating:

> On August 11, 2015, we entered into a Second Lien Credit Agreement ("Second
> Lien Term Loan") with Goldman Sachs Bank USA ("Goldman Sachs"),
> providing for a term loan maturing on August 11, 2016, in an aggregate principal
> amount of $169 million. As of September 30, 2015, the current interest rate on the
> Term Loan is 9.25% … We paid fees of $9 million upon entry into the Second
> Lien Term Loan which were recognized as deferred financing costs.

300.    However, the disclosure of the Goldman Sachs Loan was materially false and

misleading because Defendants failed to disclose that SunEdison had entered into the Goldman

Sachs Loan to pay down a margin call on the Margin Loan, because it lacked other sources of

liquidity.

301.    In the 3Q 2015 10-Q, Defendants also made materially false and misleading

statements concerning the failed LAP deal, stating:

> On October 1, 2015, Holdings received a notice from the sellers purporting to
> terminate the Share Purchase Agreement. Following receipt of such notice,
> Holdings exercised its right under the Share Purchase Agreement to terminate the
> agreement based on the failure by the sellers to satisfy certain conditions
> precedent to closing and the transaction not closing prior to September 30, 2015.
> As a result of such termination, Holdings will not acquire the Peru projects.
>
> On November 6, 2015, Holdings received a request for arbitration naming
> SunEdison, Holdings and TERP as respondents. In the request for arbitration, the
> claimants request, among other things, damages in an amount not less than $150
> million. SunEdison and TERP believe their positions are well-founded and intend
> to defend themselves vigorously. However, SunEdison and TERP are in the
> preliminary stages of reviewing the request for arbitration and, as a result, are
> unable to provide reasonable estimates as to any potential liability.

302.    These statements concerning the LAP deal were false and misleading because the

deal fell through because SunEdison failed to make *even a single payment* to LAP, including the

initial closing payment—not because LAP failed to satisfy the condition precedent.

### November 18, 2015 Deutsche Bank Investor Meeting

303.    On November 18, 2015, Defendants took part in an investor meeting with

Deutsche Bank, where they faced numerous questions about issues that were raising doubts

among investors about management's credibility and SunEdison's liquidity. In response,

Defendants continued to misrepresent SUNE's liquidity and available cash.

304.    In response to the question "How much cash does the company really have?"

Defendants told Deutsche Bank that:

> SUNE has roughly *$1.35b* of cash with about $700m of that cash held in project
> companies earmarked for working capital purposes. Timing of cash movements
> and the fact that SUNE gets EPC margin from these projects means that *the cash
> can be utilized for other capital needs*.

305.    This statement was materially false and misleading because SunEdison did not

have $1.3 billion of cash that "can be utilized for other capital needs." As discussed above in

¶¶174–180, this figure improperly included the $500 million Inaccessible Warehouse Facility,

which SunEdison could not access because it lacked projects satisfying the requisite criteria. And

as discussed above in ¶¶222–226, SunEdison had and its subsidiaries had only $74 million in

available cash as of November 18, 2015 and was in fact already considering bankruptcy.

306.    Investors were also concerned about the recently-disclosed Goldman Sachs Loan,

particularly about why SunEdison took out a loan at such a high interest rate. Defendants

responded: "The Goldman loan was structured in July as *part of the portfolio formation for*

**GLBL IPO**. The company entered into the loan in August as part of the initial agreement in order to fund the construction of some of the international projects."

307.     This was false and misleading because, as discussed above in ¶¶181–186, SUNE had really taken out the Goldman Sachs Loan because its liquidity position was so poor that it had no other way to satisfy a margin call on the Margin Loan.

308.     Investors were also concerned about the sudden reclassification of over $700 million of SunEdison's debt from non-recourse to recourse. Defendants responded: "For the $410m margin loan, SUNE had to post cash collateral in Q3 due to the sharp decline in TERP shares. Because of this cash trigger SunEdison had to reclassify the loan from non-recourse to recourse. The **interest payment on $337m exchangeable notes was always SUNE's obligation** and the classification as nonrecourse in prior quarter was due to **clerical error**."

309.     This statement was false and misleading because, given that SunEdison was always responsible for the Margin Loan if TERP stock declined in value, it should always have been classified as recourse. Moreover, SUNE had repeatedly mischaracterized the Exchangeable Notes as non-recourse in multiple fora, which cannot plausibly be explained away as a mere one-time "clerical error."

<u>**November 23 and 24, 2015 Announcements**</u>

310.     In a series of press releases and SEC filings on November 23 and 24, 2015, Defendants misled investors concerning the corporate reorganization of the YieldCos and the acquisition of the India Projects.

311.     In two separate Forms 8-K dated November 23 and 24, 2015, SunEdison announced that it had prepaid all but $5 million of the Margin Loan. In the Form 8-K dated November 23, 2015, Defendants stated that: "approximately $307 million … was prepaid by

[SunEdison] under the Margin Loan Agreement, which included payment of the principal and accrued but unpaid interest." In the Form 8-K dated November 24, 2015, Defendants stated that in connection with a payment of $95 million made on November 20, 2015, "[A]pproximately $5 million of principal amount remain outstanding under the Margin Loan Agreement, which is cash collateralized."

312.     In a Form 8-K dated November 23, 2015 and an attached press release, SunEdison announced the reconstitution of the YieldCo boards, the removal of the YieldCos' officers, and the appointment of Defendant Wuebbels as CEO of the YieldCos. In the press release announcing the change, titled "SunEdison Announces Changes to Drive Organizational Alignment and Effectiveness," SunEdison claimed that the management changes were implemented to "*improve the alignment and effectiveness of its operating structure*" and "drive operational efficiency."

313.     These statements were materially false and misleading because Defendants omitted the true reason for the corporate reorganization: because Global had refused to give SunEdison the $100 million it so desperately needed by November 20, 2015, so SunEdison, teetering on the brink of default, used its power over the YieldCos to shuffle its affiliates' boards and Conflict Committees in order to loot Global of its cash in order pay down the Margin Loan.

314.     Analysts credited Defendants' false and misleading statements. In a November 24, 2015 report, J.P. Morgan stated that SunEdison's paying down the Margin Loan was "a positive for both SUNE and TERP, removing some of the technical trading that has weighed on both stocks." Likewise, in a November 24, 2015 report, Deutsche Bank stated that the Margin Loan pay down was "a positive for SUNE and TERP shareholders as it removes the margin loan overhang, which had caused technical pressure over the last several months."

**False and Misleading Statements about Internal Controls**

315.    Defendants also made a number of false and misleading statements about SunEdison's internal controls over financial reporting throughout the Class Period.

316.    The 2014 10-K stated the following about SunEdison's internal controls:

## CONTROLS AND PROCEDURES

### Evaluation of Disclosure Controls and Procedures

We carried out an evaluation as of December 31, 2014, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended. ***Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of December 31, 2014***.

### Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Securities Exchange Act of 1934. ***Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles***.

As of December 31, 2014, management conducted an assessment of the effectiveness of our internal control over financial reporting based upon the framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in *Internal Control—Integrated Framework (2013)*. ***Based on management's assessment utilizing these criteria, our management concluded that, as of December 31, 2014, our internal control over financial reporting was effective***.

During the year ended December 31, 2014, the Company completed the acquisitions of Silver Ridge Power, LLC and subsidiaries and Capital Dynamics U.S. Solar Energy Fund, L.P. and subsidiaries, whose financial statements constitute $1,280.9 million of total assets and $56.3 million of net sales of the consolidated financial statement amounts as of and for the year ended December 31, 2014. In accordance with SEC regulations, management has elected to

exclude these acquisitions from its 2014 assessment of and report on internal control over financial reporting.

Our independent registered public accounting firm, KPMG, LLP who audited the consolidated financial statements included in this annual report has audited the effectiveness of our internal controls over financial reporting, as stated in its report, which appears in its Report of Independent Registered Public Accounting Firm, above and is incorporated herein by this reference.

### Changes in Internal Control over Financial Reporting

***There have been no changes in SunEdison's internal control over financial reporting during the quarter or year ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting***.

317.    In addition to signing the 2014 10-K, Defendants Chatila and Wuebbels also each

certified the 2014 10-K under the Sarbanes-Oxley Act of 2004 ("SOX", and "SOX

Certifications"). Each SOX Certification provided in relevant part:

The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information***[.]

318.    On May 7, 2015, SunEdison filed its 1Q 2015 10-Q, signed by Defendant

Wuebbels, which provided in relevant part:

There have been no changes in SunEdison's internal control over financial reporting during the quarter ended March 31, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting.

319.    SunEdison thus represented that its internal controls continued to be adequate.

320.    Defendant Wuebbels and Chatila each also certified the 1Q 2015 10-Q through

SOX Certifications whose text was identical to those they had signed certifying the 2014 10-K.

321.    On August 6, 2015, SunEdison filed its 2Q 2015 10-Q, signed by Defendant Wuebbels, which provided in relevant part:

> There have been no changes in SunEdison's internal control over financial reporting during the quarter ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting.

322.    SunEdison thus represented that its internal controls continued to be adequate.

323.    Defendant Wuebbels and Chatila each also certified the 2Q 2015 10-Q through SOX Certifications whose text was identical to those they had signed certifying the 2014 10-K.

324.    On November 9, 2015, SunEdison filed its 3Q 2015 10-Q, signed by Defendant Wuebbels, which provided in relevant part:

> There have been no changes in SunEdison's internal control over financial reporting during the quarter ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting.

325.    SunEdison thus represented that its internal controls continued to be adequate.

326.    Defendant Wuebbels and Chatila each also certified the 3Q 2015 10-Q through SOX Certifications whose text was identical to those they had signed certifying the 2014 10-K.

327.    The statements set out above concerning SunEdison's internal controls were false and misleading because SunEdison did have significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting, including in that SunEdison (i) did not have coordinated accounting systems, but rather relied on its individual subsidiaries' disparate accounting systems, resulting in pervasive discrepancies between its subsidiaries' financial records and pervasive errors in its records as they related to its vendors and creditors; (ii) consolidated its financial systems using Excel with no use controls, allowing personnel to anonymously alter project economics; (iii) manipulated entries on its financial statements to

make its financial position and results appear better than they truly were, including by overstating its cash resources; (iv) paid some vendors twice because delays so infuriated the vendors that the YieldCos paid the vendors' bills, even though procedures called for SunEdison to pay them; and (v) allowed employees to misuse corporate cash for personal reasons without adequately recording the expenditures on its financial statements. Further, Wuebbels and Chatila did not disclose these significant deficiencies and material weaknesses to SunEdison's auditors and audit committee, in that, as SunEdison later admitted, "the Company lacked sufficient controls and processes regarding the Company's managing of cash flows, including extensions of accounts payable and the use of cash committed for projects, and related disclosures to the Board were not comprehensive or made on a timely basis."

### Item 303 Omissions

328.    SunEdison's 2014 10-K, 1Q 2015 10-Q, 2Q 2015 10-Q, Offering Documents, and 3Q 2015 10-K were also false and misleading because they failed to disclose the information required by Item 303 of Regulation S-K [17 C.F.R. §229.303].

329.    Under item 303(a), every registration statement or Form 10-K must make certain disclosures concerning liquidity, capital resources, and results of operations. The SEC's instructions to item 303(a) explain that "the purpose of the discussion and analysis shall be to provide to investors and other users information relevant to an assessment of the financial condition and results of operations of the *registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources*."

330.    As to liquidity, issuers must:

Identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way. *If a material*

*deficiency is identified, indicate the course of action that the registrant has taken or proposes to take to remedy the deficiency. Also identify and separately describe internal and external sources of liquidity*, and briefly discuss any material unused sources of liquid assets.

331.    The SEC's instructions to item 303(a) further define "liquidity" as follows:

The term 'liquidity' as used in this Item refers to *the ability of an enterprise to generate adequate amounts of cash to meet the enterprise's needs for cash*. Except where it is otherwise clear from the discussion, the registrant shall indicate those balance sheet conditions or income or cash flow items which the registrant believes may be indicators of its liquidity condition. *Liquidity generally shall be discussed on both a long-term and short-term basis*.

332.    The SEC has elaborated on the disclosure duties arising out of a material deficiency:

Where a material deficiency in short or long-term liquidity has been identified, *the registrant should disclose the deficiency, as well as disclosing either its proposed remedy, that it has not decided on a remedy, or that it is currently unable to address the deficiency*.

*Management's Discussion and Analysis of Financial Condition and Results of Operations*, Exchange Act Release No. 34-26831, 54 Fed. Reg. 22427 (May 24, 1989) (the "1989 Guidance").

333.    As to capital resources, issuers must disclose "material commitments for capital expenditures," "the general purpose of such commitments and the anticipated source of funds needed to fulfill such commitments," and "any known material trends, favorable or unfavorable, in the registrant's capital resources."

334.    As to results of operations, issuers must disclose "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations" as well as "any known trends or uncertainties that

have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

335.    For the reasons set forth throughout this complaint, *inter alia*, SunEdison's 2014 10-K, 1Q 2015 10-Q, 2Q 2015 10-Q, Offering Documents, and 3Q 2015 10-K materially misled investors by misstating or omitting "information relevant to an assessment of the financial condition and results of operations of the registrant as determined by evaluating the amounts and certainty of cash flows from operations and from outside sources;" by failing to "[i]dentify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way;" by materially misstating or omitting "internal and external sources of liquidity" and SunEdison's true liabilities and liquidity risks.

336.    Specifically, SunEdison had a persistent but worsening liquidity deficiency. In order to address its persistent liquidity deficiencies, SunEdison had adopted a strategy of deliberately delaying payments to its vendors. The funds retained while vendor invoices consisted an important source of liquidity. Accordingly, SunEdison's deliberate and systematic delays in paying vendors were required to be disclosed as a source of liquidity in SunEdison's 10-K.

337.    Indeed, the SEC contemplates just such disclosure. In the example of necessary disclosure the SEC provides in the 1989 Guidance, the company discloses:

> The Company frequently has not been able to make timely payments to its trade and other creditors. As of year-end and as of February 29, 1988, the Company had past due payables in the amount of $525,000 and $705,000, respectively. Deferred payment terms have been negotiated with most of these vendors. However, certain vendors have suspended parts deliveries to the Company. As a result, the Company was not always able to make all shipments on time, although no orders have been cancelled to date. Were significant volumes of orders to be cancelled,

> the Company's ability to continue to operate would be jeopardized. The Company
> is currently seeking sources of working capital financing sufficient to fund
> delinquent balances and meet ongoing trade obligations.

*Id.*

338.    Moreover, just before the end of each quarterly reporting period, SunEdison went

out of its way to get as much cash on the balance sheet as possible so that it could report a large

amount of cash "as of" the last day of that reporting period. For example, it would offer its

customers discounts if they paid on or before the last day of a given quarter, and it would even

offer to pay lenders a higher interest rate if they were willing to accept payments shortly after the

last day of a given quarter. Much of that cash would be gone within a few days, such that

SunEdison's balance sheet might look very different on March 30 as opposed to April 2.

Accordingly, SunEdison's financial statements, by design, did not accurately reflect its financial

position during the quarter—only its financial position on the last day of the quarter. This course

of action was therefore required to be disclosed under Item 303.

### Defendants Were Aware that Vivint Investors Were Relying On Their Statements

339.    Throughout the Class Period, Defendants directed their statements to Vivint

investors.

340.    To announce the Vivint Acquisition, SunEdison issued a joint press release, and

held a joint call with Vivint at which each discussed their financial position and results.

SunEdison and Vivint issued two additional press releases. Moreover, during the pendency of the

Vivint Acquisition, Vivint ceased its practice of holding earnings conference calls.

341.    SunEdison filed no fewer than eight additional prospectuses and communications

in Vivint's SEC file, including a Rule 425 Communication on December 9, 2017 and Forms 8-K

on July 22, 2017; July 22, 2017; July 24, 2017; July 27, 2017; August 7, 2017; December 9,

2017; and December 14, 2017.

342.    Moreover, because Vivint investors were to receive SunEdison shares and notes

as part of the Vivint Acquisition, Vivint common stock purchasers were potential acquirors of

SunEdison shares.

## CLASS ACTION ALLEGATIONS

343.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or

otherwise acquired Vivint securities during the Class Period (the "Class"); and were damaged

thereby. Excluded from the Class are Defendants herein, SunEdison, the officers and directors of

SunEdison at all relevant times, and members of such excluded persons' immediate families and

their legal representatives, heirs, successors or assigns and any entity in which defendants have

or had a controlling interest.

344.    The members of the Class are so numerous that joinder of all members is

impracticable. Throughout the Class Period, Vivint securities were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiffs at this time and can be

ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or

thousands of members in the proposed Class. Record owners and other members of the Class

may be identified through appropriate discovery or identified from records maintained by Vivint

or its transfer agent and may be notified of the pendency of this action by mail, using the form of

notice similar to that customarily used in securities class actions.

345.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

346.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

347.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of SunEdison;

(c)     whether the Defendants caused SunEdison to issue false and misleading financial statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e)      whether the prices of Vivint's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

348.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

349.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     As a regulated issuer, Vivint filed periodic public reports with the SEC. Vivint met the requirements for listing, and was actively traded on the NYSE, under ticker VSLR;

(b)     On average, 3.3 million shares of Vivint stock were traded on a weekly basis during the Class Period. During the Class Period, there were approximately 24 million free-trading shares which were not owned by insiders. Thus, about 13.8% of all Vivint shares that were not owned by insiders traded every week, permitting a very strong presumption of efficiency;

(c)     Vivint regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(d)      Vivint was followed by at least 7 analysts, including analysts employed by Credit Suisse, Deutsche Bank, and JP Morgan, who issue reports rapidly disseminating new information about Vivint;

(e)      New company-specific information was rapidly reflected in Vivint's stock price; and

(f)      Vivint had a designated market maker, which created a broad and liquid market in its stock.

350.      Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

351.      Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## FIRST CAUSE OF ACTION

### <u>Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5<br>Against All Defendants</u>

352.      Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

353.      This cause of action is asserted against all Defendants.

354.      During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to, and throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs

and other members of the Class to purchase Vivint securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, individually and as a group, took the actions set forth herein.

355.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information as specified herein.

356.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of SunEdison's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about SunEdison and its business operations and financial condition in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers Vivint securities during the Class Period.

357.    The Individual Defendants' primary liability, and controlling persons liability, arise from the following: (a) Individual Defendants were each high-level executives and director, of SunEdison during the Class Period and members of SunEdison's management team or had control thereof; (b) by virtue of their responsibilities and activities as a senior officer and/or director of SunEdison, were privy to and participated in the creation, development and reporting of SunEdison's plans, projections and/or reports; (c) Individual Defendants enjoyed significant personal contact and familiarity with the other members of SunEdison's management team,

internal reports and other data and information about SunEdison's operations, and (d) Individual

Defendants were aware of SunEdison's dissemination of information to the investing public

which they knew or recklessly disregarded was materially false and misleading.

358.    Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such

Defendants' material misrepresentations and/or omissions were done knowingly or recklessly

and for the purpose and effect of concealing SunEdison's financial condition from the investing

public and supporting the artificially inflated or distorted price of Vivint's securities. As

demonstrated by Defendants' false and misleading statements during the Class Period,

Defendants, if they did not have actual knowledge of the misrepresentations and omissions

alleged, were reckless in failing to obtain such knowledge by failing to take steps necessary to

discover whether those statements were false or misleading.

359.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the market price for Vivint securities

was artificially inflated during the Class Period.

360.    In ignorance of the fact that market prices of Vivint's publicly-traded securities

were artificially inflated or distorted, and relying directly or indirectly on the false and

misleading statements made by Defendants, or upon the integrity of the market in which the

Vivint's securities trade, and/or on the absence of material adverse information that was known

to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants

during the Class Period, Plaintiffs and the other members of the Class acquired Vivint's

securities during the Class Period at artificially high or distorted prices and were damaged thereby.

361.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding SunEdison's financial results and condition, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired Vivint securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices prices at which they did.

362.    By virtue of the foregoing, the Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

363.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of Vivint's securities during the Class Period.

364.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## SECOND CAUSE OF ACTION

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

365.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

366.    This second cause of action is asserted against all Defendants.

367.    The Defendants acted as controlling persons of SunEdison within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of SunEdison's operations and/or intimate knowledge of aspects of SunEdison's dissemination of information to the investing public, the Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of SunEdison, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. Defendants were provided with or had unlimited access to copies of SunEdison's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

368.    In particular, Defendants had direct and supervisory involvement in the day-to-day operations of SunEdison and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

369.    As set forth above, SunEdison and Defendants violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.

370.    By virtue of their positions as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act as they culpably participated in the fraud alleged herein. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Vivint's securities during the Class Period.

371.    This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, designating Plaintiffs as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Awarding such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: March 31, 2017                         Respectfully submitted,

                                              **POMERANTZ LLP**

                                              */s/ Murielle J. Steven Walsh*
                                              Jeremy A. Lieberman
                                              Murielle J. Steven Walsh
                                              Aatif Iqbal
                                              600 Third Avenue, 20th Floor

New York, New York 10016
Telephone:      (212) 661-1100
Facsimile:      (212) 661-8665
Email: jalieberman@pomlaw.com
mjsteven@pomlaw.com
aiqbal@pomlaw.com

Laurence M. Rosen
Jonathan Horne
THE ROSEN LAW FIRM, P.A.
275 Madison Avenue, 34th Floor
New York,, NY 10016
Phone: 212-686-1060
Email: lrosen@rosenlegal.com
jhorne@rosenlegal.com

***Attorneys for Plaintiffs, Don Harris, Kyle
Tervort, and Darcy Church***

**BRONSTEIN, GEWIRTZ & GROSSMAN**
Peretz Bronstein, Esq.
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

***Additional Counsel for Plaintiff***