**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE SUNEDISON, INC. SECURITIES LITIGATION<br><br>This Document Applies To:<br><br>*Church v. Chatila, et al.*,<br>1:16-cv-07962-PKC | Case No.  1:16-md-2742-PKC |

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION TO DISMISS**
**PLAINTIFFS' SECOND AMENDED COMPLAINT**

## <u>TABLE OF CONTENTS</u>

Page

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................................................3

ARGUMENT ..................................................................................................................6

I.     PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS ................................6

II.    PLAINTIFFS FAIL TO PLEAD THAT THE ALLEGED MISSTATEMENTS
WERE MADE "IN CONNECTION WITH" THE SALE OR PURCHASE OF
VIVINT SECURITIES. .............................................................................................10

III.   PLAINTIFFS DO NOT ALLEGE AN ACTIONABLE STATEMENT. ........................12

      A.     For All But One of the Challenged Statements Plaintiffs
Fail to State a Claim for the Reasons Set Forth in the *Horowitz* Motions. ...........12

      B.     The Sole Unique Challenged Statement Is Not Actionable. ................................13

      C.     Defendants Had No Duty to Disclose Information to Plaintiffs. ..........................13

IV.   PLAINTIFFS' FAIL TO ADEQUATELY PLEAD SCIENTER. ...................................15

V.    PLAINTIFFS FAIL TO PLEAD RELIANCE AND CAUSATION. .............................18

      A.     Plaintiffs Have Not Adequately Alleged Reliance. .............................................18

      B.     Plaintiffs Improperly Rely On Highly Attenuated
Causal Chains To Plead Loss Causation. ...........................................................20

            1.     Plaintiffs' most significant alleged loss is wholly
unconnected to any alleged misstatements or omissions.........................21

            2.     Shareholder displeasure with the Vivint Acquisition was known.............22

            3.     The issuance of new debt did not reveal any undisclosed "truth." ...........23

            4.     Plaintiffs fail to allege that the LAP lawsuit
revealed any previously undisclosed "truth." .........................................24

            5.     Plaintiffs fail to plead that the consideration
of DIP financing disclosed any undisclosed "truth."...............................24

CONCLUSION...............................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972) ..............................................................................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ...................................................................................25

*In re Bank of America Corp. Sec. Deriv. and ERISA Litig.*,
    757 F. Supp. 2d 260 (2010) .........................................................................13, 14

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ......................................................................................18, 19

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) ..........................................................................................7, 8

*In re CRM Holdings, Ltd. Sec. Litig.*,
    2012 WL 1646888 (S.D.N.Y. May 10, 2012) .....................................................12

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................20

*Fogel v. Wal-Mart de Mexico SAB de CV*,
    2017 WL 751155 (S.D.N.Y. Feb. 27, 2017).......................................................10

*Footbridge Ltd. v. Countrywide Home Loans, Inc.*,
    2010 WL 3790810 (S.D.N.Y. Sept. 28, 2010) (Castel, J.) ...................................12

*Ford v. Voxx Int'l Corp.*,
    2016 WL 3982466 (E.D.N.Y. July 22, 2016).................................................15, 16

*Kemp v. Universal Am. Fin. Corp.*,
    2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) .........................................................17

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161,173 (2d Cir. 2005).................................................................*passim*

*Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp.*,
    2013 WL 4405538 (S.D.N.Y Aug. 5, 2013).......................................................20

*Louros v. Kreicas*,
    367 F. Supp. 2d 572 (S.D.N.Y. 2005) ................................................................10

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015)........................22

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) .................................................................. 15, 16, 17

*Ontario Pub. Serv. Emp. Union Pension Trust Fund v. Nortel Networks Corp.*,
    369 F.3d 27 (2d Cir. 2004) .....................................................................*passim*

*RSM Prod. Corp. v. Fridman*,
    643 F. Supp. 2d 382 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 1976).......................12

*In re WorldCom, Inc. Sec. Litig.*,
    2004 WL 1435356 (S.D.N.Y. June 28, 2004) .......................................................9

*Zelman v. JDS Uniphase Corp.*,
    376 F. Supp. 2d 956 (N.D. Cal. 2005).................................................................9

## Statutes & Rules

15 U.S.C. § 78j(b) (Section 10(b) of the Securities Act) ....................................*passim*

15 U.S.C. § 78t(a) (Section 20(a) of the Securities Act).......................................... 1, 24

17 C.F.R. § 240.10b-5 ................................................................................. 6, 10, 14

Fed. R. Civ. P. 12(b)(6)..................................................................................1

Defendants Ahmad Chatila and Brian Wuebbels respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Consolidated Securities Action Complaint, filed by Lead Plaintiff Don Harris and Named Plaintiff Kyle Tervort, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This securities class action ostensibly arises out of SunEdison's failed acquisition of Vivint Solar, Inc., a Delaware corporation specializing in the development and installation of residential and small commercial solar power units.  Plaintiffs have brought claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of a putative class of persons who purchased Vivint stock between July 20, 2015 and April 1, 2016 (the putative Class Period), against two former executives of SunEdison, for alleged misrepresentations made about SunEdison.  However, these claims rest on an unusual and problematic factual basis—Plaintiffs have sued the former executives of a company whose securities they never purchased.  Plaintiffs purchased stock in Vivint, not SunEdison.  But all of the statements Plaintiffs challenge concern SunEdison, not Vivint.

The link between the two companies—the link on which Plaintiffs' claims depend—is the companies' joint announcement, on July 20, 2015, that SunEdison would acquire Vivint.  In consideration, Vivint shareholders would receive a total value of $16.50 per share of Vivint stock through a combination of cash and SunEdison common stock and convertible notes (the Acquisition).

The Acquisition proved to be unpopular with the market.  Although Vivint's stock price initially rose following the July 20 announcement, it began falling a week later.  SunEdison's share price began to decline immediately.  A constricting renewable energy market led to further

challenges for SunEdison, limiting its access to necessary capital and placing unanticipated pressure on its business model. Ultimately, after a significant stock price decline, SunEdison lost access to the bank funding needed to finance the Vivint deal (a disclosed risk) and, on March 8, 2016, Vivint terminated the Acquisition. On April 21, 2016, SunEdison filed for bankruptcy. During the same period, Vivint experienced its own disappointing financial results and decline in stock price.

Notwithstanding the tumult in the renewable energy market and SunEdison's robust disclosures about its exposure to market and other risks, Plaintiffs now seek to lay blame for Vivint's share price decline solely at the feet of two former SunEdison executives, Ahmad Chatila and Brian Wuebbels. Plaintiffs allege that Chatila and Wuebbels intentionally made false or misleading statements regarding *SunEdison*'s financials in connection with Plaintiffs' purchases of *Vivint* stock. As demonstrated below, the flawed theory at the heart of these claims leads to insurmountable pleading failures at each step in the analysis of the Second Amended Complaint.

*First*, Plaintiffs do not have standing to assert the claims they seek to bring. Courts in this Circuit have dismissed claims on standing grounds where plaintiffs challenged statements made by a company whose stock they never purchased, and this Court should do the same.

*Second*, Plaintiffs have not adequately pled that the alleged misstatements regarding SunEdison were made "in connection with" their purchase of Vivint stock.

*Third*, the challenged statements are, with one exception, the same statements challenged in the *Horowitz* Second Amended Complaint. The claims based on these statements suffer from all of the defects identified in the *Horowitz* motions to dismiss, which we incorporate by reference into this motion. Plaintiffs' sole unique challenge suffers from the same defects.

Plaintiffs' attack on many of the challenged statements also fails for a reason unique to this case. Plaintiffs rely on an omission theory, but a company in the context of an acquisition of the kind at issue here owes no independent disclosure duty to its counterparty or the counterparty's shareholders.

*Fourth*, Plaintiffs fail to plead facts giving rise to a cogent and compelling inference of scienter.  Like their falsity allegations, Plaintiffs' scienter allegations share all of the defects identified in the Horowitz motions.  Plaintiffs' few unique allegations—all relating to confidential witnesses—do not change the analysis.  Indeed, Plaintiffs' scienter allegations are, if anything, weaker than those in *Horowitz*, given Plaintiffs' complete failure to show that Defendants had an intent to deceive Vivint investors.

*Finally*, Plaintiffs' allegations of transaction causation are insufficient, and their allegations of loss causation are premised on an improperly attenuated chain of insupportable inferences.

For all of these reasons, the Court should dismiss Plaintiffs' claims in their entirety.  And because Plaintiffs were notified of the defects in their Complaint through the pre-motion letter process, but chose not address them—demonstrating that amendment would be futile—the Court should dismiss the Complaint with prejudice.

## STATEMENT OF FACTS

The Exchange Act Defendants' Memorandum of Law In Support Of Motion To Dismiss filed in the *Horowitz* action (*Horowitz* Exchange Act Motion) sets forth relevant factual background concerning SunEdison.  We incorporate by reference but do not repeat that discussion here.  What follows is a summary of key factual allegations related to Vivint.

Vivint develops and installs residential and smaller commercial solar power units.  On July 20, 2015, SunEdison and its yieldco, TerraForm Power, Inc. (or "TERP") announced that they had entered into an agreement to acquire Vivint for approximately $2.2 billion, payable through a combination of cash, shares of SunEdison common stock, and SunEdison convertible notes.  Com. ¶ 74.  Under the terms of the agreement, the value of the stock that Vivint shareholders were to receive was fixed and would not vary depending on subsequent fluctuations in the trading price of either Vivint or SunEdison stock.  Vivint shareholders were to receive a value of $16.50 per share, consisting of $9.89 in cash, $3.31 in SunEdison stock and $3.30 in SunEdison convertible notes.  *Id.* ¶ 77; Ex. 13.[1]  SunEdison further announced that the cash portion of the merger consideration was to come from (1) the proceeds of a $500 million secured term loan from Goldman Sachs, for which certain future Vivint projects would be held as collateral, and (2) the completion of the sale of $922 million in assets to TERP.  *Id.*

The market, as noted, reacted negatively to the July 20, 2015 announcement of the Acquisition.  While Vivint's stock price initially increased, it began to decline starting on July 28, 2015.  Ex. 38.  SunEdison and TERP's stock prices fell immediately upon the announcement of the Acquisition.  Com. ¶ 170.  By August 31, 2015, SunEdison's stock price had fallen from

---

[1] Because the amount of SunEdison stock a Vivint shareholder would receive was determined pursuant to a fixed value—$3.31—rather than a conversion ratio, the value of this consideration remained constant regardless of stock price fluctuations.  SunEdison's stock was trading at approximately $33 the day the Vivint deal was announced; $3.31 worth of SunEdison stock would accordingly equate to approximately 0.1 share.  According to the deal terms, the calculation was made with respect to a 30-day weighted average trading price rather than the trading price on a single date.  Ex. 13, Ex. 2.1 at 3–4).  If SunEdison's stock *price* declined between the time the Acquisition was announced and the closing date, a Vivint shareholder would receive a larger *portion* of stock.  For example, if SunEdison's 30-day average stock price fell to $30, a Vivint shareholder would receive approximately 0.11 shares of SunEdison stock for every share of Vivint stock—less valuable stock, but more of it.  If the 30-day average stock price fell below $27.50, the Vivint shareholder would be further compensated for the decline by application of a multiplier of 1.2.  *Id.*  Thus, for example, a 30-day average price of $25 would produce 0.13 shares of SunEdison stock for every share of Vivint stock; with the multiplier, this would become 0.156 shares of SunEdison stock. In this way too, the value of the merger consideration was decoupled from declines in SunEdison's stock price.

$33.45 on the date of the announcement of the Vivint deal, to $10.40.  *Id.*  TERP's stock price fell from $34.90 to $22.50 during the same period.  *Id.*  Well before any alleged corrective disclosure, market analysts anticipated that the Vivint deal could fall apart.  As early as August 26, 2015, analysts discussed the possibility that the deal would "unravel" and remarked that SunEdison could "abandon" the Acquisition.[2]  By October 2015, *TheStreet.com* was already describing the Vivint deal as "Up in Smoke."[3]

During the same time, as set forth in the *Horowitz* Exchange Act Motion, the renewable energy sector constricted due to falling oil and gas prices, which limited SunEdison's access to necessary capital and put downward pressure on stock prices in the industry as a whole.  Vivint suffered too.  On November 16, 2015, Vivint announced poor third quarter financial results and its stock price fell steeply.  Com. ¶¶ 216–17.

On December 9, 2015, SunEdison and Vivint announced an amendment to the Acquisition agreement.  *Id.* ¶ 228.  Under the Amended Merger Agreement, each Vivint share would receive $7.89 in cash, $3.31 in SunEdison stock, and $3.30 in SunEdison convertible notes.  *Id.* ¶ 229.  The Amended Merger Agreement also provided Vivint with the option of all-cash consideration for its shareholders, in which case a vehicle sponsored by Vivint's investor Blackstone would receive SunEdison stock and convertible notes.  *Id.* ¶ 230.

On December 22, 2015, the hedge fund Appaloosa Management filed a demand for inspection of books and records on TERP, seeking documents related to the TERP board's approval of the Acquisition.  *Id.* ¶ 237.  Appaloosa subsequently filed a motion to enjoin the

---

[2] https://seekingalpha.com/news/2747246-sune-plus-8_8-percent-vslr-minus-5_2-percent-amid-rumors-acquisition-unravel

[3] http://thefly.com/landingPageNews.php?id=2245609&headline=SUNE;VSLR-Rumor-SunEdison-moves-up-on-speculation-it-could-abandon-Vivint-acquisition.

Acquisition, which was denied on February 26, 2016. *Id.* ¶ 246. On March 8, 2016, Vivint announced that it was terminating the Amended Merger Agreement, and the same day it sued SunEdison for breach of contract in connection with termination of the Acquisition. *Id.* ¶¶ 252–53. This action was filed on May 3, 2016.

## ARGUMENT

## I.   PLAINTIFFS LACK STANDING TO ASSERT THEIR CLAIMS

Standing is a threshold question that the Court must address before analyzing the merits of Plaintiffs' claims. *Ontario Pub. Serv. Emp. Union Pension Trust Fund v. Nortel Networks Corp.* ("*Nortel*"), 369 F.3d 27, 34 (2d Cir. 2004). While neither the language of Section 10(b) nor Rule 10b-5 nor their legislative or regulatory history establishes a private right of action, courts have long held that purchasers of securities have standing to assert such a right under certain circumstances. Here, however, in asserting claims on behalf of purchasers of *Vivint* stock against former officers of *SunEdison*, Plaintiffs stretch the judicially created right of action well beyond what can be supported by the law or policy.

Courts in this Circuit have not directly addressed whether purchasers of securities in an intended target corporation have standing to sue the acquiring corporation (or its officers) under Section 10(b) in a case where the anticipated transaction is a complete acquisition of the target. But in *Nortel*, which involved the intended acquisition of a *portion* of the target company, the Second Circuit established a framework for analyzing both partial and complete acquisitions. Application of that framework to this case shows that Plaintiffs lack standing.

Plaintiffs in *Nortel* were purchasers of stock in JDS Uniphase. Defendants were Nortel and its executives, who had made public statements about Nortel's plans to acquire a portion of JDS Uniphase's business. In holding that the JDS Uniphase stock purchasers lacked standing to sue Nortel and its executives on the basis of those statements, the *Nortel* court first considered

the text of Section 10(b).  Plaintiffs had argued that standing could be derived from the reference in Section 10(b) to fraud "in connection with the purchase or sale of *any* security."  369 F. 3d at 32 (emphasis in original; quoting statute).  The court soundly rejected plaintiffs' argument. "Any security," the court held, is a reference to all *types* of securities in the company "to which the prospectus, representation, or omission relates."  *Id.* (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747 (1975)).  By the same token, "any security" does *not* mean all securities in any *company* whose stock price is purportedly affected by a challenged statement. *Id.*  The Second Circuit accordingly concluded that the text of the statute provided no basis to find standing on the part of purchasers of a different company's stock.

The *Nortel* court reached the same conclusion on practical grounds, again drawing on the Supreme Court's analysis in *Blue Chip Stamps*.  The Supreme Court was concerned there that a claim premised on a transaction more attenuated than a purchase or sale of stock in the company at issue would unduly privilege plaintiffs' oral testimony about their investment decisions, leading to proof problems and potentially abusive litigation.  421 U.S. at 743.  The *Nortel* court concluded that the same problems could occur if securities plaintiffs were allowed to pursue claims based on transactions in the stock of any company ostensibly affected by the challenged statement, rather than being limited to transactions in the stock of the company that actually made the statement.  369 F.3d at 32–33.  Citing and quoting *Blue Chip Stamps*, the *Nortel* court found untenable a situation in which "a plaintiff is bringing an action based on the statements of a company whose securities he did not purchase [such that] '[p]laintiff's entire testimony could be dependent upon uncorroborated oral evidence of many of the crucial elements of his claims and still be sufficient to go to the jury.'"  *Id.* at 33

*Nortel*'s analysis applies to the present case notwithstanding the fact that the central transaction here was the planned acquisition of a company in its entirety rather than the acquisition of only certain businesses of that company. The *Nortel* court's textual analysis applies equally to both situations. Regardless of the scope of a planned acquisition, "any security" means any *kind* of security of the company making the challenged statement; it does not mean any security of any *company*.

The same is true of *Nortel*'s practical analysis. Plaintiffs here do not challenge any statement related to Vivint or even to the Acquisition. Indeed, Plaintiffs do not appear to be alleging that Defendants misled them about SunEdison's plan to acquire Vivint at all. Rather, they allege that Defendants misled them about SunEdison's internal controls, about liquidity predictions, and about "trends" in past quarters. Given the unusual and attenuated nature of this theory—in which the representations describing the very transaction that gives rise to their claims are unchallenged—Plaintiffs' oral testimony about their intentions, beliefs, and investment strategy will assume outsized significance in this case. As both *Blue Chip Stamps* and *Nortel* recognize, such a situation invites abusive litigation and unfairly prejudices securities defendants, who cannot divine what was in a securities plaintiff's mind, and are hampered in employing customary tools of cross-examination. There is no reason to stretch standing doctrine to achieve this result.

It is true, as Plaintiffs will doubtless point out in opposition, that the *Nortel* court reserved judgment on whether standing might exist where plaintiffs are purchasers of stock in a company that is the target of a complete rather than a partial acquisition. 369 F.3d at 34. On this question, the *Nortel* court "express[ed] no opinion." *Id.* But the circumstances that the court envisioned might establish standing in such a case—a "direct link" between the stock prices of the

companies at issue, and a "direct relationship" between the challenged statements and the stock price movements that cause plaintiffs' losses—do not exist and cannot be pled here.

First, the central terms of the planned transaction did not tie but rather explicitly *divorced* the value Vivint shareholders would receive from the trading price of SunEdison stock. As outlined above, Vivint shareholders would receive the same consideration—a value of $16.50— regardless of how SunEdison's stock performed. A decline in the trading price of SunEdison's securities would be offset by an increase in the number of shares allotted. *Supra* at 4 & n.1. This fact alone undermines any claim that the two investments were directly linked.[4]

The relationship between the challenged statements and Plaintiffs' alleged losses is equally indirect and attenuated. Plaintiffs assert that they suffered losses because SunEdison was unable to complete the Acquisition. A claim based on a direct relationship between a challenged statement and loss would therefore be a claim that SunEdison made misrepresentations about the Acquisition. But that is not the claim Plaintiffs are trying to assert. Instead, Plaintiffs' theory is that the purported class of Vivint stock purchasers made investment decisions based on SunEdison's statements about its internal controls, or on SunEdison's opinions concerning its liquidity, or on SunEdison's purported failure to identify "trends" several quarters in the past. This indirect and counterintuitive theory of fraud does not fit within the *Nortel* court's limited dicta concerning the potential standing of purchasers of third-party companies' stock in cases

---

[4] This fact also distinguishes the present case from *Zelman v. JDS Uniphase Corp.*, 376 F. Supp. 2d 956 (N.D. Cal. 2005) and *In re WorldCom, Inc. Securities Litigation*, 2004 WL 1435356 (S.D.N.Y. June 28, 2004). In those cases, the courts found, explicitly or implicitly, that the purchasers of securities in one entity had standing under Section 10(b) to sue a separate company and its officers. However, in both cases, the plaintiffs held equity-linked debt securities, which were derivative instruments of the defendant company and for which redemption value was contractually linked to the defendant company stock's trading price. No such link is present here. Instead, as discussed, the deal terms specifically de-linked the merger consideration from the shifting value of SunEdison's stock.

involving direct connections.  Plaintiffs have not pled facts establishing standing here.

## II.   PLAINTIFFS FAIL TO PLEAD THAT THE ALLEGED MISSTATEMENTS WERE MADE "IN CONNECTION WITH" THE SALE OR PURCHASE OF VIVINT SECURITIES.

Section 10(b) and Rule 10b-5 make it unlawful to commit a fraud "in connection with the purchase or sale of any security."  15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  When an alleged misrepresentation concerns the "value, nature or investment characteristics of the securities at issue," it satisfies the "in connection with" requirement.  *Louros v. Kreicas*, 367 F. Supp. 2d 572, 588 (S.D.N.Y. 2005); *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *12 n. 14 (S.D.N.Y. Feb. 27, 2017).

Plaintiffs have not met that standard.  They have not pled that the challenged statements relate to any characteristic of the "securities at issue" because the only "securities at issue" here are the Vivint securities that Plaintiffs bought.  The challenged statements, on the other hand, relate solely to SunEdison's business; they do not relate to Vivint's business or even to the Acquisition.  Again, Plaintiffs do not challenge any statement SunEdison made about the Acquisition.  What is presented by this case is consequently not the statutorily-required "connection" but instead a complete disconnect between the securities at issue and the challenged statements.

Plaintiffs seek to surmount this difficulty by alleging a connection between SunEdison's statements and Vivint's *stock price*.  Plaintiffs observe that in the week after the Acquisition was announced, Vivint's stock rose to a point just shy of the $16.50 per share value Vivint stockholders were to receive as consideration.  Plaintiffs speculate that the stock responded in this way because investors turned to SunEdison's prior quarterly and annual filings and were reassured by statements there about the adequacy of SunEdison's internal controls, about the

trends (or absence of trends) affecting its business, and about management's opinions concerning liquidity.

But even if it were permissible to bypass the "in connection with" requirement by means of a link between challenged statements and stock price rather than challenged statement and stock purchases, Plaintiffs' theory would fail. Plaintiffs' speculation that Vivint's stock price responded to information about SunEdison's internal controls, trends and the like is contradicted by the undisputed facts before the Court. Under the deal terms, the entirety of the cash component Vivint shareholders were to receive would be paid from a $500 million loan from an investment bank and the sale of nearly $1 billion of assets to TERP. *Supra* at 4. Whether the Acquisition would be completed depended on these two financing arrangements, not on facts related to SunEdison's internal controls, trends, and the like. Given the deal terms, the fluctuations in Vivint's stock price following the July 20 announcement cannot serve as the missing connection between the challenged statements—which were about SunEdison—and the securities transactions—which were purchases of Vivint stock. Under the deal terms, the issues that were the subject of the challenged statements simply had nothing to do with whether or not the Acquisition could or would be completed. The funding for the deal did not depend on those matters. On these facts, it cannot be said that statements about SunEdison's internal controls, loan classification, trends and the like – statements contained in SEC filings made months before the Acquisition was announced—were somehow made "in connection" with open-market purchases of Vivint stock.[5]

---

[5] Plaintiffs claim at one point that SunEdison needed to prove that its liquidity was sufficient in order to convince lenders to help finance the transaction. Com. ¶ 124. But whatever this may show about the connection between the challenged liquidity statements and *lenders*' dealings with *SunEdison*, it does not establish that those statements were made in connection with *Plaintiffs*' purchases of *Vivint* stock.

## III.   PLAINTIFFS DO NOT ALLEGE AN ACTIONABLE STATEMENT.

### A.   For All But One of the Challenged Statements, Plaintiffs Fail to State a Claim for the Reasons Set Forth in the *Horowitz* Motions.

With one exception, Plaintiffs challenge the same statements challenged in *Horowitz*. This is shown in the Appendix to this brief, in which we have charted the overlapping challenged statements in the two cases.  Plaintiffs' claims fail in this case with respect to all of the overlapping statements for the same reasons the *Horowitz* plaintiffs' claims fail.  To avoid repetition, we do not restate the arguments made in the motions to dismiss and accompanying memoranda in *Horowitz* but instead incorporate those motions and memoranda by reference here.

Moreover, to the extent those challenged statements are based on allegations drawn straight from the *Horowitz* Second Amended Consolidated Complaint,[6] the use of such allegations is impermissible in the Second Circuit, and the allegations are deemed immaterial. *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (citing *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 892–94 (2d Cir. 1976)) ("Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial . . . ."), *aff'd*, 387 F. App'x 72 (2d Cir. 2010); *see also Footbridge Ltd. v. Countrywide Home Loans, Inc.*, 2010 WL 3790810, at *5 (S.D.N.Y. Sept. 28, 2010) (Castel, J.) (striking allegations "based on pleadings, settlements, and government investigations in other cases"); *In re CRM Holdings, Ltd. Sec. Litig.*, 2012 WL 1646888, at *26 (S.D.N.Y. May 10, 2012) ("Plaintiffs' citation to 'unproven allegations' made in the [other] complaints do not

---

[6] *See, e.g.,* Com. ¶¶ 87-88, 90, 92, 97-98, 100, 103-04, 118, 135, 140-43, 147, 158, 160-61.

constitute factual allegations. . . . Thus, Plaintiffs may not rely on these sources as evidence of the alleged fraud").

### B.       The Sole Unique Challenged Statement Is Not Actionable.

The only statement challenged in this case that is not also challenged in *Horowitz* appears as Statement No. 6 in the attached Appendix.  Specifically, Plaintiffs allege that in the second-quarter 2015 10-Q—which was filed on August 6, 2015—Defendants' disclosures regarding the terms of the Margin Loan were misleading insofar as Defendants failed to disclose that SunEdison "had already sought additional financing to pay down the margin call and was in the process of negotiating the Goldman Sachs Loan, which SunEdison secretly finalized five days later on August 11, 2015 . . . ."  However, Plaintiffs can provide no support for the assertion that SunEdison was required to disclose a transaction that had not been completed as of the filing date.[7]

### C.       Defendants Had No Duty to Disclose Information to Plaintiffs.

Certain statements challenged in this case have defects even beyond those set forth in the *Horowitz* briefs—defects stemming from Plaintiffs' unusual status as purchasers of stock in a third-party company.  This Court has held that plaintiffs who seek to assert claims against a company (or its executives) other than the company whose stock they have acquired may not proceed on an omission theory for the simple reason that the third-party company does not owe them any duty to disclose.  *In re Bank of America Corp. Sec. Deriv. and ERISA Litig.*, 757 F.

---

[7] In identifying the universe of challenged statements, we are guided by Plaintiffs' designations, and specifically by the heading "Defendants' False and Misleading Statements," which covers paragraphs 262–338 of the Complaint. Plaintiffs also make scattered assertions in the background section of the Complaint regarding purportedly false revenue projections and projections relating to the volume of residential and small commercial solar capacity that SUNE/Vivint would be able to install in 2016.  Com. ¶¶ 123–130.  Because Plaintiffs do not group these allegations with the challenged statements, we do not regard them as such.  Any claims based on these statements would fail in any event because Plaintiffs do not allege any associated corrective disclosure(s).

Supp. 2d 260 (2010).  In *BofA*, shareholders of BofA, which acquired Merrill Lynch, brought

Section 10(b) claims against Merrill Lynch and its CEO, alleging that these defendants wrongly

omitted to disclose damaging facts about Merrill Lynch's recent financial performance and

bonus commitments.  This Court dismissed the claim, holding that the BofA shareholders lacked

a basis on which to assert it.  The Court explained that "[n]ondisclosure claims asserted under

Section 10(b) and Rule 10b-5 are premised on the existence of a fiduciary or similar obligation

extending from a defendant to a shareholder."  *Id.* at 287.  No such duty runs from a company or

its executives to shareholders or purchasers of a different company's stock in the context of an

acquisition, where the two companies are adverse.  *Id.* at 287–88.[8]  That holding applies squarely

here, and bars Plaintiffs from asserting any claim premised on an omission theory.

 Plaintiffs seek to assert an omission-based claim in seven instances:

- With respect to Statements Nos. 5, 6, 9 and 10 (as numbered in the Appendix), all of which appear in SunEdison's second-quarter 10-Q or in the Preferred Offering documents, Plaintiffs claim that Defendants should have disclosed (1) the alleged existing or imminent call on the Margin Loan, and (2) SunEdison's alleged pursuit of new financing through the August 11, 2015 Second Lien Loan.
- With respect to Statement No. 7, Plaintiffs assert that Wuebbels should have disclosed the same information during the second-quarter earnings call.
- With respect to Statement No. 18, Plaintiffs fault Defendants for purportedly failing to disclose the purpose of the Second Lien Loan.
- With respect to Statement No. 25, Plaintiffs claim that Defendants were required to disclose the reasons for the changes in management at the Yieldcos.

 These omission claims all fail because Plaintiffs do not and cannot allege that Defendants

owed a duty to them, as purchasers of stock in a target company, to disclose anything at all.

*BofA*, 757 F. Supp. 2d at 287.  The same defect is inherent in Plaintiffs' claim that Defendants

---

[8] The *BofA* decision does not address the standing and "in connection with" issues, discussed above, that may also arise in the third-party situation; possibly the parties did not raise those issues in that action.

failed to disclose "known trends" as required by Item 303 of Regulation S-K. This too is purely an omission claim, and it fails because Defendants owed no duty of disclosure to Plaintiffs.

## IV.  PLAINTIFFS' FAIL TO ADEQUATELY PLEAD SCIENTER.

As with falsity, Plaintiffs' scienter allegations are a combination of inadequate allegations adopted from *Horowitz* and a few unique, but equally problematic and insufficient new allegations. We address the deficiencies in both groups of allegations. Also as with falsity, Plaintiffs' scienter allegations have a unique defect—namely, that Plaintiffs have not alleged and cannot allege a motive on the part of Defendants to inflate the price of *Vivint's* stock.

*First*, the confidential witness allegations Plaintiffs have copied from the *Horowitz* complaint can be disregarded in their entirety as immaterial.[9] *See* Section III.A, *supra*. And even if considered by the Court, those allegations fail for the reasons stated in the *Horowitz* motions. *See Horowitz* Exchange Act Motion at 33-40.

The Court should also disregard Plaintiffs' allegations concerning the majority of the cited Former Employees for the same reasons set out in the *Horowitz* motions, including that many do not make any substantively distinct assertions.[10] With respect to these purportedly unique confidential witnesses, Plaintiffs have not adequately alleged that they were in a position to know the information attributed to them, have not connected them to any specific knowledge on the part of Defendants, and have not tied the issues they purport to raise to any of the alleged misstatements.[11] Former Employee 6 is a good example. Plaintiffs claim that this witness was a

---

[9] *See, e.g.,* Com. ¶¶ 87-88, 90, 92, 97-98, 100, 103-04, 118, 135, 140-43, 147, 158, 160-61.

[10] This would include FE 2, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13.

[11] Under controlling law, courts will consider allegations attributed to unnamed sources only when (1) plaintiffs identify witnesses with sufficient detail to establish that they had knowledge of the information purportedly provided, and (2) that information is described with sufficient particularity to demonstrate that the challenged statements were false. *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000); *Ford v. Voxx Int'l Corp.*, 2016 WL 3982466, at *5 (E.D.N.Y. July 22, 2016).

Finance Assistant at SunEdison and that he or she told Plaintiffs that the finance team worked 20 hour shifts and frequently worked overnight, creating risks that teams would make mistakes. Com. ¶ 117.  But Plaintiffs do not, and cannot tie this general assertion about work schedules to any challenged statement or any purported knowledge on the part of Defendants.[12]

*Second*, none of the information Plaintiffs attribute to two additional witnesses—Former Employees 1 and 3—supports an inference of scienter either.

As a general matter, most of the statements attributed to FE 1 and 3 lack the requisite specificity[13] and/or do not allege that Defendants were aware of the issues which purportedly concerned these witnesses.[14]

Several additional statements attributed to FE 1 and 3 must also be disregarded as Plaintiffs have failed to adequately allege any basis for the purported knowledge of these witnesses regarding the attributed statement.  In the case of FE 1, although he purportedly comments on problems with SunEdison's general accounting practices as far back as 2014, up until March 2016, he did not have any position related to company finances.  Com. ¶ 37. Similarly, Plaintiffs do not adequately allege the basis for FE 3's knowledge of Defendants' alleged intentional delays in the Vivint Acquisition—merely stating that he received emails copying Defendants and participated on calls where they were also in attendance, without any specifics as to the timing, nature, or content of those communications that would support the

---

[12] Similarly, FE 5 is described as an employee of TERP who only "occasionally" participated on conference calls that included Chatila.  Neither his job description nor any statements attributed to him demonstrate any knowledge regarding or visibility into SunEdison's financial reporting or internal controls.  Accordingly these allegations also do not support any inference of scienter.  *Novak*, 216 F.3d at 314; *Ford*, 2016 WL 3982466 at *5.

[13] *See e.g.,* Com. ¶ 124 (FE 1's generic statement about projections for projects and mergers); Com. ¶ 96 (FE 3's assertions about the percentage of bills paid).

[14] For example, FE 1 asserts that customers were offered discounts if they paid before the last day of the quarter and vendor/lender payments were delayed until after quarter end.  Com. ¶ 6.  Plaintiffs do not allege that Defendants knew of this practice or that it was done at their direction.

allegation. *Novak*, 216 F.3d at 314. Moreover, neither FE 1 nor FE 3, as *SunEdison* employees, can speak to the impact of alleged delays in the Acquisition on *Vivint's* financial performance, and yet Plaintiffs attempt to rely on these SunEdison employees to support their attenuated theory of a causal link between the challenged statements and Vivint's own poor financial performance.[15] Plaintiffs do not purport to have obtained any information from Vivint employees.

FE 1 and 3's other allegations related to the Vivint Acquisition fall far short of what is required to link the purported concerns of a confidential witness to scienter on the part of Defendants—allegations that the witness *communicated* those concerns to Defendants, that Defendants *adopted* the witness's view, and that Defendants *believed* that the witness's view undermined the company's public statements, but persisted in making those statements anyway.[16] For example, FE 1's additional statements regarding a purported misstatement of Vivint acquisition projections (Com. ¶¶ 128–29) are not tied to any challenged statement and again do not demonstrate anything beyond a difference in opinion between SunEdison and Vivint as to how to calculate projections for their anticipated combined capabilities. "[M]ere opinions of confidential witnesses . . . are not actionable" in securities fraud cases. *See, e.g.*, *Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, at *13 (S.D.N.Y. Jan. 10, 2007).[17]

---

[15] Plaintiffs also cannot show loss causation connecting the challenged statements and decline in Vivint stock value following the release of Vivint's financials, for the reasons discussed below. *See* Sec. V.B.1, *supra*.

[16] *See Horowitz* Exchange Act Motion at 22 n.12.

[17] For this reason as well, FE 1's assertion that executives of First Wind, at a separate point in time, felt that cash was insufficient for the running of their newly acquired company within the SunEdison umbrella (Com. ¶ 94), in no way demonstrates that cash was, in fact, insufficient or that Defendants were intentionally misleading with regards to the challenged statements. Similarly, FE 1's statement that the Vivint Acquisition was moving slower than other acquisitions he had previously been involved with was an opinion, which, again, was not communicated to Defendants. *Id.* ¶ 190.

***Finally***, Plaintiffs fail to plead scienter in this case for the additional reason that they have not alleged any motive for the purported fraud.  Like the *Horowitz* plaintiffs, Plaintiffs here do not even attempt to show that Defendants had a financial incentive for their supposed wrongdoing; the fact that Defendants purchased rather than selling SunEdison stock during the alleged Class Period weighs heavily against any inference of scienter.  *See Horowitz* Exchange Act Motion at 24-25.  That pleading failure is magnified this case:  Plaintiffs also make no effort to show that Defendants were motivated to inflate the price of *Vivint's* stock.  And for good reason.  It would simply be nonsensical to posit that officers in one company made false statements in order to artificially inflate the price of a third-party company's securities— securities they are not alleged to have owned and whose trading price can have been of no interest to them.  Here as in other areas, the central premise of Plaintiffs' case does not withstand scrutiny.

## V.   PLAINTIFFS FAIL TO PLEAD RELIANCE AND CAUSATION.

The central factual defect in Plaintiffs' claim, as discussed, is that Plaintiffs never purchased stock in the company whose statements they challenge.  This has ramifications not only for standing, for the "in connection with" requirement, and for Plaintiffs' omission theory, but also for the elements of reliance and causation.  With respect to these elements too, Plaintiffs fall short.

### A.     Plaintiffs Have Not Adequately Alleged Reliance.

Plaintiffs assert that they "will rely in part upon the presumption of reliance established by the fraud-on-the-market doctrine."  Com. ¶ 349.  But as a pleading matter, Plaintiffs have not alleged the facts necessary to invoke the presumption.  The fraud-on-the-market presumption depends on the premise that in an efficient market, a company's stock price reflects all *material* public information *regarding that company*.  *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).  The

company at issue here is Vivint, not SunEdison:  It is only Vivint whose stock Plaintiffs purchased.  In order for the fraud-on-the-market presumption to be of any assistance to Plaintiffs, it would therefore have to be the case that Vivint's stock price incorporated the allegedly false information about which Plaintiffs complain—information about SunEdison's internal controls, undisclosed "trends," management changes, and the like.  But Plaintiffs plead no facts suggesting that this was the case—that, through the medium of Vivint's stock price, all information about SunEdison indirectly reached and could be relied on by investors purchasing Vivint stock.  Nor do Plaintiffs even attempt to plead facts establishing reliance at the individual level.  They allege nothing suggesting that they or any other purported class member decided to purchase Vivint stock based on allegedly false or misleading statements about SunEdison itself—as opposed to statements about Vivint or the Acquisition.[18]

Plaintiffs also seek to forge a link between the challenged statements and the investment decisions of purported class members by pointing to the fact that SunEdison issued joint press releases with Vivint, and, as an acquiring company, filed 8-Ks and other reports in Vivint's EDGAR account.  But these joint press releases and SEC filings *are not alleged to have contained any false or misleading statements.* Com. ¶¶ 340–41.  These communications therefore cannot establish either that the *challenged statements*—which appeared in SunEdison's historical SEC filings, not Vivint's—were material to purchasers of Vivint stock or that such purchasers should be presumed to have relied on them.  *Id.*

---

[18]  Plaintiffs also invoke the *Affiliated Ute* presumption of reliance applicable to certain omission claims.  Com. ¶ 351 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 152–153 (1972)).  But because this Court's *BofA* decision forecloses Plaintiffs' omission theory, *supra* at 13-14, the *Affiliated Ute* presumption is not available here.

**B.      Plaintiffs Improperly Rely On Highly Attenuated Causal Chains To Plead Loss Causation.**

Plaintiffs have not alleged facts sufficient to establish loss causation as a pleading matter either.  Their attempt to link declines in Vivint's share price to the challenged statements depends on exactly the kind of attenuated causal chain that the courts of this Circuit have deemed insufficient as a matter of law.

Under controlling law, a Section 10(b) plaintiff adequately establishes loss causation only when he or she shows that the "*subject* of the fraudulent statement or omission was the cause of the actual loss suffered."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis in original) (citations omitted); *see also Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005) (plaintiff must plead and prove causal link between challenged statement and stock price decline).  To survive a pleading motion, Plaintiffs must accordingly furnish factual allegations showing either that the market reacted negatively to a corrective disclosure that revealed the purported fraud or "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp.*, 2013 WL 4405538, at *9 (S.D.N.Y Aug. 5, 2013) (citations omitted).  "[I]f the connection is attenuated, or if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie."  *Lentell*, 396 F.3d at 174 (citations omitted).  In such cases, courts do not hesitate to dismiss on loss causation grounds at the pleading stage.  *E.g.*, *Lentell*, 396 F.3d at 174; *Lighthouse Fin. Grp.*, 2013 WL 4405538, at *9.

Plaintiffs in this case have identified multiple days on which Vivint's stock price fell. Com. ¶¶ 13–22.  But they plead no facts showing or suggesting that the drop was caused by the revelation of any "truth" previously concealed by the challenged statements concerning

SunEdison's business or financial position.  The Court should accordingly dismiss Plaintiffs' claims with respect to each of those stock price declines.

### 1. Plaintiffs' most significant alleged loss is wholly unconnected to any alleged misstatements or omissions.

The most significant drop in Vivint's stock price during the purported Class Period occurred on November 17, 2015—the day after *Vivint* announced disappointing third-quarter financial results.  Com. ¶¶ 216–220.  Notwithstanding the fact that the purportedly corrective disclosure related to a decline in Vivint's—not SunEdison's—fortunes, Plaintiffs seek to tie the stock price drop to SunEdison and its previous representations.  According to Plaintiffs, Vivint's poor third-quarter performance was the result of the "distraction" occasioned by the pending Acquisition.  And according to Plaintiffs' confidential witnesses, that distraction was at least in part the consequence of SunEdison's tactic of "slow-walking" unspecified acquisition-related tasks.  *Id.*

This theory does not pass muster even at the pleading stage.  No facts Plaintiffs allege show that the announcement of Vivint's poor third-quarter results revealed some truth previously concealed by SunEdison's public statements or reflected the materialization of some risk previously omitted by SunEdison.  At best, Plaintiffs have sketched out—with little or no factual support—the following causal chain:  (1) SunEdison made statements about its business and financial position prior to the announcement of the Acquisition; (2) secretly, Defendants knew that SunEdison's financial position was weaker than reported, and in fact so weak that the Company could not complete the Vivint acquisition; (3) SunEdison nevertheless moved ahead with the Acquisition, but deliberately "slow-walked" pre-closing tasks to temporarily avoid the inevitable collapse of the deal; (4) this "slow-walking" increased the burden on Vivint of completing the pre-closing tasks and caused Vivint employees to become distracted; (5) the

burden and distraction suffered by Vivint's employees led to its poor third-quarter performance; and (6) the revelation of *Vivint*'s weak performance therefore indirectly revealed the truth that *SunEdison*'s financial position was not as represented.

This attenuated chain is plainly inadequate under controlling law. *Lentell*, as noted, holds that securities plaintiffs must plead facts showing that the *subject* of the challenged representation caused their alleged losses. 396 F.3d at 173. The loss here did not flow from any revelation of truth relating to the subject of the challenged statements. It was precipitated by the announcement that Vivint had suffered a poor quarter. Plaintiffs seek to connect the one with the other through the lengthy and tortured chain of supposed causes and effects set forth above, but this is plainly insufficient as a matter of law. *Id.* at 174 (Section 10(b) claim "will not lie" if the connection between an alleged misstatement and an investment loss is "attenuated"); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 587 (S.D.N.Y. 2014) (dismissing a complaint because the "number of dots the Court must connect to produce an adequate theory of loss causation are too numerous"), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

The same analysis applies to a second stock drop that Plaintiffs assert (again without support) was caused by the alleged fraud—the drop following the publication of Vivint's March 14, 2016 10-K, which included Q4 2015 results. Com. ¶¶ 255–56. Here too, Plaintiffs fail to plead facts showing a connection between the allegedly corrective disclosure—about Vivint's poor quarter—and the challenged statements—about SunEdison's historical financial performance and liquidity predictions.

### 2. Shareholder displeasure with the Vivint Acquisition was known.

Plaintiffs next assert that a December 22, 2015 books and records inspection demand by a large TERP investor, Appaloosa, caused a drop in Vivint stock price. Com. ¶¶ 13(e), 237–38. The stated purpose of the demand was to allow Appaloosa to investigate potential breaches of

fiduciary duties by TERP directors and officers, owed to TERP, in connection with the Acquisition. *Id.* at 237. When the demand was disclosed, the market learned that at least one TERP shareholder believed the Acquisition was bad for TERP. Plaintiffs do not, however, plead any connection between this investor demand and the challenged statements, all of which relate to SunEdison's business and financial position, and none of which relates to the effect of the Acquisition on TERP. Plaintiffs accordingly fall short of *Lentell*'s requirement that securities plaintiffs show that challenged statements and alleged corrective disclosures relate to the same subject. *Lentell*, 396 F.3d at 173.

Plaintiffs' own allegations also show that the books and records demand did not constitute *new* information even about TERP and its shareholders. Plaintiffs allege that Appaloosa's senior partner, James Bolin, had already published correspondence before the December 22, 2015 inspection demand expressing displeasure with the Acquisition. Com. ¶ 237. Against this background, the demand did not constitute even new information, let alone a corrective disclosure related to SunEdison's prior statements.

### 3. The issuance of new debt did not reveal any undisclosed "truth."

Plaintiffs next assert that when SunEdison obtained $725 million in Second Lien funding and issued new debt to secure that loan in January 2016, this "cast further doubt" on SunEdison's claims that its liquidity was adequate. Com. ¶¶ 239–40. But these events do not show that earlier statements about liquidity or other matters were false *when made*. Indeed, although Plaintiffs challenge numerous written and oral statements about SunEdison's liquidity going back to March 2015, Plaintiffs do not even attempt to explain which of those statements was purportedly shown to be false or misleading by this January 2016 announcement.

### 4. Plaintiffs fail to allege that the LAP lawsuit revealed any previously undisclosed "truth."

The second largest decline in Vivint's stock price during the alleged Class Period coincided with the filing of a lawsuit by LAP on February 10, 2016.  Com. ¶¶ 13(e), 242–45. But while Plaintiffs omit the fact, the public had known for months that the LAP deal had failed and that LAP blamed SunEdison for that failure.  *See e.g.*, Ex. 28.  Indeed, SunEdison disclosed in its third-quarter 10-Q, filed November, 9, 2015, that the deal had unraveled and that LAP had made an arbitration demand.  Ex. 12.  Particularly in light of the pre-existing arbitration demand, the filing of the LAP lawsuit did not reveal the purported falsity of any previous statement about SunEdison's financial position.

### 5. Plaintiffs fail to plead that the consideration of DIP financing disclosed any undisclosed "truth."

Finally, Plaintiffs cite a March 22, 2016 statement made in *Debtwire*, an on-line financial news source, that SunEdison was in talks with lenders for debtor-in-possession financing.  Com. ¶¶ 19, 257.  Plaintiffs do not even attempt to connect this purported corrective disclosure to a misstatement or omission, merely asserting that a SunEdison bankruptcy would make recovery in an action arising from the failed Acquisition more difficult for them.  *Id.*  Such an assertion does not establish loss causation.  *Lentell*, 396 F.3d at 173.  Moreover, by *March 2016*, the market was already aware that SunEdison could file for bankruptcy.  *See, e.g.*, Ex. 26.

### CONCLUSION

Notwithstanding their voluminous allegations, Plaintiffs cannot plead around the fatal defects caused by two undisputed facts—that they challenge solely statements made by SunEdison executives regarding SunEdison but never purchased SunEdison securities.  These facts are a barrier to standing and further undercut their allegations of reliance and loss causation. Moreover, as discussed in the *Horowitz* Exchange Act Motion, none of what Plaintiffs allege

shows that the challenged statements—high-level opinions, predictions and characterizations of liquidity, descriptions of various lending arrangements and their risks, summaries of board and management changes—were materially false or misleading, much less made with an intent to deceive or a state of mind approximating such an intent.  Accordingly, Defendants respectfully request that the Court dismiss Plaintiffs' Section 10(b) claim in its entirety and dismiss Plaintiffs' Section 20(a) claim for want of an underlying Section 10(b) violation.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd*., 493 F.3d 87, 108 (2d Cir. 2007).  Given Plaintiffs' opportunity and failure to cure the defects in their complaint through the pre-motion letter practice, Defendants request that dismissal be with prejudice.

DATED:  June 9, 2017                         Respectfully submitted,


By:     */s/ Sara B. Brody*                         

Sara B. Brody
Jaime A. Bartlett
Sarah A. Hemmendinger
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, California 94104
Telephone:   (415) 772-1200
Facsimile:   (415) 772-7400
sbrody@sidley.com
jbartlett@sidley.com
shemmendinger@sidley.com

Dorothy J. Spenner
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599
Email: dspenner@sidley.com

Norman J. Blears
SIDLEY AUSTIN LLP
1001 Page Mill Road, Building 1

Palo Alto, California 94304
Telephone:   (650) 565-7000
Facsimile:    (650) 565-7100
nblears@sidley.com

Robin Wechkin
SIDLEY AUSTIN LLP
701 Fifth Avenue, Suite 4200
Seattle, Washington 98104
Telephone:   (206) 262-7680
rwechkin@sidley.com

*Attorneys for Defendants Ahmad*
*Chatila and Brian Wuebbels*

**APPENDIX**

**SUMMARY OF CHALLENGED STATEMENTS IN *CHURCH* COMPLAINT**

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|---|---|---|---|---|
| 1 | 3/2/15 | 2014 10-K statements re liquidity as of 12/31/14.<br><br>• "Cash and cash equivalents, plus cash committed for construction" equals $1,074.4 million.<br>• "We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan."<br>• "We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases for our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015." | ¶ 263 | ¶ 286 |
| 2 | 5/7/15 | 2015 10-Q for Q1 statements re liquidity as of 3/31/15.<br><br>• "Cash and cash equivalents, plus cash committed for construction" equals $919 million.<br>• "We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan."<br>• "We expect cash on hand, 2015 operating cash flows, project finance debt, the Renewable Energy credit facility, the TerraForm senior notes and project construction facility to provide sufficient capital to support the acquisition and construction phases for our currently | ¶ 264 | ¶ 295 |

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|---|---|---|---|---|
| | | planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015." | | |
| 3 | 8/6/15 | 2015 10-Q for Q2 statements re liquidity as of 6/30/15.<br><br>• "Cash and cash equivalents, plus cash committed for construction" equals $1,998 million.<br>• "We believe our liquidity will be sufficient to support our operations for the next twelve months, although no assurances can be made if significant adverse events occur, or if we are unable to access project capital needed to execute our business plan."<br>• "We expect cash on hand, 2015 operating cash flows, project finance debt, the Solar Energy credit facility, the TerraForm term loan and project construction facility to provide sufficient capital to support the acquisition and construction phases for our currently planned projects for 2015 and otherwise meet our capital needs for the remainder of 2015." | ¶ 265 | ¶ 307 |
| 4 | 8/6/15 | Wuebbels' statements and investor presentation:<br><br>• Of the $2 billion in cash at the end of the quarter, roughly $400 million was in TerraForm Power and $620 million related to TerraForm Global, leaving SunEdison, the development company, with greater than $1 billion of cash and sufficient liquidity to support the future growth of the platform."<br>• "If you look at the capital and the liquidity that's in the business, as well as the dividend forbearance that the parent has done through 2016 on that, there's sufficient capital within the vehicle to be able to grow that business for the first 12-18 months at its 20% stated dividend rate." | ¶¶ 268-69 | ¶¶ 308-309 |
| 5 | 8/6/15 | 2015 10-Q for Q2 non-disclosure of margin call: "Defendants knew and failed to disclose that | ¶¶ 271-72 | ¶¶ 314-15 |

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|---|---|---|---|---|
| | | SunEdison had already or would imminently face a significant margin call on the Margin Loan. | | |
| 6 | 8/6/15 | 2015 10-Q for Q2 non-disclosure of fact that SUNE "had already sought additional financing to pay down the margin call and was in the process of negotiating the Goldman Sachs Loan, which SunEdison secretly finalized five days later on August 11, 2015…" | ¶ 272 | -- |
| 7 | 8/6/15 | Wuebbels' non-disclosure of margin loan call or August 11 loan in response to analyst question about capital raises:  SUNE might continue to do "on-off construction financing" but "as far as corporate financing, we don't see any additional financings to be able to achieve this growth." | ¶ 273 | ¶ 316 |
| 8 | 8/6/15 | 2015 10-Q for Q2 and investor presentation accompanying conference call: misclassification of $700 million of SUNE debt as non-recourse. | ¶ 274 | ¶¶ 318-19 |
| 9 | 8/17/15 | Preferred Offering Docs non-disclosure of the August 11 Loan.[19] | ¶¶ 277-78 | ¶ 328 |
| 10 | 8/17/15 | Preferred Offering Docs non-disclosure of SUNE's "likely breach[] of the debt covenants under the Margin Loan, triggering the margin call on August 7, 2015, requiring SunEdison to post at least $159 million in cash collateral on the Margin Loan." | ¶ 279 | ¶ 332 |
| 11 | 8/17/15 | Preferred Offering Docs statement re use of proceeds:  "We expect to use the net proceeds of this offering for general corporate purposes, which we expect to include funding working capital and growth initiatives.  At this time, we have not specifically identified a large single use for which we intend to use the net proceeds." | ¶¶ 280-81 | ¶¶ 330-31 |

---

[19] Plaintiffs also allege generally that the Preferred Offering Documents incorporated by reference the 2014 10-K, 1Q 2015 10-Q and 2Q 2015 10-Q and the purportedly misleading statements contained therein.  Com. ¶ 276.

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|---|---|---|---|---|
| 12 | 9/2/15 | Chatila statements to the press re liquidity:<br><br>• "The cash is coming"<br>• "the most important questions for investors is when do we start generating cash for a living…probably early 2016 or late 2015." | ¶¶ 282-83 | ¶¶ 333-334 |
| 13 | 10/7/15 | Wuebbels statement at investor conference call: "Excluding the cash available from TerraForm and Global, the cash available at the standalone DevCo, was standing at approximately $1.4 billion at the end of the quarter, up from $900 million at the end of the second quarter." | ¶ 285 | ¶ 337 |
| 14 | 10/7/15 | Business update stating that SUNE had over $1.3 billion in available cash at the end of the Third Quarter | ¶ 285 | ¶ 338 |
| 15 | 10/7/15 | Chatila statement at investor call: "the Company remains well capitalized with adequate liquidity and the new optimized economic engine positions us with cash-generating ability that exceeds the liabilities of the business, including acquisitions and converts." | ¶ 287 | ¶ 340 |
| 16 | 10/7/15 | Wuebbels statement at investor call:  a further margin call would not be forthcoming because "we did complete an amendment with the existing bank group on the loan to adjust the triggers to a point that is significantly below the current market price." | ¶ 290 | ¶ 344 |
| 17 | 10/7/15 | Wuebbels statement at investor call:  Regarding the failure of the LAP deal, "we're really disappointed with the result.  We're still committed to Latin America…The seller there did not satisfy the condition's precedent, the closing of the share purchase agreement.  So instead of trying to fix it, remedying it, we're saying that the agreement is terminated. | ¶ 291 | ¶ 346 |
| 18 | 11/9/15 | 3Q 2015 10-Q:<br><br>• "$2.4 billion of cash and cash equivalents…" | ¶¶ 295-96 | ¶¶ 349-50 |

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|---|---|---|---|---|
|  |  | • "As of September 30, 2015, SunEdison had access to $1.3 billion of cash and cash equivalents, including cash committed for construction projects." <br> • "positive working capital of $655 million.." <br> • "we believe our sources of liquidity described below will be sufficient to support our operations for the next twelve months…" |  |  |
| 19 | 11/9/15 | 3Q 2015 10-Q:  non-disclosure of the purpose of the August 11 Loan for payment of the margin call on the Margin Loan | ¶¶ 299-300 | ¶¶ 356-57 |
| 20 | 11/9/15 | 3Q 2015 10-Q:  alleged misstatements regarding the circumstances leading to the termination of the LAP deal | ¶ 301 | ¶¶ 358-59 |
| 21 | 11/10/15 | Wuebbels statement during investor call:  "we have sufficient liquidity…with approximately $1.4 billion as of the end of the quarter." | ¶ 296 | ¶ 351 |
| 22 | 11/10/15 | Investor presentation stating "$1.4 billion Cash at parent." | ¶ 296 | ¶ 352 |
| 23 | 11/18/15 | "Defendants" stated during a Deutsche Bank investor call in response to a question:  "SUNE has roughly 1.3b of cash with about $700m of that cash held in project companies earmarked for working capital purposes.  Timing of the cash movement and the fact that SUNE gets EPC margin from these projects means that the cash can be utilized for other capital needs." | ¶ 304 | ¶ 365 |
| 24 | 11/18/15 | "Defendants" stated during a Deutsche Bank investor call in response to a question related to the August 11 Loan: "The Goldman loan was structured in July as *part of the portfolio formation for GBL IPO*. The company entered into the loan in August as part of the initial agreement in order to fund the construction of some of the international projects." | ¶ 306 | ¶ 367 |
| 25 | 11/18/15 | "Defendants" stated during a Deutsche Bank investor call in response to a question related to the | ¶ 308 | ¶ 369 |

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|-----|------|-------------------|---------------|-----------------|
|  |  | reclassification of debt: "For the $410m margin loan, SUNE had to post cash collateral in Q3 due to the sharp decline in TERP shares. Because of this cash trigger SunEdison had to reclassify the loan from non-recourse to recourse. The *interest payment on $337m exchangeable notes was always SUNE's obligation* and the classification as nonrecourse in prior quarter was due to *clerical error*." |  |  |
| 26 | 11/23/15 | Form 8-K dated November 23, 2015 and an attached press release, SunEdison announced the reconstitution of the YieldCo boards, the removal of the YieldCos' officers, and the appointment of Defendant Wuebbels as CEO of the YieldCos. In the press release announcing the change, titled "SunEdison Announces Changes to Drive Organizational<br><br>Alignment and Effectiveness," SunEdison claimed that the management changes were<br><br>implemented to "*improve the alignment and effectiveness of its operating structure*" and "drive<br><br>operational efficiency." | ¶ 312 | ¶ 374 |
| 27 | 03/02/15 | 2014 10-K statements regarding internal controls:<br><br>• "Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of December 31, 2014."<br>• "Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. generally accepted accounting principles."<br>• "Based on management's assessment utilizing these criteria, our management concluded that, as of December 31, 2014, | ¶ 316 | ¶¶ 289-90 |

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|-----|------|-------------------|---------------|------------------|
|  |  | our internal control over financial reporting was effective." <br> • "There have been no changes in SunEdison's internal control over financial reporting during the quarter or year ended December 31, 2014 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting." |  |  |
| 28 | 03/02/15 | 2014 10-K SOX Certifications, signed by Chatila and Wuebbels: <br><br> "I have disclosed [. . .] all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information[.]" | ¶ 317 | ¶ 290 |
| 29 | 05/07/15 | 1Q2015 10-Q statements regarding internal controls: <br><br> "There have been no changes in SunEdison's internal control over financial reporting during the quarter ended March 31, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting." | ¶ 318 | ¶ 302 |
| 30 | 05/27/15 | 1Q2015 10-Q SOX Certifications, signed by Chatila and Wuebbels: (Same certifications as in 2014 10-K) | ¶ 320 | ¶ 303 |
| 31 | 08/06/15 | 2Q2015 10-Q statements regarding internal controls: <br><br> "There have been no changes in SunEdison's internal control over financial reporting during the quarter ended June 30, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting." | ¶ 321 | ¶ 321 |

| NO. | DATE | ALLEGED STATEMENT | *CHURCH* COM. | *HOROWITZ* COM. |
|---|---|---|---|---|
| 32 | 08/06/15 | 2Q2015 10-Q, SOX Certifications, signed by Chatila and Wuebbels: (Same certifications as in 2014 10-K) | ¶ 323 | ¶ 322 |
| 33 | 11/09/15 | 3Q2015 10-Q statements regarding internal controls:<br><br>"There have been no changes in SunEdison's internal control over financial reporting during the quarter ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, SunEdison's internal control over financial reporting." | ¶ 324 | ¶ 360 |
| 34 | 11/09/15 | 3Q15 10-Q, SOX Certifications, signed by Chatila and Wuebbels (Same certifications as in 2014 10-K) | ¶ 326 | ¶ 361 |
| 35 | 3/2/15-11/09/15 | 2014 10-K, 1Q 2015 10-Q, 2Q 2015 10-Q, Preferred Stock Offering Documents, 3Q 2015 10-Q, Item 303 Omissions:<br><br>Failure to disclose information required by Item 303 of Regulation S-K. | ¶¶ 335-338 | ¶¶ 292, 305, 324, 327, 363 |